## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **GEORGIA REPUBLICAN PARTY, INC., NATIONAL REPUBLICAN SENATORIAL COMMITTEE, PERDUE FOR SENATE, and GEORGIANS FOR KELLY LOEFFLER,**<br><br>               **Plaintiffs,**<br><br>   v.<br><br>**BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, REBECCA N. SULLIVAN, in her official capacity as the Vice Chair of the State Election Board, DAVID J WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacity as Members of the State Election Board,**<br><br>               **Defendants.** | Case No. _____<br><br><br>**DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** |

## <u>VERIFIED COMPLAINT</u>

Plaintiffs respectfully seek declaratory and injunctive relief on an expedited basis in order to increase confidence in the fairness and openness of the 2021 runoff election for Georgia's U.S. Senators by further enhancing procedures to assure the integrity of processing absentee ballots. "Having once granted the right to vote on

equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). An emergency motion and motion for a TRO and preliminary injunction is being filed contemporaneous with this Complaint.

## NATURE OF THE CASE

1.      All eyes are on Georgia for the upcoming runoff election for both U.S. Senate seats. Public confidence in the integrity of the elections process is essential to the preservation of our democratic system. Unfortunately, there are constitutional flaws in the current process for checking absentee voter signatures that must be remedied before county clerks begin processing absentee ballots on December 21, after which time constitutional violations will be impossible to remedy. Plaintiffs seek modest injunctive relief targeted at improving election administration *before* the election votes are processed. All validly cast votes should be counted and none of those should be diluted by counting invalid or unverified ballots.

2.      Georgia election officials, from the state level to the local level, have undertaken significant efforts to assure the integrity of the Georgia election process in the runoff. Those efforts should be commended, and this lawsuit is brought to augment and further improve them. The Official Election Bulletin, dated Dec. 9, 2020, while addressing signature verification, unfortunately, does not resolve the

problems identified in this Complaint. The recent changes were and are necessary due in part to a greatly increased use of absentee voting in Georgia in this election cycle. In close elections where voting is by a sharply divided electorate, a greater use of absentee ballots can have a greater impact on election integrity simply because more absentee ballots present a greater potential impact on the outcome than when a smaller number of absentee ballots are cast. Verification of absentee ballots is inherently more challenging than is verification of in-person voting.

3.     This case seeks to vindicate the constitutional rights of Georgia electors and candidates whose constitutional rights will be violated by an unreliable and non-transparent process of verifying signatures for absentee voting, the standards for which vary by county, indeed from reviewer to reviewer. This process would deny equal protection of the law to voters and candidates alike. To the extent improper and invalid, or even unverified, absentee ballots could be counted in the 2021 runoff elections for Georgia's U.S. Senate seats, the Plaintiffs' legal rights and the rights of their members will be irreparably harmed. The modest remedies sought herein are to avoid that harm.

4.     Despite earnest efforts to modernize and improve how Georgia processes absentee votes, there is a serious problem with one critical part of the process. Signature verification is central to validating absentee ballots and ensuring

integrity in how the fastest growing share of the overall vote is counted. When votes are cast in person, Georgia requires photo identification to protect the integrity of the election process. O.C.G.A. 21-2-417. In contrast, absentee ballots are verified by signature comparison, not secure photo identification. By statute, a single election official compares the signature on the absentee ballot oath to the voters' signature on file. O.C.G.A. § 21-2-386(B). If the signature is missing or rejected, then the ballot is segregated and the office contacts the voter to provide an opportunity to cure the invalid ballot. O.C.G.A. § 21-2-386(C). As explained in more detail below, many counties in Georgia in the November 3, 2020 general election accepted virtually all absentee ballot signatures, rejecting impossibly low numbers of mismatched signatures, and even failing to find any missing signatures. The lax signature validation process stands in conflict with any fair or consistent process for verifying signatures.

5.    Interested parties challenged this process as constitutionally deficient because the "standardless and unreliable signature matching procedure" allowed an "untrained county election officials acting without any state guidance" to "reject ballots where they perceive a signature mismatch," in violation of the U.S. Constitution. See *Democratic Party of Ga., et al. v. Raffensperger, et al.*, No. 19-cv-5028-WMR Doc.#30, p.3. The state resolved this challenge by agreeing to a consent

decree which called for *additional* review from two other officials before a signature could be rejected, as well as bolstering the process provided for contacting voters who had signatures rejected to allow them an opportunity to cure any deficiencies. *Id.* Doc.#53; State Election Board Rule 83-1-14.13.

6.      The Secretary of State recently issued an Election Bulletin, dated December 9, 2020. That document states that signature verification should have public observation, but only if that observation cannot actually see any signatures. While the Bulletin notes there should be "meaningful" observation of the signature verification process, it provides no means to accomplish meaningful observation: the process continues to (i) lack any additional reviewer, and (ii) it has no mechanism for truly being able to observe and object to apparently invalid signatures, or to observer and report irregularities in the verification process. Thus, while the intent of the Bulletin's guidance may have been to improve election integrity, more specific measures are needed to accomplish that goal.

