# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **GEORGIA REPUBLICAN PARTY, INC., NATIONAL REPUBLICAN SENATORIAL COMMITTEE, PERDUE FOR SENATE, and GEORGIANS FOR KELLY LOEFFLER,**<br><br>                    **Plaintiffs,**<br><br>      v.<br><br>**BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, REBECCA N. SULLIVAN, in her official capacity as the Vice Chair of the State Election Board, DAVID J WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacity as Members of the State Election Board,**<br><br>                    **Defendants.** | Case No.  _____<br><br><br>**DECLARATORY AND INJUNCTIVE RELIEF SOUGHT** |

# PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................3

STANDARD OF REVIEW ....................................................................9

ARGUMENT .......................................................................................10

    I.    Plaintiffs Will Succeed On The Merits Of Their Claims....................10

        A.    Georgia's signature verification process unconstitutionally burdens the right to vote guaranteed by the First and Fourteenth Amendments......................................11

        B.    Georgia's weak to nonexistent signature verification process violates Constitutional Procedural Due Process protections..............................................................................15

        C.    Defendants will imminently deprive Plaintiffs of their Fourteenth Amendment Right to Equal Protection. ................18

        D.    Plaintiffs have standing...........................................................20

    II.    The Harm To Plaintiffs Is Irreparable.................................................22

    III.    The Balance of Equities Favors Plaintiffs...........................................23

    IV.    The Public Interest Favors Plaintiffs...................................................24

CONCLUSION ....................................................................................25

**INTRODUCTION**

Plaintiffs, the Georgia Republican Party, Inc., the National Republican Senatorial Committee, Perdue for Senate, and Georgians for Kelly Loeffler, (together, "Plaintiffs"), bring this action against Defendants, the Georgia Secretary of State and the members of the State Election Board, to address the state's unconstitutional, arbitrary, and inconsistent enforcement of the signature matching process for absentee ballots.   Emergency relief is necessary because of the impending January 5, 2021 runoff for two U.S. Senate seats, where control of the Senate hangs in the balance.  All eyes are on Georgia to provide a safe, secure, and constitutional election to its voters and the candidates running for office.

It is axiomatic that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).  It is also axiomatic that it should be the objective of every official responsible for elections in Georgia to do the utmost to ensure the integrity of the election process, a goal fully subscribed to and shared by the Plaintiffs.

Yet in the November 3, 2020 election, a vastly greater number of mailed in ballots were accepted than in prior elections, following changes in election procedure that made it more cumbersome to reject a ballot based on mismatched

signatures and, by comparison, far easier to accept proffered signatures as matching. Based on a statistical analysis of those election results, a substantial likelihood exists that, absent immediate action from this Court, invalid absentee ballots will be counted in the upcoming January 5, 2021 runoff election. Indeed, the analysis demonstrates to a near statistical certainty that election officials in Georgia have either abandoned the critical anti-fraud tool of signature matching, a process that is mandated by the Georgia General Assembly, or are applying that tool in such an arbitrary and inconsistent way so as to violate Plaintiffs' constitutional rights.

Emergency relief is necessary because the harm to Plaintiffs' constitutional rights cannot be remedied after the election, when ballots cast are separated forever from the voter's signature. Relief must come now, before Georgia begins processing absentee ballots on December 21.

Accordingly, to redress the dilution of votes, including those for the candidates supported by the Plaintiffs, that occurs when an unlawfully cast ballot is counted, Plaintiffs request that this Court issue the requested relief and enjoin Defendants to direct: (1) Georgia election officials to conduct a meaningful signature matching process; (2) that three election officials review the voter's signature on the absentee ballot to ensure that it matches the voter's reference

signatures so that there is sufficient assurance that a lawful ballot has been cast; and (3) require that observers from the parties participating in the election be permitted to view the signature matching process by a means and in a manner sufficient to meaningfully observe signature matching and report any irregularities in the process.

## BACKGROUND

In accordance with its constitutional mandate, Georgia's General Assembly has provided a statutory framework for verifying signatures on absentee ballots. Georgia law requires that each election official shall:

> compare the identifying information on the oath with the information on file in his or her office, shall compare the signature or mark on the oath with the signature or mark on the absentee elector's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark taken from said card or application.

