# Exhibit B

# Expert Report of Scott E. Gessler

1. I have been asked to render an opinion whether Georgia conducts adequate signature matching for absentee ballots. This is a preliminary report intended to provide a broad overview of my initial opinion. A more thorough opinion will be forthcoming.

## Summary of Opinion

2. It is my opinion that Georgia's signature review routinely accepts absentee ballot voter signatures that do not match the voter signatures in the registration rolls.

## Education and Experience

3. As a general overview, I have litigated, administered, and taught elections for nearly two decades, wearing a number of different hats. I have litigated nearly every type of election law case, taught election law at both the University of Colorado and University of Denver law schools, and served as Colorado's 37th Secretary of State. Particularly relevant to this matter, my experience there includes implementing Colorado's highly regarded statewide, all-mail ballot system.

4. My education is as follows: I received a B.A. from Yale University, a J.D. from the University of Michigan Law School, and an M.B.A. from the J.L. Kellogg School of Management at Northwestern University. I also received a certificate for the Senior Executives in State and Local Government at the Kennedy School of Government at Harvard University.

5. I served as the Colorado Secretary of State from January 2011 until January 2015. In Colorado, the Secretary of State serves as the state's chief election officer. In that capacity my responsibilities included: supervising the conduct of primary, general, congressional vacancy, and statewide ballot issue elections in Colorado; enforcement of the Colorado election code; interpretation of the election code and promulgation of statewide regulations; statewide coordination and compliance with all federal election laws, including the Voting Rights Act ("VRA"), the National Voter Registration Act ("NVRA"), the Help America Vote Act ("HAVA"), and the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"); training, review, and oversight of local countywide election officials and local election practices and procedures; maintenance and modifications to the statewide voter database and state voter registration systems, maintenance of the statewide voter rolls, testing and certification of voting equipment, implementation and enforcement of campaign finance laws, and development of election policies; development of statewide election legal strategy and responses to legal actions; and management of office personnel, policies, and procedures.

6. As Colorado Secretary of State, I implemented various new programs and initiatives involving the administration of Colorado's elections. These included:

    a. Participation in Election Registration Information Center ("ERIC") program, launched by the Pew Charitable Trusts. As Secretary of State, I evaluated the ERIC program and ensured Colorado was one of the very first states to join. During my time Colorado served as one of the first states to use voter registration and driver's license matching to improve voter registration efforts, as well as improve the accuracy of voter rolls.

b. Development of a program to remove non-citizens from the voter registration rolls. During my time as Secretary of State, Colorado became the first state to match driver's license and voter roll information to identify potential non-citizens on the voter rolls, and Colorado and Florida were the first two states to obtain access to the Systematic Verification for Entitlements ("SAVE") program for purposes of maintaining voter rolls.

c. A re-evaluation and adjustment to Colorado's procedures for removing the names of deceased voters from the voter registration database. I launched this effort after my office discovered the names of numerous dead voters on the voter rolls.

d. The expansion and rebuilding of online voter registration in Colorado, which enabled voters not only to register online but also to maintain their registration records online and remove their names from Colorado's voter rolls. To my knowledge, this system has been the most popular and heavily used system nationwide, from 2012 until the present. For this, Colorado was awarded the 2013 "State Technology Innovator Award" from the National Association of State Chief Information Officers.

e. The review of all election procedures and the implementation of process mapping to improve and refine statewide and local procedures for election administration. This includes voter list maintenance and voter registration procedures and policies.

f. A complete rewriting and streamlining of Colorado's election regulations.

g. Implementation of Colorado's transition from in-person voting to a statewide vote-by-mail system. Prior to 2013, Colorado had an in-person voting system. In 2013 Colorado enacted a universal vote-by-mail system, and starting in late 2013 Colorado election officials sent ballots by mail to active voters, all of whom had the opportunity to vote by mail. As Colorado's chief election officer, I implemented the new legislation and oversaw Colorado's transition to an all-mail ballot state.

h. In response to new legislation, development of an online, statewide electronic poll book and real-time access to the statewide voter database, to allow election-day voter registration and voting throughout the state. Colorado developed this complete system overhaul in nine months, deployed and operated it flawlessly, and was the first state to deploy such a system.

i. Development of new online training programs for the public and for local election officials. For this program, Colorado won the 2014 "Ideas Award" from the National Association of Secretaries of State.