7.      To assure election integrity and fairness in the process, the signature verification procedure should put equal weight on including valid matches and excluding invalid ones. As recently modified, the Georgia system for absentee signature verification thus provides both (1) three-person review and transparency, and (2) opportunity to redress mistakes in signature verification—but only for

signatures that are rejected. When improper signatures are initially accepted, there are (1) no additional persons to review, and (2) no opportunity to redress mistakes or invalid signatures. Crucially, both improperly rejected *and accepted* signatures undermine the integrity of the election process and result in validly cast votes being discarded or diluted. Plaintiffs seek to provide a fair and transparent process for the rest of the absentee ballot signature verification process.

## **BACKGROUND**

8.     In November 2020, Georgia held a general election for both of its seats in the United States Senate, which are currently held by Senators David A. Perdue and Kelly L. Loeffler. The election failed to yield a majority vote for either office. Accordingly, per state law, Georgia will now hold a runoff election on January 5, 2021.

9.     As a result of the COVID-19 pandemic, the November general election saw an unprecedented number of absentee ballots. Georgians cast 1,322,529 absentee ballots in the November 2020 general election, a 350% increase from the November 2018 general election. As the pandemic rages on, a record number of absentee ballots are also expected in the runoff.

10.     The review procedures provided by the Georgia General Assembly for verifying absentee ballots are inadequate for the dramatic increase in absentee

voting. In particular, Georgia's signature matching process—whereby county officials compare an absentee voter's signature on his or her ballot envelope with the voter's signature—was applied haphazardly and inconsistently throughout the state, if not abandoned altogether, such that this critical fraud detection procedure was in many precincts effectively nullified.

11.    More specifically, the extremely low rejection rates for signature mismatches in some counties reveal that officials in those counties failed to meaningfully conduct the signature matching process required by the Georgia General Assembly, resulting in thousands of absentee ballots being counted without an adequate check on their validity. Moreover, the disparity in verification rates across Georgia's 159 counties reveals that, even where officials may have attempted to implement the signature matching process, the procedures and criteria they employed differed from county to county. In addition, the election data from the November 3, 2020 general election demonstrates that rejection rates based on signature mismatch dropped substantially compared to the 2018 and 2016 elections, suggesting that new review procedures implemented on November 3, which require three-person review *only of* ballots that are being considered for *rejection*, may have caused reviewers to disregard the General Assembly's mandate to conduct a meaningful signature matching process.

12.    The same problems experienced in the 2020 general and special elections will again manifest in the runoff if this Court does not grant immediate relief in the form of declaratory and injunctive relief directing Georgia's Secretary of State and its State Election Board to bolster the signature matching process to provide the meaningful fraud protections mandated by the General Assembly. The urgency of this relief is manifest: absentee ballots are already being completed, and Defendants will begin processing these ballots on December 21, 2020. *See* SEB Rule 183-1-14-0.9-.15(1); Sec'y State, *2020 State Elections and Voter Registration Calendar*

https://sos.ga.gov/admin/files/2020%20Revised%20Short%20Calendar.pdf.

13.    At that point—*i.e.*, when the absentee ballots are separated from their envelopes for processing—any attempt to conduct a more thorough signature matching process and exclude illegal votes will be futile, as ballot secrecy requirements mean that any votes lacking a proper signature will be mixed in with legitimate votes and thus become impossible to identify.

14.    To ensure that the signature matching process is performed fulsomely and consistently throughout the state, Plaintiffs respectfully request that the Court immediately (i) declare that the current Georgia signature matching process is unconstitutional under the First and Fourteenth Amendments to the United States

Constitution; (ii) order Defendants to implement signature review of all absentee ballots by three reviewers, including providing meaningful public observation from at least one person from each political party represented by the candidates; (iii) order Defendants to implement election safeguards to require ballots with mismatched signatures as determined by reviewers to be segregated for additional review consistent with procedures for rejected ballots; (iv) order Defendants to provide consistent signature-matching standards to all reviewers.

## PARTIES

15.     Plaintiff Georgia Republican Party, Inc. is a state committee, as defined by 52 U.S.C. § 30101(15), a Georgia Political Party as defined by O.C.G.A. § 21-2-2(25), a domestic non-profit corporation, and the official Republican Party organization of the state of Georgia. Plaintiff represents a diverse group of members and stakeholders across Georgia, including elected officials, candidates for elected office, state committee members, advisory caucuses, affiliate groups, and active voters. These members and constituents, including many eligible voters, regularly support and vote for candidates affiliated with the Republican Party, including candidates seeking election to the United States Senate. Plaintiff's members vote in federal elections and aid and urge others in voting. Senators David A. Perdue and

Kelly L. Loeffler, both candidates for the current runoff election, are members of the Georgia Republican Party and electors in Georgia.