O.C.GA. § 21-2-386(a)(1)(B).  If the signature on the oath does not match any of the reference signatures identified in the statute, the ballot must be rejected.  *Id.* at § 21-2-386(a)(1)(C).  Nonetheless, the voter is notified of the rejection and is given the opportunity to cure the deficiency.  *Id.*

In March 2020, Secretary of State Brad Raffensberger and the State Election Board entered into a settlement with the Democratic Party of Georgia to provide

additional procedures that required a more involved process for Georgia election officials in rejecting absentee ballots for mismatched signatures than for accepting such signatures. *See* Compromise Settlement Agreement and Release, *Democratic Party of Ga. v. Raffensperger*, No. 19-cv-05028 (Mar. 6, 2020) (ECF 56-1). As part of that settlement, the Secretary of State was required to issue an Official Election Bulletin, which provided, among other things, that a single absentee ballot clerk or registrar could not reject an absentee ballot for signature mismatch. *Id*. at 3. Instead, if a clerk or registrar believed that the signature on the oath did not match a reference signature, he or she was required to seek review from two other officials. *Id.* The absentee ballot would be rejected only if two of the three officials found a mismatch. *Id.* However, only the action of one election official is required to match a signature and thus include that ballot for tabulation of the vote.

These new procedures were applied for the first time during the November 3, 2020 general and special election, which included races for both of Georgia's U.S. Senate seats. No senatorial candidate won more than fifty-percent of the vote, thus requiring a runoff election to be held on January 5, 2021. *See* O.C.G.A. § 21-2-501(a)(1), (3); GA Const. art. II, § 2, ¶ 2. This runoff election will determine party control of the Senate, which is currently projected at 50 Republicans and 48 Democrats. Observers expect that this election will be extremely close, making it

imperative that all lawfully cast votes—and only those lawfully cast votes—be counted.

In a sense, the voting process from the most recent election provided a controlled experiment for the upcoming Senate runoff. The data from the November 3, 2020 election provide a strong evidentiary basis to predict the manner in which Georgia's election officials will apply, not apply, or arbitrarily apply election procedures, including verifying signatures on absentee ballots. This data, along with a trove of other historical data, is publicly available on the Secretary of State's website. *See* https://elections.sos.ga.gov/Elections/voterabsenteefile.do. From this data, one can identify each absentee ballot that was rejected for a mismatched signature and the county in which the ballot was cast.

The total number of ballots rejected for mismatched signatures is shockingly low, both based on raw numbers and in comparison to the rejection rate in prior elections. In the November 3, 2020 election, county officials rejected a mere 719 absentee ballots for invalid signatures from a record total of 1,331,222 absentee ballots cast. This constitutes a rejection rate of only 0.05%. By way of context, the rejection rate from the 2016 election was four times higher (0.20%), and the rate for the 2018 election was twice as high (0.09%). Sorens Report at 7 (Exhibit A). Notably, the rate of ballot rejection for missing signatures, a process that

involves no signature comparison, has remained relatively stable around 0.10% across all three election cycles.  *Id.*

Even more shocking is that 100 of Georgia's 159 counties (nearly two-thirds) failed to reject a single ballot for having a mismatched signature.  Of the counties that did reject absentee ballots, Plaintiffs' expert statistician, Jason Sorens, Ph.D., analyzed the data and concluded that nine Georgia counties were outside the statewide norm at a 99.99% confidence level, meaning that the probability of obtaining the signature mismatch rejection rates in nine of these counties is less than 0.01%.  Sorens Report at 7. "In other words," Dr. Sorens explains, "one could pick 10,000 random samples from the statewide population of absentee ballots, each of the size of the absentee ballot sample of the county in question, and still not expect to find one with a rejection level as extreme as that found in each of these counties."  *Id.*  Additionally, four counties reported rejection rates whose probability is less than 0.1%.  *Id.*