j. Development and implementation of the "Accountability in Colorado Elections" ("ACE") program, which provides online, interactive maps for election information, including voter registration statistics, registration by districts, voter turnout, election cost statistics, and county election activity and legal compliance information. For this project, Colorado was a finalist for the 2016 "Ideas Award" from the National Association of Secretaries of State.

k. The launch and improvement of a statewide electronic delivery system for ballots to military and overseas civilian voters, which resulted in a substantial increase in military and overseas civilian voter turnout.

l. Development and direction of legal strategy, particularly with respect to election-related lawsuits under both state and federal law. As an example, I personally served as the office's lead negotiator in responding to a threatened lawsuit that alleged noncompliance with Section 8 of the NVRA, due to inactive voters on the voting rolls. Based on the office's response to the potential plaintiff's concerns, the plaintiff decided not to pursue litigation.

7. I have worked as an attorney, primarily in the area of election law, from 2001 until 2011, and again from 2015 until the present. In this capacity I have represented candidates, parties, ballot issue committees, and independent groups in nearly all aspects of election-related activities. Further, I have litigated many types of election-related lawsuits, including voting rights, voting procedures, and voter registration issues.

8. I have taught Election Law for over five years as an adjunct professor at the University of Denver Law School, and I have previously taught Election Law at the University of Colorado Law School.

9. I have attended multiple conferences involving election operations, including conferences conducted by the National Association of Secretaries of State, the Pew Foundation, and the Heritage Foundation, among others.

10. I have been qualified as an expert, submitted expert reports, or been retained as an expert, in the following cases:

a. I was qualified as an expert and provided both deposition and trial testimony in *American Civil Rights Union v. Snipes*, No. 16-cv-61474 (S.D. Fla. 2018). My testimony addressed the issue of whether the Broward County Supervisor of Election took reasonable steps to maintain the accuracy of the county voter rolls.

b. I submitted an expert report in *Jacobson v. Detzner*, No. 4:18-cv-00262-MW-CAS (N.D. Fla. 2018). I was asked to opine on whether alternating ballot styles for different precincts would create a substantially greater administrative burden than using the same ballot order for all precincts. That matter was resolved without requiring live testimony.

c. In September 2020 I submitted an expert report in *Martel v. Condos*, No. 5:20-cv-00131-GWC (D. Vt. 2020). In that case my report addressed whether Vermont's plan to send a mail ballot to every active registered voter will create an unacceptably large risk of fraud and mistake, which could result in disenfranchisement or vote dilution. The court relied upon my report, did not seek live testimony, and resolved the matter at the preliminary injunction stage.

d. In October 2020 I submitted an expert report in *Public Interest Law Found. v. Boockvar*, No. 1:20-cv-01905 (M.D. Penn. 2020). My report addressed the issue of whether

the Pennsylvania Secretary of State took reasonable steps to remove dead voter names from the state voter rolls. That case was dismissed without requiring testimony from me.

    e.    In November 2020 I was retained by Donald J. Trump for President in *Donald J. Trump for President v. Boockvar*, No. 4:20-cv-02078 (M.D. Penn. 2020), to analyze ballot handling procedures in Pennsylvania, particularly signature verification and cure procedures for absentee and mail-in ballots. That case was dismissed before I completed a report.

    f.    Also in November 2020 I submitted an expert report in *Law v. Witmer* 20-OC-001631B (Carson City, Nev. 2020). My report addressed whether the State of Nevada could be confident that the election results accurately identified the winner for president, based on that state's implementation of a new, statewide mail-in ballot system.

11.    My rate for this matter is $450 per hour.

## Documents and Materials Relied Upon

12.    I reviewed and used the following materials and documents in preparing this report:

    a.    Draft complaint, *Georgia Republican Party v. Brad Raffensperger*,

    b.    Jason Sorens, *Absentee Ballot Signature Matching in Georgia: Statistical Analysis and Report.* (including exhibits), and

    c.    Nick Wooten*, GA Republicans want 'signature audit' of absentee ballots. Why it likely won't happen*, Columbus Ledger-Inquirer, November 23, 2020, available at: https://www.ledger-enquirer.com/news/politics-government/election/article247371684.html

## Opinion

**A.    Georgia has an impossibly low pre-cure signature rejection rate.**

13.    In his expert report for this case, Mr. Jason Sorens concluded that the low signature mismatch rates reported by many Georgia counties were highly improbable, based on his statistical analysis. He included with his analysis an exhibit that included each county's signature rejection numbers and rejection rates, before any ballots were cured by a voter.