16.    Plaintiff NRSC is a Republican political committee that is established and maintained as a national political party, as defined in 11 C.F.R. § 110.2(c)(2)(iii) and 52 U.S.C. § 30116(h). The NRSC is a national organization solely devoted to strengthening the Republican Senate Majority and electing Republicans to the United States Senate. The NRSC accomplishes this mission by supporting and assisting current and prospective Republican U.S. Senate candidates throughout the country, including in Georgia, in the areas of budget planning, election law compliance, fundraising, communications tools and messaging, and research and strategy. In 2020, the NRSC made substantial contributions and expenditures to support the two Republican Senate candidates in Georgia in the November 3, 2020 general election, it has already made substantial contributions and expenditures to support these candidates in the January 5, 2021 runoff, and it intends to make further expenditures in connection with the runoff election. The NRSC frequently represents the interests of Republican Senator candidates, including Senators, David A. Perdue and Kelly L. Loeffler as candidates for the Georgia runoff election.

17.     Plaintiff Perdue for Senate is the principal campaign committee supporting David A. Perdue's campaign for the United States Senate, within the meaning of 52 U.S.C. § 30102(e).

18.     Plaintiff Georgians for Kelly Loeffler is the principal campaign committee supporting Kelly L. Loeffler's campaign for the United States Senate, within the meaning of 52 U.S.C. § 30102(e).

19.     Defendant Brad Raffensperger is the Secretary of State of Georgia ("the Secretary"). Under Georgia law, the Secretary is "the state's chief election official." O.C.G.A. § 21-2-50(b); *see also id.* § 21-2-210. The Secretary has the authority and responsibility to manage Georgia's electoral system. *See Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011) (explaining that the office of Secretary of State "imbues [the Secretary] with the responsibility to enforce the [election] law or laws at issue in the suit").

20.     Under Georgia law, the Secretary is also the Chairman of the State Election Board ("the Board"), which has "the duty" "[t]o promulgate rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1).

The Board also has the duty to ensure the "fair, legal, and orderly conduct of primaries and elections." *Id.* § 21-2-31(2), (10).

21.    Defendant Rebecca N. Sullivan is the Vice Chair of the State Election Board, and Defendants David J. Worley, Matthew Mashburn, and Anh Le are Members of the State Election Board. These Defendants—acting together with the Secretary—carry out the duties of the State Election Board as laid out in Georgia law. *See, e.g.*, O.C.G.A. § 21-2-31.

22.    The Secretary and the State Election Board have the authority to direct each county's officials who are responsible for administering elections in Georgia. *See* O.C.G.A. § 21-2-31(1). The State Election Board promulgates rules or emergency rules that provide uniform guidance to county officials regarding the conduct of elections. *See id.*; *see also id.* § 50-13-4 (describing the rulemaking process); *Rules and Rulemaking of the State Election Board*, State Election Board (Last visited Dec. 4, 2020) (listing all the rules and emergency rules promulgated by the                State                Election                Board), https://sos.ga.gov/index.php/elections/state_election_board. The Secretary has, from time to time, also issued Official Election Bulletins to Georgia's counties.

23.    All Defendants are sued for declaratory and injunctive relief in their official capacities.

## JURISDICTION AND VENUE

24.    This Court has subject-matter jurisdiction over this action because it arises under the laws and Constitution of the United States. 28 U.S.C. § 1331. Specifically, this action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 to enforce and to enjoin violations of the First and Fourteenth Amendments to the U.S. Constitution. The Court also has subject-matter jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4), because this action seeks "[t]o redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress provision for equal rights of citizens," and "to secure equitable or other relief under [an] Act of Congress providing for the protection of civil rights, including the right to vote."

25.    Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

26.    This Court has personal jurisdiction over Defendants, who are sued in their official capacity only.

27.    Venue is proper in this District because all Defendants reside in Georgia and because a substantial part of the events giving rise to Plaintiffs' claims will occur within this judicial District. *See* 28 U.S.C. § 1391(b)(1), (2).

28.     Plaintiffs have standing in their own right. Defendants' failure to apply Georgia election laws fairly and equally directly harms Plaintiffs' organizational mission of increasing voter turnout for the January 5, 2021 runoff election, electing the two Republican candidates in that election, and educating voters. Plaintiffs have expended extraordinary resources to encourage Georgians to vote in the 2021 runoff election, to aid the two Republican candidates, and to educate Georgia voters regarding Georgia's voting procedures, including with respect to Georgia's signature matching procedure. Counting potentially invalid absentee ballots frustrates Plaintiffs' mission and dilutes lawful votes cast for Republican candidates in the runoff election.