Traditional political demographics do not explain these extreme variations from county to county.  For example, one of Georgia's two least populous counties (Quitman) rejected zero ballots for mismatched signatures, while the other least populous county (Taliaferro) had a rejection rate that was 13 times higher than the statewide average.  Likewise, geographic location within the state does not explain

the variation.  Dr. Sorens concluded that Cobb, Fulton, Gwinnett, and Paulding counties, which are all demographically similar and lie within the Atlanta metropolitan area, had "dramatically different experiences with absentee ballot rejections."  Sorens Report at 8.  In particular, Cobb, DeKalb, and Fulton counties, three of the four most populous counties in Georgia, rejected absentee ballots for signature mismatch at a much lower rate than expected.  *Id.*  In fact, had they followed the statewide norm (already shockingly low), Dr. Sorens expected that these counties would have rejected 168% more absentee ballots than they in fact did.  *Id.*  Finally, as Dr. Sorens points out, three counties that rejected zero ballots (Douglas, Muscogee, and Rockdale) "have unusually high poverty rates and large populations of elderly and first-time voters, the sorts of voters one might expect to make mistakes on their ballots."  *Id*.

Based on his analysis, Dr. Sorens excluded several explanations for these statistical anomalies, including voter capabilities and misreported data.  Rather, he concluded that the "most plausible" explanation is arbitrary enforcement of the state's procedures and/or no enforcement at all: "[C]ounties could be enforcing different standards for rejecting absentee ballots, particularly for signature mismatch, where the anomalies are generally more frequent and persistent.  Some counties may be failing to do signature matching at all, or do so only sporadically."

Sorens Report at 9.

Dr. Sorens' conclusion is bolstered by the analysis of Scott E. Gessler, an expert in election procedures who served as the Secretary of State of Colorado and oversaw that state's transition from in-person to a statewide vote-by-mail system. Gessler Report at ¶¶ 5-6 (Exhibit B).   Mr. Gessler compared the rate of ballot rejection for signature mismatch in Georgia to other states and concluded that Georgia's "signature rejection rates are impossibly low." *Id.* at ¶ 14.   In Colorado, the rejection rate ranges between 2% and 4% before voters have an opportunity to cure any signature deficiencies, but even after voters have an opportunity to cure, the rejection rate there remains at 1%. *Id.* at ¶ 16.   In Mr. Gessler's opinion, "a pre-cure rejection rate of well less than one percent is highly unusual," which "indicates a system problem with signature review, and . . . that Georgia's signature verification process is seriously flawed." *Id.*  Mr. Gessler identified four problems with Georgia's signature review process that "likely lead to such an impossibly low" rate of signature rejection: (1) a single person makes irrevocable decisions whether or not to verify signatures, with absolutely no oversight, creating a single point of failure that is undetectable; and (2) Georgia does not allow poll watchers (which Mr. Gessler describes as a "critical part of an election" that, by bringing potential issues to the attention of supervisors, help prevent "small

problems from becoming large, systemic failures") or members of the public to observe the signature verification process . . ."  Mr. Gessler also notes Georgia does not conduct adequate training and has unclear standards.  *Id.* at ¶¶ 17-24.

The arbitrary or sporadic application of Georgia's signature verification procedures will dilute the valid votes of Georgians across the state, amounting to a violation of their Constitutional rights.  Additionally, by not rejecting ballots with invalid signatures, Defendants will injure Plaintiffs and the Republican Senatorial candidates, in violation of the Constitution.  For these reasons, as more fully discussed below, the Court should grant Plaintiffs' Motion.

## STANDARD OF REVIEW

A movant must make four showings to be entitled to preliminary relief:  "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Otto v. City of Boca Raton, Fla.*, No. 19-10604, 2020 WL 6813994, at *2 (11th Cir. Nov. 20, 2020) (citations and internal quotations omitted); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  The same standard guides the Court's determination as to whether a temporary restraining order should issue.

*See Ingram v. Ault*, 50 F.3d 898, 900 (11th Cir. 1995).  Because Plaintiffs have shown that all four factors weigh in their favor, they are entitled to preliminary relief.

## ARGUMENT

### I.     Plaintiffs Will Succeed On The Merits Of Their Claims.

Georgia's defective practices for verifying absentee ballot signatures violate core Constitutional rights and calls for immediate relief.  Federal courts have frequently adjudicated the constitutionality of signature mismatch rejection in Georgia, and this case addresses the closely related issue of signature mismatch acceptance, an equally critical part of the same ballot verification process.  *See Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018); *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018).