14.    I have reviewed Mr. Sorens' exhibit and agree that the signature rejection rates are impossibly low. My method of analysis, however, differs. Specifically, I based my conclusion on numbers reported by other states, as well as Colorado's experience in processing millions of absentee ballots over many election cycles.

15.    Georgia's signature rejection rate – before signature cures are taken into account – is impossibly low. And they numbers are consistently low, from county to county.

16. By comparison, pre-cure rejection rates for Colorado generally range between two and four percent, based on my experience as Secretary of State, as well as experience in campaign ballot cure efforts this cycle. (Colorado does not maintain statewide numbers for pre-cure rejections). And Colorado reports post-cure rejection rates – after voters have received an opportunity to cure ballot signature problems – at about one percent or lower.

17. As another point of comparison, Nevada recently reported signature *post*-cure rejections rates of 0.42% percent. This rate is approximately 80 times greater than Georgia's pre-cure rejection rate of 0.005%. And Nevada's process itself was marred by election officials who encouraged election workers to overlook signature mismatches, thereby artificially inflating verification rates.

18. A pre-cure rejection rate of well less than one percent is highly unusual. Based on my experience and knowledge in this area, such a low rejection rate indicates a systemic problem with signature review, and it indicates that Georgia's signature verification process is seriously flawed.

**B. Georgia's low rejection rate very likely stems from signature verification by one person, with little training, and no watcher oversight.**

19. A brief review of Georgia's signature review process shows four problems that likely lead to such an impossibly low percentage of signature mismatches and missing signatures.

20. First, Georgia's process creates a single point of failure that makes it impossible to detect – let alone correct – errors in signature verification. Specifically, a single person makes irrevocable decisions whether or not to verify signatures, with absolutely no oversight. If that person erroneously accepts a signature, no one can detect the problem. Watchers cannot see mistakes. The process does not allow for joint or secondary review. And even worse, a pattern of errors cannot be detected or corrected.

21. Second, Georgia does not allow watchers or other members of the public to observe the signature verification process, contributing to the problem of a single point of failure.

22. Watchers are a critical part of an election. They improve the quality and reliability of an election, quickly bringing problems to the attention of high-ranking election officials and allowing those officials to take immediate actions. This prevents small problems from becoming large, systemic failures. In short, watchers play a vital role in ensuring that errors or improper behavior are not part of larger pattern.

23. Oftentimes, watcher observation and verification are the only meaningful assurances of election integrity. Elections are large, complex affairs conducted on a very short timeline. And post-election remedies require incredibly compressed timelines that do not allow full investigation or disclosure of the facts. This means that effective assurances of election integrity require immediate action during an election, not after. For example, a signature that should have been rejected but is instead approved (and counted) cannot be reversed.

24. Third, Georgia does not seem to conduct adequate training. The Georgia Secretary of State does not provide guidance or training for counties or individuals conducting signature

verification. Procedurally, training seems to be spotty or nonexistent. And looking at the results of signature verification, it seems that there has been almost no meaningful training for signature comparison.

25.     Fourth, the low verification rate is especially suspect because many signatures on the voter rolls are poor quality. Georgia has automatic voter registration, which relies heavily on signature samples obtained from motor vehicle registrations. Because these signatures are normally obtained using an electronic touchpad, they are notoriously poor quality. That means counties likely rely on motor vehicle signatures for voters who request absentee ballots online.

26.     Fifth, Georgia has unclear standards. I identified one article in which a spokesperson for the Georgia Secretary of State said that exact signature match is not required. Rather, a voter's absentee ballot signature "must be consistent" with one or more on file.[1] Requiring a ballot signature to be "consistent" seems to be an impossible and impractical standard, and the Georgie Secretary of State has not issued regulations or guidance to specifying what a "consistent" standard means. Indeed, this type of guidance may likely explain the unusually low signature rejection rates.

## Conclusion

27.     Overall, Georgia's incredibly low signature rejection rate, combined with deficiencies in the state's procedures, shows that Georgia does not conduct adequate signature review.

28.     Please be aware, however, that this report has been completed on a very compressed timeline, and therefore a fuller investigation and review may produce a different analysis or modified conclusions.

Scott E. Gessler

---

[1] Nick Wooten, *GA Republicans want 'signature audit' of absentee ballots. Why it likely won't happen.* Columbus Ledger-Inquirer, November 23, 2020; available at: https://www.ledger-enquirer.com/news/politics-government/election/article247371684.html