29.     Plaintiffs must divert resources away from their mission of electing Republican candidates and urging Georgians to vote for Senators Perdue and Loeffler in the upcoming runoff election to address the impact of the unlawful signature matching process, including the loss of voter confidence in the fairness of the election arising from lax enforcement of the signature matching process.

30.     In addition, Plaintiffs have standing because Plaintiffs' members unquestionably would have standing to sue in their own right. Plaintiffs may vindicate their members' interests (including the election of Republican candidates, the implementation of fair and equal election procedures in the 2021 runoff election,

and the prevention of vote dilution for the two Republican Senate candidates) because they are crucial to Plaintiffs' purpose. Furthermore, the claims asserted and the relief requested do not require the participation of individual members in this lawsuit. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

31.    Two of Plaintiffs' members, Senators David A. Perdue and Kelly L. Loeffler, ran for election to the U.S. Senate in the 2020 general and special elections and will be on the ballot in the 2021 runoff election for Georgia's U.S. Senate seats.

32.    These and other of Plaintiffs' members voted in the 2020 November election and intend to vote in the 2021 runoff election for Georgia's U.S. Senate seats.

33.    Plaintiffs and their members will be imminently injured by Georgia's failure to consistently implement, or even implement at all, the signature matching process mandated by the General Assembly because such failure in the runoff is likely to result in unlawful votes being counted and lawful votes for Republican candidates being diluted. Plaintiffs' members will also be injured because signature matching procedures are applied unequally throughout the state.

34.    Plaintiffs' candidate-members suffer "a personal, distinct injury" because they are harmed by the state's procedurally deficient signature matching process. *See Wood v. Raffensperger, et al.*, No. 20-14418 (11th Cir., Dec. 5, 2020).

35.    These injuries are caused by the signature matching process and Defendants' improper application of that process, which will lead to the counting and certification of invalid absentee ballots.

36.    Plaintiffs' injuries and the injuries of Plaintiffs' members will be redressed if the Court grants the relief requested.

## **FACTUAL ALLEGATIONS**

37.    Georgia's November 2020 election featured a general and a special election to fill each of its two U.S. Senate seats. Over 1.3 million absentee votes were cast in the November 2020 election, approximately one quarter of all votes cast.

38.    No candidate for either of Georgia's Senate seats received a majority of the votes cast. *See November 3, 2020 General Election*, Ga. Sec'y of State Brad Raffensperger    (last    updated    Nov.    20,    2020,    3:37    PM), https://results.enr.clarityelections.com/GA/105369/web.264614/#/summary.

39.    Accordingly, Georgia law requires the election to proceed to a runoff. *See* O.C.G.A. § 21-2-501(a)(1); GA Const. art. II, § 2, ¶ 2.

40.    The runoff election is scheduled for January 5, 2021. *See* O.C.G.A. § 21-2-501(a)(3). Observers expect that the election will be close, *see* Jenni Fink, *What Polls Say About Kelly Loeffler and Raphael Warnock One Month Before*

*Georgia's Election*, Newsweek (Dec. 5, 2020), https://www.newsweek.com/what-polls-say-about-kelly-loeffler-raphael-warnock-one-month-before-georgias-election-1552241, in a state where the Presidential election was determined by just 12,670 votes, or 0.3% of all votes cast.

41.    As of the filing of this lawsuit, the projected make-up of the United States Senate in the 117th Congress is 50 Republicans and 48 Democrats.

42.    Therefore, the results of the Georgia runoff will determine which party controls the Senate. *See* Siobhan Hughes & Cameron McWhirter, *Senate Control Hinges on Four Uncalled Election Results With Republicans Holding Edge*, Wall St. J. (Nov. 4, 2020), https://www.wsj.com/articles/senate-election-2020-results-11-04-2020-11604511606?mod=searchresults_pos13&page=5.

### *Georgia's Absentee Ballot Review and Signature Matching Process*

43.    This Court has recognized that the State of Georgia undoubtedly has "a strong interest in maintaining the integrity of elections," which is furthered by the requirement that its election officials verify that the signature on an absentee ballot matches a reference signature for the voter. *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339 (N.D. Ga. 2018). Indeed, signature matching requirements are a "commonplace and eminently sensible" means of preventing fraud. *Middleton v. Andino*, 976 F.3d 403, 405 (4th Cir. 2020) (Wilkinson, J. and Agee, J., dissenting

from grant of rehearing en banc); *see Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020) (reinstating signature match requirement).

44.    Under O.C.G.A. § 21-2-386(a)(l)(B), the Georgia General Assembly instructs the county registrars and clerks (the "County Officials"), and anyone else who handles absentee ballots, to conduct the following procedure:

> Upon receipt of each ballot, a registrar or clerk shall write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk shall then compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or mark on the oath with the signature or mark on the absentee elector's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath. Each elector's name so certified shall be listed by the registrar or clerk on the numbered list of absentee voters prepared for his or her precinct.