The failure to prevent the imminent counting of unlawful absentee ballots will result in the dilution of the lawfully cast ballots of Plaintiffs' members.  *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").  These constitutional violations can be, and indeed must be, addressed before votes are counted.

Addressing the unconstitutional violations prospectively will protect the constitutional right to vote and participate in a free and transparent election without risking the disenfranchisement of *any* votes.

> **A.      Georgia's signature verification process unconstitutionally burdens the right to vote guaranteed by the First and Fourteenth Amendments.**

Georgia's defective signature verification process unconstitutionally burdens the right to vote.  Burdens on the right to vote are analyzed under the "*Anderson-Burdick* framework." *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020); *see Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).  Under this framework, "severe burden[s]" on the right to vote are permissible only if they are "narrowly tailored" and "advance[] a compelling interest."  *New Georgia Project*, 976 F.3d at 1280 (citations and internal quotations omitted).  "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019) (citing *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009)). In addition, "episodic events" in which "the election process itself reaches the point of patent and fundamental unfairness" violate voters' substantive due process rights guaranteed by the Fourteenth Amendment.

11

*Curry v. Baker*, 802 F.2d 1302, 1315 (11th Cir. 1986).  Defendants run afoul of both standards.

Every unlawful vote counted by the State directly counteracts Plaintiffs' legitimate votes.  *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("The right to vote can neither be denied outright . . . nor diluted by ballot-box stuffing. . . . [T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." (citations omitted)).  As the Eleventh Circuit has explained, allowing states to count unlawful ballots "would dilute the votes of those voters who m[e]et the requirements of" the law.  *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 581 (11th Cir. 1995).

In *Roe*, the Eleventh Circuit concluded that plaintiffs "demonstrated fundamental unfairness" by the State of Alabama after a state court required officials to count "absentee ballots that did not comply with [the state's election code]."  *Id.* at 580–81.  Thus, "[E]lection laws that will effectively 'stuff the ballot box,' implicat[e] fundamental fairness issues."  *Id.* at 581 (citing *United States v. Saylor*, 322 U.S. 385, 389 (1944)).  The Court found that this "post-election departure from previous practice in Alabama" would, *inter alia*, "dilute the votes of those voters who met the requirements of the [absentee ballot rules] as well as

those voters who actually went to the polls on election day." *Id.* at 581.

Here, as in *Roe*, Defendants' tabulation and certification of invalid ballots "implicate[s] fundamental fairness and the propriety of the . . . election[] at issue." *See id.* Defendants' inability to act is precisely the type of election process "that will effectively 'stuff the ballot box,'" *see id.* at 581 (citation omitted), and that "implicates the very integrity of the electoral process." *Duncan*, 657 F.2d at 691. The counting and certification of these votes thus violates a fundamental element of Plaintiffs' franchise:  a voter's "right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson*, 417 U.S. at 227.

The evidence establishes that the vote dilution burden here warrants exacting scrutiny.  *See* Sorens and Gessler Reports. With the likelihood of a close runoff election, the failure to fairly and consistently verify absentee signatures threatens to change the outcome of one or both runoff elections.  The Eleventh Circuit has held that a law that affected "less than 5 hundredths of a percent of . . . more than 9 million total ballots cast" imposed a "serious burden on the right to vote." *Lee*, 915 F.3d at 1319–21; *accord Anderson*, 417 U.S. at 227 ("The deposit of forged ballots in the ballot boxes, no matter how small or great their number, dilutes the influence of honest votes in an election, and whether in greater or less degree is

13

immaterial." (citation and internal quotations omitted)); and *Saucedo v. Gardner*,
335 F. Supp. 3d 202, 217 (D.N.H. 2018) (low rejection rate of signature mismatch
support federal claim and remedy).  Dr. Sorens found that, had three of Georgia's
four largest counties rejected absentee ballots for signature mismatch at the same
rate as the state as a whole (a rate already "impossibly low," Gessler Report at
¶ 14), they would have rejected 168% more absentee ballots.  "Having induced
voters to vote by absentee ballot, the State must provide adequate process to ensure
that voters' ballots are fairly considered and, if eligible, counted."  *Id.* at 217.