O.C.G.A. § 21-2-386(a)(1)(B).

45.    Georgia law provides no guidance to its election officials to determine whether the signature on the oath matches a reference signature, and no standards have been developed to guide the signature matching process. Nor does Georgia's signature matching process provide for any oversight or observation of the determination by election officials scattered across Georgia's 159 counties as to

whether a signature matches, precluding any reasonable assurance that an absentee ballot was in fact cast by an eligible Georgia voter. Thus, the signature matching process is arbitrary.

46.    Where an elector has failed to sign the oath on the outside envelope enclosing their ballot or the signature does not conform with the signature on the absentee elector's voter registration card or other appropriate record, the Georgia General Assembly also provides a process for addressing such defective ballots.

47.    "If the elector has failed to sign the oath, or if the signature does not appear to be valid, or if the elector has failed to furnish required information or information so furnished does not conform with that on file in the registrar's or clerk's office, or if the elector is otherwise found disqualified to vote, the registrar or clerk shall write across the face of the envelope 'Rejected,' giving the reason therefor." O.C.G.A. § 21-2-386(a)(1)(C).

48.    The elector is then required to be given the opportunity to cure the problem resulting in the rejection of the ballot by submitting an appropriate affidavit and a copy of one of the accepted forms of identification. *Id.* If the ballot is cured, and the County Officials find "the affidavit and identification to be sufficient, the absentee ballot shall be counted." *Id.*

49.    However, to the extent a rejected absentee ballot is not cured according to Georgia law, or the affidavit and identification are not found to be sufficient, the rejected absentee ballot may not be counted in an election. *Id.*

50.    On March 6, 2020, Defendants (and others) entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") in the case of *Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.,* Case No. 1:l9-cv-05028-WMR (N.D. Ga. Mar. 6, 2020), ECF No. 56-1, which added to the statutory procedures for the signature matching process in certain important respects.

51.    Specifically, the Litigation Settlement imposed the following additional procedures for signature matching:

> If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file . . . , **the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks.** A mail-in absentee ballot **shall not be rejected unless a majority** of the registrars, deputy registrars, or absentee ballot clerks reviewing the signature **agree that the signature does not match any of the voter's signatures on file** . . . . If a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file . . . , the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the

> reason for the rejection as required under OCGA 21-2-
> 386(a)(1)(C). . . .

*Id.* § 3(a) (emphasis added).

52.    In other words, the Litigation Settlement provides that a ballot may not be rejected for a signature mismatch unless (i) it is reviewed by three County Officials, and (ii) at least two of those County Officials agree that the signature on the absentee ballot envelope does not match the absentee voter's signatures on file. No such additional procedures or review are required, however, to determine whether the signature on the absentee ballot oath matches a reference signature and is thus a valid, countable ballot.

53.    Importantly, the additional review procedures for rejected ballots increase the average per-ballot review time and necessarily triple the number of County Officials required to review an absentee ballot that would otherwise be rejected, at a time when unprecedented numbers of absentee ballots are being cast and increased COVID-19 safety restrictions limit the number of people available and increase the amount of physical space required to review and count ballots. Ga. Exec. Order No. 11.30.20.01 (Nov. 30, 2020) (extending COVID-19 State of Emergency through January 8, 2021, past the date of the runoff election). Because the same burdensome procedures do not apply to the determination of whether the signature on the oath matches a reference signature, the additional procedures mandated by

the Litigation Settlement make it virtually certain that Georgia officials, inundated with a significant number of absentee ballots, will accept those ballots without review in violation of O.C.G.A. § 21-2-386(a)(1)(B).

54.     Moreover, Georgia law does not require or provide for training of County Officials to conduct signature matching. As such, the matching process is necessarily being applied inconsistently across the state.

55.     Nor does Georgia law provide for oversight of the signature matching process, which occurs as the votes are received and before they are processed. Thus, there is no way to know whether the signature matching process is occurring at all, let alone effectively.

### *Georgia's Signature Matching Process Has Not Been Applied Effectively or Equally Across the State*

56.     In the November 3, 2020 general election, Georgia's election officials rejected a mere 719 absentee ballots for mismatched signatures, a rejection rate of approximately 0.05%.

57.     A county-by-county analysis of the signature matching rejection rates on November 3, as well as a comparison of those prior election rates to the rejection rates, demonstrates conclusively that the signature matching process is resulting in the counting of thousands of votes unequally across the state, many without any signature matching review whatsoever.

58.   *First*, the data demonstrates that several counties are not conducting signature matching properly. Of Georgia's 159 counties, fully 100 did not reject a single absentee ballot because of a signature mismatch. It is implausible that 100 counties within the nation's eighth largest state did not receive a single absentee ballot with an improper signature. These counties represent a sizable portion of the Georgia electorate.