Defendants cannot meet their burden under any standard of review because
the state interests are minimal.  To be sure, the State has an interest in "*combatting*
voter fraud" and "*increasing* confidence in elections," but it has no such interest in
*facilitating* fraud and *undermining* public confidence in elections.  *See Greater*
*Birmingham Ministries v. Secretary of State for Alabama*, 966 F.3d 1202, 1230
(11th Cir. 2020).  Likewise, although the State "has an important interest in
structuring and regulating its elections to avoid chaos and to promote the smooth
administration of its elections," *Lee*, 915 F.3d at 1322, that interest is not sufficient
to justify the burden on Plaintiffs' voting rights.  The Eleventh Circuit has held that
requiring a state to conduct notice-and-cure requirements for thousands of ballots
rejected for signature mismatches would not "inordinately disrupt the smooth

facilitation of [a statewide] election." *Id.* at 1322.

Here, the relief requested is less burdensome than the notice-and-cure obligations in *Lee*. And the number of ballots impacted by the lax acceptance of signatures is far greater than the number of ballots potentially wrongly rejected for mismatch signatures. Only 719 signature mismatches were identified in the Nov. 3, 2020 election. By way of contrast, 1.3 million ballots were processed through the unconstitutionally lax verification process. Constitutional protections are warranted on both sides of the coin; rejecting mismatched signatures and accepting signatures as valid. Thus, as in *Lee*, "the serious burden on voters outweighs [the State]'s identified interests[.]" *Id.* at 1326. Plaintiffs are thus likely to succeed on their First and Fourteenth Amendment right to vote claim.

## B. Georgia's weak to nonexistent signature verification process violates Constitutional Procedural Due Process protections.

Incontrovertible evidence shows that Georgia's electorate is being deprived of equal or consistent standards in how absentee ballot signatures are verified. An arbitrary process is no process at all. Evidence is overwhelming that in many counties, *no* signatures (not even missing signatures) are found lacking. Due to Georgia's robust ballot cure process, any signature rejected as invalid or not matching will not result in that ballot being rejected, and the voter disenfranchised, without additional process protections providing an opportunity to cure a deficient

signature. Despite this safeguard, many counties are not doing the job of verifying signatures in any meaningful sense. This extreme, unprecedented, lax application of the law contrasts with other counties where meaningful signature verification procedures are applied.  Fundamentally, Georgia's signature matching procedure is arbitrary and applied unequally in a way that violates the First and Fourteenth Amendments.

"The Fourteenth Amendment due process clause protects against 'the disenfranchisement of a state electorate.'" *Curling v. Raffensperger*, 397 F. Supp. 3d 1334, 1403 (N.D. Ga. 2019) (quoting *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981)).  "When an election process 'reaches the point of patent and fundamental unfairness,' there is a due process violation."  *Id.* (quoting *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1183–84 (11th Cir. 2008)). The debasement or dilution of votes may constitute a due process violation "even if such conduct does not completely deny Plaintiffs the right to vote."  *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1322 (N.D. Ga. 2018).  "[C]andidates' constitutional rights under the First and Fourteenth Amendments to associate for political ends and to participate equally in the electoral process" are likewise protected by these principles.  *Swanson v. Worley*, 490 F.3d 894, 902 (11th Cir. 2007).

The Fourteenth Amendment's Due Process Clause requires that the State

provide an individual with adequate process where it deprives that individual of a liberty or property interest. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To determine the process due, courts consider three factors: (1) the private interest at stake, (2) the risk of an erroneous deprivation of that interest under the current procedures and the probable value of additional procedure, and (3) the Government's interest. *Id.* at 334–35. Because voting is a protected liberty interest, Plaintiffs may assert their procedural due process rights in challenging burdens on the right to vote. *See Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270–73 (11th Cir. 2019) (Pryor, J. concurring in the denial of the motion for a stay).

Here, these three factors militate in favor of the additional process requested by Plaintiffs. *First*, Plaintiffs have established that Defendants' actions will significantly undermine their "fundamental right to vote," "giving this first *Mathews* factor substantial weight." *Id.* at 1271. *Second*, the risk of erroneous deprivation of Plaintiffs' voting rights is high because, as noted, the statistical analysis shows that Georgia's elections officials are not consistently applying the signature matching process, where it is employed at all. *Third*, for the reasons stated, the government's interest is low, because the remedy sought by Plaintiffs is narrowly tailored to redress the harm arising from the inconsistent application of

Georgia's signature matching process while minimizing any additional administrative burden to the state.  Accordingly, Plaintiffs are likely to succeed on their procedural due process claim.