59.   *Second*, the data demonstrates significant differences in rejection rates across counties, indicating that the signature matching process is being applied unequally across the state. In contrast to the 100 counties that did not reject a single ballot for a mismatched signature, the rejection rate in Taylor County (2.09%) was more than forty times higher than the statewide rejection rate. Similarly, the rejection rate in Clay County (1.20%) was more than twenty times higher than the statewide rate.

60.   *Third*, the vast disparity in rejection rates cannot be explained by population size. For instance, Georgia's least populous county, Taliaferro County, had the third highest rejection rate of 0.65%, while Georgia's second least populous county, Quitman County, rejected zero ballots.

61.   *Fourth*, the disparity also cannot be explained based on a county's geographic location within the state. Of the ten contiguous counties comprising the

Atlanta region, *see* Atlanta Regional Comm'n https://atlantaregional.org/atlanta-region/about-the-atlanta-region ("The Atlanta region includes Cherokee, Clayton, Cobb, DeKalb, Douglas, Fayette, Fulton, Gwinnett, Henry and Rockdale counties . . . ."), two counties (Douglas and Rockdale) rejected zero ballots for mismatched signatures, while three others (Fayette, Gwinnett, and Henry) had rejection rates far exceeding the statewide average.

62.   *Fifth*, Georgia's recently low signature rejection rate is dramatically lower than signature rejection rates from other states. For example, Nevada's rejection rate for mismatched signatures in the 2020 general election was 0.42%, *see* https://www.nvsos.gov/sos/home/showdocument?id=9058, which is more than eight times higher than Georgia's rejection rate.

63.   *Sixth*, no known statistical analysis supports the county-by-county rejection rates for mismatched signatures. To the contrary, the analysis establishes that the likelihood of obtaining the rejection rates as reported by ten of the counties (Cherokee, Cobb, DeKalb, Fulton, Dougherty, Gwinnett, Henry, Liberty, and Taylor) is practically impossible, with a statistical likelihood of less than 0.01%.

64.   As one federal court found, a signature mismatch rate of 0.35% is an "*extremely low* rate of rejection due to a signature mismatch…" *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 211 (D.N.H. 2018) (emphasis added). In light of that, Georgia's

rejection rate of 0.05%—representing a mere fraction of the rate found to be "extremely low" in *Saucedo*—cannot be allowed to stand.

65.     *Seventh*, numerous Georgia counties have extremely low or non-existent numbers of rejected absentee ballots for missing signatures, including Cherokee, Clayton, Cobb, Douglas, Muscogee, Paulding, and Richmond. This generous acceptance, when combined with extremely now or non-existent signature mismatch rates, is explained by the complete lack of any signature verification occurring in some counties.

66.     In Muscogee County, for example, data reported by the Secretary of State show that zero absentee ballots in the 2020 general election were rejected for lack of signature, or mismatched signature. Given the relatively large size of the county's electorate, with more than 20,000 absentee ballots cast, it is empirically implausible that not a single ballot lacked a signature or had a mismatched signature.

### Only Prompt Action by This Court Will Prevent Injury to the Voting Rights of Plaintiffs' Members

67.     The evidence gathered from November 3 clearly establishes that as a result of the signature matching process, absentee ballots that would otherwise be properly rejected and not counted will be improperly accepted and counted in the 2021 runoff election unless this Court takes action.

68.     Failure to prevent this imminent counting of unlawful absentee ballots will result in the dilution of the lawfully cast ballots of Plaintiffs' members. *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

69.     It will also harm Plaintiffs' candidate-members' "constitutional rights under the First and Fourteenth Amendments to associate for political ends and to participate equally in the electoral process." *Swanson v. Worley*, 490 F.3d 894, 902 (11th Cir. 2007) (citations omitted).

70.     This Court's immediate intervention is required to ensure a lawful signature matching process, because this harm cannot be resolved through post-election review of ballots. Once an absentee ballot is separated from its envelope, it is mixed in with all valid absentee ballots and "shall be counted." O.C.G.A. § 21-2-386(a)(1)(C). That process will begin on December 21.

71.     As such, this Court should immediately order Defendants to implement additional safeguards in the signature matching process. Specifically, the Court should order Defendants to implement signature review of all absentee ballots by three reviewers, including at least one reviewer from each political party represented by the candidates.

72.     In the absence of unanimous agreement, the Court should further order that the ballots be segregated for additional review consistent with procedures for provisional ballots. *See* O.C.G.A. § 21-2-419.

73.     To prevent arbitrary and unequal signature review across the state, the Court should also order Defendants to provide signature-matching standards and training to all reviewers.

74.     Finally, to ensure the signature matching procedures are followed consistently across the state, the Court should order Defendants to allow observers to be present for the signature matching process in all counties.

75.     This requested relief will both guarantee the integrity of the electoral process in light of the haphazard and unequal application of the signature matching process on November 3 and ensure that Georgia residents who lawfully cast a ballot will have their votes properly counted.