### C. Defendants will imminently deprive Plaintiffs of their Fourteenth Amendment Right to Equal Protection.

Plaintiffs are also likely to succeed because application of the absentee ballot signature verification process violates the Fourteenth Amendment.  The Equal Protection Clause prohibits Georgia from depriving "any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.  In the context of voting rights, the Equal Protection Clause safeguards the "equal weight accorded to each vote and the equal dignity owed to each voter."  *Bush v. Gore*, 531 U.S. 98, 104 (2000)).  And it is violated where, as here, the vote counting procedures employed by the State will "accord[ ] arbitrary and disparate treatment to voters in its different counties."  *Id.* at 107; *see also Moore v. Ogilvie*, 394 U.S. 814 (1969) (invalidating county-based procedure that diluted the influence of citizens in certain counties); *Gray v. Sanders*, 372 U.S. 368 (1963) (similar).

The empirical evidence in this case shows that standards for accepting or rejecting signatures on absentee ballots varies from county to county.  Through a statistical analysis of all 159 Georgia counties over the last three elections cycles, Plaintiffs' expert found "that ballot rejection rates due to signature mismatch differ

18

statistically significantly across counties."  Sorens Report 2.  For example, in the 2020 election, Cherokee, Cobb, DeKalb, and Fulton Counties "had mismatch rejections far below what could be attributed to random statistical variation." Sorens Report 7.   Meanwhile, "Gwinnett, Henry, Liberty, and Taylor had mismatch rejections far above what could be attributed to random statistical variation."   *Id.*   These and other county-by-county discrepancies "strongly demonstrat[e] that the signature matching process is being applied unequally across the state."  *Id.* at 2.

Indeed, there is no other plausible explanation for the discrepancies. Plaintiffs expert examined reasonable alternatives and found that "[t]he disparity in rejection rates between counties cannot be explained by population size or a county's geographic location within the state."   *Id*.   For example, several demographically similar counties in the Atlanta metropolitan area had dramatically different experiences with absentee ballot rejections.  *Id.* at 8.  And three of the four counties in the State that threw out zero ballots despite handling more than 10,000 of them – Douglas, Muscogee, and Rockdale – "have unusually high poverty rates and large populations of elderly and first-time voters, the sorts of voters one might expect to make mistakes on their ballots."  *Id.*

In short, the evidence shows that application of Georgia's signature

verification process has and will continue to afford arbitrary and disparate treatment to voters in different Georgia counties, depriving Plaintiffs and their members of equal protection of the laws.  Plaintiffs will succeed on their equal protection claim.

### D.    Plaintiffs have standing.

Plaintiffs have associational standing to bring this case on behalf of their members.  *See Arcia v. Fl. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014).  The showing required of Plaintiffs at this preliminary stage to demonstrate standing is considerably lower than at post-discovery stage of the litigation.  *See Pavek v. Simon*, 467 F. Supp. 3d 718, 738 (D. Minn. 2020).  *First*, Plaintiffs have standing on behalf of their members who are voters.  These members' votes will be diluted by the counting of unlawfully cast ballots.   The Eleventh Circuit has recognized that "vote dilution can be a basis for standing." *Wood v. Raffensperger*, __ F.3d __, 2020 WL 7094866, at *5 (11th Cir. Dec. 5, 2020); *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007) (explaining that "vote dilution" is a "concrete and personalized injur[y]").

*Second*, Plaintiffs have standing on behalf of Senate candidates whose First and Fourteenth Amendment associational rights and competitive interest in winning the January 5, 2021 runoff will be harmed by the counting of unlawfully

cast ballots and unequal application of the signature matching process.  *See Tx. Democratic Party v. Benkiser*, 459 F.3d 582, 588 (5th Cir. 2006); *Nelson v. Warner*, __ F. Supp. 3d __, 2020 WL 4004224, at *6 (S.D. W. Va. 2020).  As the Eleventh Circuit recently explained, "a political candidate harmed by [a state election process]" suffers "a personal, distinct injury."  *Wood*, 2020 WL 7094866, at *4 (citing *Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995)); *see also Drake v. Obama*, 664 F.3d 774, 782–83 (9th Cir. 2011) (collecting cases).