76.     Plaintiffs do ***not*** request that this Court preclude ***any*** lawful voters from casting an absentee ballot.

## FIRST CLAIM FOR RELIEF
### (First and Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – UNDUE BURDEN ON VOTING AND ASSOCIATIONAL RIGHTS)

77.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

78.    Under the *Anderson-Burdick* balancing test, "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). This test employs a flexible, sliding scale that analyzes "severe" burdens on First and Fourteenth Amendment rights under "strict scrutiny," and lesser burdens under less exacting scrutiny. *See New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020).

79.    In addition, "[t]he Fourteenth Amendment due process clause protects against 'the disenfranchisement of a state electorate.'" *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1403 (N.D. Ga. 2019) (quoting *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981)). "When an election process 'reaches the point of patent and fundamental unfairness,' there is a due process violation." *Id.* (quoting *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1183–84 (11th Cir. 2008)). The debasement or dilution of votes may constitute a due process violation "even if such

conduct does not completely deny Plaintiffs the right to vote." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1322 (N.D. Ga. 2018).

80.     "[C]andidates' constitutional rights under the First and Fourteenth Amendments to associate for political ends and to participate equally in the electoral process" are likewise protected by these principles. *Swanson v. Worley*, 490 F.3d 894, 902 (11th Cir. 2007).

81.     Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

82.     Georgia's signature matching procedure and its arbitrary and unequal application will severely burden the First and Fourteenth Amendment rights of Plaintiffs and their members.

83.     Counties Cherokee, Cobb, DeKalb, and Fulton have a disproportionately and unprecedentedly low number of absentee ballots that are rejected as a result of the signature on the absentee ballot envelope not appearing to be valid. Several of these counties also have a disproportionally and unprecedentedly low number of absentee ballots that are rejected as a result of a missing signature on the absentee ballot envelop.

84.     But for Georgia's signature-review-and-matching process, ballots on which the signature does not appear to be valid would be "rejected" as invalid absentee ballots and may not be lawfully tabulated, unless cured consistent with the rejected ballot cure process.

85.     By diluting lawful votes, Defendants will severely burden the associational and voting rights of Plaintiffs and their members.

86.     In addition, Defendants' actions will discourage lawful voting, further burdening these rights.

87.     Defendants cannot justify the burden on these rights.

88.     The burden also amounts to fundamental unfairness.

89.     Accordingly, Defendants' counting and certification of unlawful ballots will imminently place an undue and fundamentally unfair burden on Plaintiffs' and its members' First and Fourteenth Amendment rights. *See, e.g.*, *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 581 (11th Cir. 1995) (holding unconstitutional state's decision to count unlawful absentee ballots because doing so would have "effectively stuff[ed] the ballot box" thereby "dilut[ing] the votes of those voters who met the requirements of [the absentee voting law] as well as those voters who actually went to the polls on election day." (citations and internal quotations omitted)).

## SECOND CLAIM FOR RELIEF
### (Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – VIOLATION OF DUE PROCESS)

90.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

91.     The Fourteenth Amendment provides that states shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

92.     The right to vote is a protected liberty interest.

93.     The right of association is a protected liberty interest.

94.     Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

95.     Georgia's signature matching procedure and its arbitrary and unequal application will erroneously deprive Plaintiffs and their members of their fundamental rights of association and suffrage without due process of law, including through the debasement that will result from permitting unlawful tabulation and certification of invalid absentee ballots.

96.     It is impossible to remedy that deprivation *after* an invalid absentee ballot is accepted and mixed with valid ballots.

97.     The additional procedural safeguards included in Plaintiffs' prayer for relief would prevent or substantially reduce the unlawful deprivation of the fundamental rights of Plaintiffs and their members.

98.     The state would face only a minimal administrative burden in implementing these procedures and has no legitimate interest in tabulating and certifying invalid ballots. Due Process thus demands the additional procedures requested by Plaintiffs. *See Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

**THIRD CLAIM FOR RELIEF**
**(Fourteenth Amendment, as enforced by 42 U.S.C. § 1983 – VIOLATION OF THE EQUAL PROTECTION CLAUSE)**

99.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though set forth fully herein.

100.    Under the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV.

101.    "[T]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." *Bush v. Gore*, 531 U.S. 98, 107 (2000).

102.   Under 42 U.S.C. § 1983, every person acting under color of state law who deprives another person of his or her constitutional rights is also liable at law and in equity.

103.   Georgia's signature matching procedure and its arbitrary and unequal application will deprive Plaintiffs and their members of equal protection of the laws.

104.   Counties Cherokee, Cobb, DeKalb, and Fulton as well as Dougherty, Gwinnett, Henry, Liberty and Taylor have implemented Georgia's signature-review-and-matching procedure inconsistently, with the first four counties having extremely low mismatch rates and the latter four having statistically high mismatch rates when compared to the norm for the November 3, 2020 election in Georgia.