In addition, Plaintiffs have suffered harm in their own right, because they are required to divert resources from the January 2021 runoff campaign to address the harm caused by the constitutional violations arising from Georgia's signature matching process.  *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018) (finding resource diversion injury in challenge to Georgia's signature matching process).

Lastly, the harm is traceable to Defendants and redressable by them "[g]iven Defendant's role as the chief election official of the state."  *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1291 (N.D. Ga. 2018).  Indeed, Defendants have already given binding direction to Georgia's local election officials as part of the settlement of another lawsuit.

## II.    The Harm To Plaintiffs Is Irreparable.

Absent an injunction from this Court, Plaintiffs will suffer irreparable injury both through the diversion of resources from supporting its candidates, an opportunity cost that can never be recovered, and from the competitive injury their members will suffer absent relief.  "An injury is irreparable if it cannot be undone through monetary remedies."  *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) (quoting *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010)) (internal quotations omitted).  Because "[n]o compensation a court can offer could undo" an injury to the right to vote, "[a] restriction on the fundamental right to vote constitutes irreparable injury."  *Id.* at 828–29 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)) (internal quotations omitted) (alterations omitted); *see also Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1271–72 (11th Cir. 2020).  "Courts routinely deem restrictions on fundamental voting rights irreparable injury."  *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (collecting cases).  Vote dilution—in violation of the Constitution—irreparably harms voters' "right to an honest count . . . possessed by each voting elector" because legitimate voters' ballots are "distorted by fraudulently cast votes."  *See Anderson*, 417 U.S. at 226–27 (citations and internal quotations omitted).  Because "there can be no do-over and no redress,"

"[t]he injury to these voters is real and completely irreparable if nothing is done to enjoin this law." *League of Women Voters of N. Carolina*, 769 F.3d at 247 (reversing district court).

This irreparable harm is imminent if the Court does not take action. The State of Georgia will begin processing absentee ballots on December 21, meaning that the ballots will be separated from the envelopes that bear the voter's signature. Once this occurs, it is impossible to determine whether the ballot was properly and lawfully cast, and any dilution of the vote will have irreparably occurred. As Plaintiffs' expert Mr. Gessler opined, "effective assurances of election integrity require immediate action during an election, not after." Gessler Report at ¶ 21.

## III.   The Balance of Equities Favors Plaintiffs.

When courts balance a State's interests in administrative efficiency against the right to vote, the latter must carry the day. *See Gonzalez*, 978 F.3d at 1272–73 (holding that the "right to vote" outweighed Georgia's asserted interest in "avoiding chaos and uncertainty in the State's election procedures"). Even "significant" justifications in which "the State has a weighty interest" "are unavailing as compared to the plaintiffs' interest in their opportunity to exercise the core democratic right of voting." *Jones*, 950 F.3d, at 829. Where, as here, the only interest to offset Plaintiffs' voting is "a state's administrative burden," "there

is no contest[.]" *See id.* at 830 (citing *Fish v. Kobach*, 840 F.3d 710, 755 (10th Cir. 2016)).

## IV. The Public Interest Favors Plaintiffs.

Finally, granting a preliminary injunction will benefit the public interest. The public has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Indeed, the Eleventh Circuit has repeatedly found that "[t]he 'cautious protection of the Plaintiffs' franchise-related rights is without question in the public interest.'" *Jones*, 930 F.3d at 830 (quoting *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005)). In addition, allowing ineligible voters to unlawfully dilute the ballots of legitimate voters and potentially alter the outcome of the election "would be harmful to the public's perception of the election's legitimacy[.]" *See id.* (citations and internal quotations omitted).