105.   As a result, the disparity in conducting Georgia's signature-review-and-matching procedure subjects similarly situated voters to differing standards and signature-matching procedures based on their county of residence.

106.   This disparate treatment is unquestionably a violation of the "rudimentary requirements of equal treatment and fundamental fairness." *Bush*, 531 U.S. at 109.

107.   Accordingly, Defendants' counting and certification of invalid votes that would otherwise be rejected in other Georgia counties will imminently deny Plaintiffs and their members equal protection of the laws.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, as follows:

A. Declare that Georgia's signature matching procedure violates the First and Fourteenth Amendments to the United States Constitution;

B. Preliminarily and permanently enjoin Defendants to implement signature review of all absentee ballots signature verification by three reviewers, in the presence of at least one meaningful observer from each political party represented by the candidates;

C. Preliminarily and permanently enjoin Defendants from validating signatures where one of the reviewers objects to the validity of a signature, unless (i) the questioned signature and associated ballot go through the process for curing defective ballots, O.C.G.A. § 21-2-386(D);

D. Preliminarily and permanently enjoin Defendants to provide consistent signature-matching standards and training to all reviewers;

E. Preliminarily and permanently enjoin Defendants to allow observers to be meaningfully present for the signature matching process in all counties;

F. Award Plaintiffs their allowable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 or any other basis in law, as appropriate; and

G. Grant such further and additional relief as this Court deems just and proper.

December 10, 2020

By: /s/ Peter N. Farley
Peter N. Farley (GA Bar No. 255165)
1230 Peachtree Street, N.E.
Promenade, Suite 2100
Atlanta, GA 30309-3534
Tel: 404-443-5500
Fax: 404-443-5599
pfarley@mcguirewoods.com

George J. Terwilliger*
Michael Francisco*
Brooks H. Spears*
2001 K Street N.W., Suite 400
Washington, DC 20006
Tel: 202-857-1700
Fax: 202-857-1737
gterwilliger@mcguirewoods.com
mfrancisco@mcguirewoods.com
bspears@mcguirewoods.com

Richard Cullen*
800 East Canal Street
Richmond, VA 23219-3916
Tel: 804-775-1000
Fax: 804-775-1061
rcullen@mcguirewoods.com
*Counsel for Plaintiffs*
*Georgia Republican Party, Inc.*
*National Republican Senate Committee*
*Perdue for Senate*
*Georgians for Loeffler*
*Pro Hac Vice Applications*
*Forthcoming*

**<u>VERIFICATION</u>**

I declare under penalty of perjury under the laws of Georgia and the United States of America, including 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint and know the contents thereof, and that such Verified Complaint is true and correct based on my personal knowledge, except as to those things stated upon information and belief, and as to those I believe them to be true.

This 10th day of December, 2020.

Sworn to and before me this 10th day of December, 2020.

Notary Public

My Commission Expires:



KAREN I HENTSCHEL
Notary Public  Georgia
Cobb County
My Commission Expires
February 03, 2024

-37-

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Plaintiffs' Verified Complaint has been prepared in accordance with the font type and margin requirements of L.R. 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: December 10, 2020

*Counsel for Plaintiffs*

*/s/ Peter N. Farley*

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing in the above-captioned matter to be filed with the United States District Court for the Northern District of Georgia, Atlanta Division, via the Court's CM-ECF system.  I also hereby certify that I caused the foregoing in the above-captioned matter to be served, via email on December 10, 2020 and by hand delivery on December 11, 2020, with the appropriate Waiver of Service of Summons forms, upon:

> Secretary of State Brad Raffensperger
> 214 State Capitol
> Atlanta, GA  30334
> brad@sos.ga.gov
> soscontact@sos.ga.gov
>
> Rebecca N. Sullivan
> Georgia Department of Administrative Services
> 200 Piedmont Avenue SE
> Suite 1804, West Tower
> Atlanta, GA  30334-9010
> rebecca.sullivan@doas.ga.gov
>
> David J. Worley
> Evangelista Worley LLC
> 500 Sugar Mill Road, Building A, Suite 245
> Atlanta, GA  30350
> david@ewlawllc.com
>
> Matthew Mashburn
> Aldridge Pite, LLP
> 3575 Piedmont Road, NE
> Suite 300
> Atlanta, GA  30305

mmashburn@aldridgepite.com

Ahn Lee
P.O. Box 4008
Decatur, GA  30031

Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway, Suite 525
Atlanta, GA  30339
ale@hrflegal.com

/s/ Peter N. Farley
Peter N. Farley
Georgia Bar No. 255165
MCGUIREWOODS LLP
Suite 2100, Promenade
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3534
Telephone:    (404) 443-5500
Facsimile:    (404) 443-5599
pfarley@mcguirewoods.com

*Counsel for Plaintiffs*