The normal considerations that may counsel against enjoining election procedures in advance of an election—articulated in *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006)—are inapplicable here. *First*, an injunction by this Court would not lead to "voter confusion," *id.*, because the signature matching policy is not voter-facing. And to the extent voter confusion is a factor at all, resolving the disparate application of signature matching standards across different counties would *reduce*

24

such confusion. *See, e.g.*, *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1341 (N.D. Ga. 2018) (explaining that "statewide discrepancy regarding" an election procedure could "lead to future voter confusion"). *Second*, the relief requested here is modest and targeted, precisely the kind of pre-election procedural tweaks that are regularly upheld by the Eleventh Circuit. *See, e.g.*, *People First of Alabama v. Sec'y of State for Alabama*, 815 F. App'x 505, 514 (11th Cir. 2020), (Rosenbaum, J. & Pryor, J., concurring in three-judge panel's denial of stay) ("At most, [the relief] requires defendants to provide additional training to ballot workers—a feat hardly impossible in the allotted time."). *Third*, Plaintiffs were not dilatory in requesting this relief because the signature matching problems did not become apparent until after the November election. *See, e.g.*, *Crittenden*, 347 F. Supp. at 1339 (rejecting laches argument where "many of the issues . . . did not arise until after election day"). In sum, Defendants have no equitable interest to justify infringing Plaintiffs' fundamental right to vote.

## CONCLUSION

For all the foregoing reasons, the Court should grant the Motion for a Temporary Restraining Order and a Preliminary Injunction.

Respectfully submitted,

December 10, 2020                    By:  */s/ Peter N. Farley*
                                    Peter N. Farley (GA Bar No. 255165)
                                    1230 Peachtree Street, N.E.
                                    Promenade, Suite 2100
                                    Atlanta, GA 30309-3534
                                    Tel: 404-443-5500
                                    Fax: 404-443-5599
                                    pfarley@mcguirewoods.com

                                    George J. Terwilliger*
                                    Michael Francisco*
                                    Brooks H. Spears*
                                    2001 K Street N.W., Suite 400
                                    Washington, DC 20006
                                    Tel: 202-857-1700
                                    Fax: 202-857-1737
                                    gterwilliger@mcguirewoods.com
                                    mfrancisco@mcguirewoods.com
                                    bspears@mcguirewoods.com

                                    Richard Cullen*
                                    800 East Canal Street
                                    Richmond, VA 23219-3916
                                    Tel: 804-775-1000
                                    Fax: 804-775-1061
                                    rcullen@mcguirewoods.com

                                    *Counsel for Plaintiffs*
                                    *Georgia Republican Party, Inc.*
                                    *National Republican Senate Committee*
                                    *Perdue for Senate*
                                    *Georgians for Loeffler*
                                    **Pro Hac Vice Applications Forthcoming*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Plaintiffs' Motion for a Temporary Restraining Order and a Preliminary Injunction and Incorporated Memorandum of Law has been prepared in accordance with the font type and margin requirements of L.R. 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: December 10, 2020

*Counsel for Plaintiffs*

*/s/ Peter N. Farley*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing and all exhibits and attachments thereto in the above-captioned matter to be filed with the United States District Court for the Northern District of Georgia, Atlanta Division, via the Court's CM-ECF system.  I also hereby certify that I caused the foregoing and all exhibits and attachments thereto in the above-captioned matter to be served, via email on December 10, 2020 and by hand delivery on December 11, 2020, upon:

> Secretary of State Brad Raffensperger
> 214 State Capitol
> Atlanta, GA  30334
> brad@sos.ga.gov
> soscontact@sos.ga.gov
>
> Rebecca N. Sullivan
> Georgia Department of Administrative Services
> 200 Piedmont Avenue SE
> Suite 1804, West Tower
> Atlanta, GA  30334-9010
> rebecca.sullivan@doas.ga.gov
>
> David J. Worley
> Evangelista Worley LLC
> 500 Sugar Mill Road, Building A, Suite 245
> Atlanta, GA  30350
> david@ewlawllc.com
>
> Matthew Mashburn
> Aldridge Pite, LLP
> 3575 Piedmont Road, NE
> Suite 300
> Atlanta, GA  30305

mmashburn@aldridgepite.com

Ahn Lee
P.O. Box 4008
Decatur, GA  30031

Harley, Rowe & Fowler, P.C.
2700 Cumberland Parkway, Suite 525
Atlanta, GA  30339
ale@hrflegal.com

/s/ Peter N. Farley
Peter N. Farley
Georgia Bar No. 255165
McGuireWoods LLP
Suite 2100, Promenade
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3534
Telephone:    (404) 443-5500
Facsimile:    (404) 443-5599
pfarley@mcguirewoods.com

*Counsel for Plaintiffs*

3