IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GEORGIA REPUBLICAN PARTY, INC, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 1:20-cv-5018-ELR |
| v. | ) ) | |
| BRAD RAFFENSPERGER, *et al.*, | ) ) | |
| Defendants. | ) | |

---

**DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR
MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF**

---

Christopher M. Carr
Attorney General
Bryan K. Webb
Deputy Attorney General
Russell D. Willard
Senior Assistant Attorney General
Charlene S. McGowan
Assistant Attorney General

Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334

*Counsel for Defendants*

## <u>TABLE OF CONTENTS</u>

**INTRODUCTION**................................................................................1

**FACTUAL BACKGROUND**...............................................................3

**ARGUMENT AND CITATION OF AUTHORITIES**........................7

  **I.**  **The Court Lacks Subject Matter Jurisdiction because Plaintiffs Cannot Establish Article III Standing.**...............................................7

    **A. Plaintiffs have not clearly alleged an injury in fact.** ................8

    **B. Plaintiffs' alleged injuries are not traceable to Defendants, nor can they be redressed by their requested relief.** ...............12

  **II. Plaintiffs' Claims are Barred by Laches.** ...................................15

  **III. Plaintiffs' Motion for Injunctive Relief Should be Denied.** .......17

    **A. Plaintiffs are not likely to succeed on the merits of their claims.** ..........17

    **B. Plaintiffs face no irreparable harm if the status quo is maintained.** ......23

    **C. The balance of equities and public interest weigh heavily against an injunction.**................................................................24

# INTRODUCTION

Plaintiffs ask this Court to intervene in the ongoing January 5, 2021, run-off election and alter the rules for the verification of absentee ballots currently in use by elections officials across Georgia's 159 counties. The rules adopted by the State Election Board and guidance issued by the Secretary of State were adopted over 8 months ago and have been in place for at least 3 separate elections now. Moreover, the rules and guidance challenged by Plaintiffs here have been the subject of numerous lawsuits raising similar claims, which have been repeatedly rejected by federal courts.[1]

There is no reason for this Court to hold differently, because this case is squarely controlled by the Eleventh Circuit's decision in *Wood v. Raffensperger*, which rejected a nearly identical challenge to the same absentee ballot rules and procedures. 2020 U.S. App. LEXIS 37971 at *2 (11th Cir. Dec. 5, 2020). Finding that the plaintiff in that case lacked an injury in fact sufficient to establish Article III standing, the Court of Appeals made clear that federal courts are not "constituted as

---

[1] *See Texas. v. Georgia*, No. 22O155 (U.S. Sup. Ct.) (motion for emergency writ denied); *Wood v. Raffensperger*, No. 1:20-cv-04651-SDG, 2020 U.S. Dist. LEXIS 218058 (N.D. Ga. Nov. 20, 2020), *aff'd* Appeal No. 20-1245-C, 2020 U.S. App. LEXIS 37971 (11th Cir. Dec. 5, 2020) (affirming denial of motion for emergency injunction); *Pearson v. Kemp*, No. 1:20-cv-4809 (N.D. Ga.) (dismissed).

freewheeling enforcers of the Constitution," and "may not entertain post-election contests about garden-variety issues of vote counting and misconduct that may properly be filed in state courts" *Id*. at *2, 10.

Consistent with this controlling authority, Plaintiffs' action must be dismissed because they lack Article III standing. Because of Plaintiffs' inexcusable delay in raising their challenge to the state's absentee ballot procedures, their claims are also barred by laches. Finally, Plaintiffs' lawsuit fails to raise any cognizable constitutional claims.

This case is not about voting rights. Rather, Plaintiffs are trying to change the rules in the middle of an election because they believe that *not enough* absentee ballots will be rejected, or at least not enough will have to go through the additional step of being "cured" by the voter before being counted. But the Eleventh Circuit has cautioned federal courts against interfering with state administration of elections while the election is ongoing. *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1283 (11th Cir. 2020). County election officials have already received, processed, and accepted over 300,000 absentee ballots under the state's existing rules and procedures. Any injunction entered by this Court "would thus violate *Purcell*'s well-known caution against federal courts mandating new election rules—especially at

the last minute." *Id.* This Court should deny Plaintiffs' untimely request for an injunction and dismiss this action.

## FACTUAL BACKGROUND

In 2019, General Assembly enacted sweeping reforms to Georgia's Elections Code in HB 316, which adopted a new electronic voting system and modified the technical requirements for absentee ballots.[2] Whereas voters previously had to include their address, date of birth, and a signature on the outer envelope, HB 316 modified the language of the oath on the outer absentee ballot envelope to leave the signature requirement but remove the elector's address and date of birth. *See* O.C.G.A. § 21-2-384. Further, HB 316 added a "cure" provision, which requires election officials to give a voter until three days after the date of the election to cure any issues with the voter's signature before rejecting an absentee ballot for a missing or mismatched signature on the outer envelope. *See* O.C.G.A. § 21-2-386(a)(1)(C). The "cure" provision works in conjunction with the statutory requirement that

---

[2] HB 316 followed a number of federal court decisions enjoining certain Georgia counties from rejecting absentee ballots for missing or non-matching information during the 2018 general election. *See Democratic Party of Ga., Inc. v. Crittenden*, F. Supp. 3d 1324 (N.D. Ga. 2018); *Martin v. Crittenden*, 347 F. Supp. 3d 1302; *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018).

election officials "promptly notify" the voter of a rejected absentee ballot due to a missing or mismatched signature.

On November 6, 2019, the Democratic Party of Georgia, DSCC, and DCCC (collectively, "Political Party Organizations") sued the State Defendants, alleging that, despite the reforms of HB 316, the "promptly notify" language of O.C.G.A. § 21-2-386(a)(1)(C) was still vague and ill-defined, and left counties without uniform standards for verifying signatures on absentee ballots.

While that action was pending, the State Election Board ("SEB") approved a rule that established a uniform standard for counties to follow to "promptly notify" voters when their absentee ballot is rejected as required by O.C.G.A. § 21-2-386(a)(1)(C). The rule provides that when a timely submitted absentee ballot is rejected, the board of registrars or absentee ballot clerk must send the voter notice of the rejection and opportunity to cure within three business days, or by the next business day if within ten days of Election Day. Ga. Comp. R. & Regs. r. 183-1-14-.13 (the "Prompt Notification Rule"). The Prompt Notification Rule was adopted pursuant to the SEB's rule-making authority under O.C.G.A. § 21-2-31(2), promulgated pursuant to the Georgia Administrative Procedure Act, published for public comment, and discussed at multiple public hearings before it became effective on March 22, 2020.

4

Because the Prompt Notification Rule resolved the primary issue in the pending lawsuit, the parties resolved the matter in a settlement agreement ("Settlement Agreement") that included, among other terms, an agreement that (1) the State Election Board would promulgate and enforce the Prompt Notification Rule; and (2) the Secretary of State would issue guidance to county election officials regarding the signature matching process.

On May 1, 2020, the Secretary of State distributed an Official Election Bulletin that advised county election officials of the Prompt Notification Rule and provided additional guidance for reviewing signatures on absentee-ballot envelopes ("OEB Guidance"). (Declaration of Chris Harvey ¶ 5). The OEB Guidance instructed that after an election official makes an initial determination that the signature on the absentee ballot envelope does not match the signature on file for the voter pursuant to O.C.G.A. § 21-2-386(a)(1)(B) and (C), two additional registrars, deputy registrars, or absentee ballot clerks should also review the signature, and the ballot should be rejected if at least two of the three officials agree that the signature does not match. (*Id.*) The guidance document expressly instructs county officials to comply with state law. (*Id.*)

Plaintiffs' claim that these "new procedures were applied for the first time during the November 3, 2020 general and special elections" is simply not true. (*See*

Doc. 2-1 at 4). The Prompt Notification Rule was adopted by the SEB in March, and the OEB Guidance was issued in May, in advance of the combined Presidential Preference Primary and statewide general primary on June 9, 2020, as well as the subsequent primary run-off election held on August 11, 2020. These procedures have been in place for at least three separate elections, and yet Plaintiffs never raised an objection or legal challenge until weeks after the November general election.

Contrary to Plaintiffs' claim that the Prompt Notification Rule and the OEB significantly altered the signature verification process and rejection rate (Doc. 2-1 at 2), these measures have had no detectable effect on the absentee ballot rejection rate since the last general election in 2018. (Harvey Dec. ¶ 6). An analysis of the number of absentee-ballot rejections for signature issues for 2020 as compared to 2018 found that the rejection *rate* for absentee ballots with missing or non-matching signatures in the 2020 general election was essentially the same rejection rate for signature issues as in 2018, even though the total number of absentee ballots submitted (and rejected) increased exponentially. (*Id.*)

Following the November general election, and in response to increased calls to make the signature verification process open to public scrutiny, the Secretary of State issued an Official Election Bulletin dated December 9, 2020, instructing counties that the verification process can be made open to the public based upon the

Elections Code's general requirement that elections officials "perform their duties in public."[3] (Harvey Dec. ¶ 7.) However, the OEB clarifies that public observers are not permitted to see confidential information or to interfere in the process, *see* O.C.G.A. § 21-2-597, and elections officials are instructed to put in place reasonable regulations to protect the voter's personal identification information from public view.

## ARGUMENT AND CITATION OF AUTHORITIES

### I. The Court Lacks Subject Matter Jurisdiction because Plaintiffs Cannot Establish Article III Standing.

Federal courts have an independent obligation to ensure that subject-matter jurisdiction exists before reaching the merits of a dispute. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (vacating and ordering dismissal of voting rights case due to lack of standing). "For a court to pronounce upon . . . the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires." *Id.* (citation omitted). "If at any point a federal court discovers a lack of jurisdiction, it must dismiss the action." *Id.*

---

[3] The Elections Code does not explicitly permit partisan observers to participate in the signature verification process. *See generally* O.C.G.A. § 21-2-386 (stating that this process is to be performed by deputy registrars).

Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. A party invoking federal jurisdiction bears the burden of establishing standing at the commencement of the lawsuit. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). As an irreducible constitutional minimum, Plaintiffs must show they have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Id.* at 561. As the party invoking federal jurisdiction, Plaintiffs bear the burden at the pleadings phase of "clearly alleg[ing] facts demonstrating each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

**A. Plaintiffs have not clearly alleged an injury in fact.**

Injury in fact is the "first and foremost" of the standing elements. *Spokeo*, 136 S. Ct. at 1547. An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020). Plaintiffs fail to show that they have suffered a concrete and particularized injury or an injury that is actual and imminent, rather than hypothetical.

1. *Plaintiffs allege a generalized grievance, not a concrete and particularized injury.*

Plaintiffs' alleged injury is that votes will be "diluted by the counting of unlawfully cast ballots." (Doc 2-1 at 20). However, this is not an injury particularized to Plaintiffs that is "distinct from a generally available grievance about government." *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018). As the Eleventh Circuit held in *Wood*, a claim that the government has not followed the law, without more, is a generalized grievance, because any voter can raise it. 2020 U.S. App. LEXIS 37971 at *12. And the Supreme Court has made clear that a generalized grievance, "no matter how sincere," cannot support standing. *Id.*; *see also Lance v. Coffman*, 549 U.S. 437, 440– 41 (2007) (holding that "a generalized grievance that is plainly undifferentiated and common to all members of the public" is not sufficient for standing).

Like in *Wood*, Plaintiffs here cannot "explain how [their] interest in compliance with state election laws is different from that of any other person," because all Georgia voters could be said to share Plaintiffs' interest in ensuring that run-off election is properly administered. 2020 U.S. App. LEXIS 37971 at *13. Although Plaintiffs allege that their members' votes are likely to be diluted if unlawful votes are counted, this theory was expressly rejected in *Wood* as a basis for standing. While the Eleventh Circuit noted that vote dilution can support standing in

the context of certain gerrymandering or malapportionment cases, that is because in those types of cases, "vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts." *Id.* at 12 (citing *Baker v. Carr*, 369 U.S. 186, 207-08 (1962)); *see also Gill v. Whitford*, 136 S. Ct. 1916, 1930 (2018) (distinguishing gerrymandering cases like *Baker* in which voters alleged "facts showing disadvantage to themselves as individuals"). But here, "no single voter is specifically disadvantaged" if a vote is counted improperly, even if the error might have a "mathematical impact on the final tally and thus on the proportional effect of every vote." 2020 U.S. App. LEXIS 37971 at *13 (citing *Bognet v. Sec'y Commonwealth of Pa.*, 2020 WL 6686120, at *12 (3d Cir. Nov. 13, 2020).

Courts have also rejected Plaintiffs' asserted "competitive interest in winning the January 5, 2021 runoff" as a basis for standing. In this way, Plaintiffs seek to vindicate "group political interests, not individual legal rights." *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018). But federal courts are "not responsible for vindicating generalized partisan preferences." *Id.*; *see also Jacobson*, 974 F.3d at 1251 (holding that an organization's general interest in its preferred candidates winning elections is a "generalized partisan preference" that federal courts are "not responsible for vindicating"). Accordingly, Plaintiffs have not articulated a concrete and particularized injury in fact sufficient to confer standing to pursue their claims.

10

2.  *Plaintiffs' alleged injury is based on hypothetical future harm that is not certainly impending.*

Because Plaintiffs seek prospective relief to prevent a future injury, they must also establish that "the threatened injury is certainly impending." *Indep. Party of Fla. v. Sec'y, State of Fla.*, 967 F.3d 1277, 1280 (11th Cir. 2020); *see also Jacobson*, 974 F.3d at 1245; *Anderson v. Raffensperger*, 1:20-CV-03263, 2020 WL 6048048, at *14-15 (N.D. Ga. Oct. 13, 2020). Allegations of "possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Plaintiffs' alleged injury is based entirely upon speculation that they will be harmed "by the counting of unlawfully cast ballots and unequal application of the signature matching process" in the upcoming January run-off. (Doc 2-1 at 21). But Plaintiffs have shown no evidence that counties actually counted unlawful absentee ballots in the November general election, let alone are "certainly" likely to do so in the future. *See Anderson v. Raffensperger*, 1:20-CV-03263, 2020 WL 6048048 at *39 (N.D. Ga. Oct. 13, 2020) ("any theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending").

To the extent Plaintiffs are relying on a diversion of resources theory to establish standing (Doc 2-1 at 21), this theory is also based on their speculative belief that counties *may* allow unlawful votes to be counted. But to establish an imminent

11

injury, Plaintiffs must show that the counting of unlawful votes is *actually likely* to occur. *See Clapper*, 568 U.S. at 402 ("[Plaintiffs] cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.").

Moreover, Plaintiffs do not identify with specificity the expenditures they are making to address their perceived problems with absentee ballot verification process for the January run-off. Nor can they explain how electoral harm to their candidates is certain to occur absent injunctive relief. Even if harm to a candidate's electoral prospects is a sufficient basis for standing, there is no evidence that such harm is "certainly imminent" here for the two candidate Plaintiffs. *See Jacobson*, 974 F.3d at 1251 (concluding that the Democratic Party "never proved that electoral harm to one of the Party's candidates is 'certainly impending,' so it lacks standing to seek prospective relief").

### B. Plaintiffs' alleged injuries are not traceable to Defendants, nor can they be redressed by their requested relief.

Not only have Plaintiffs failed to demonstrate an injury in fact, they cannot satisfy the causation requirement of standing, which requires that "a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result

of the independent action of some third party not before the court.'" *Jacobson*, 974 F.3d at 1253 (citation omitted); *see also Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1265 (11th Cir. 2011) (holding that an injury sufficient to establish standing cannot "result [from] the independent action of some third party not before the court.").

Here, Plaintiffs allege that *counties*—not the Defendants—are failing to implement signature verification procedures in a uniform or consistent manner. Under Georgia law, county elections officials are solely responsible for processing, validating, and tabulating absentee ballots. *See* O.C.G.A. § 21-2-386. As such, Plaintiffs' claimed injury resulting from alleged irregularities in the signature verification process is not traceable to any of the Defendants. *See Jacobson*, 974 F.3d at 1253 (concluding that alleged injury from state's ballot order statute was not traceable to the Secretary of State because county election superintendents were "independent officials who are not subject to the Secretary's control").

Plaintiffs' argument that their injuries are traceable to Defendants and redressable by them because of the Secretary of State's role as the chief election official of the state was soundly rejected in *Jacobson* and in subsequent cases in this judicial district. As noted in *Anderson*, the Secretary's "general powers are insufficient to establish traceability" under "binding case law." 2020 U.S. Dist.

13

LEXIS 188677, at *63 (citing *Jacobson*, 974 F.3d at 1254 ("voters and organizations . . . cannot rely on the Secretary's general election authority to establish traceability," nor can they rely on his authority "to promulgate a rule" or "issue directives").[4]

Similarly, no relief can be entered against the Secretary that would be binding on county officials, meaning that Plaintiffs cannot establish the redressability element of standing. The Eleventh Circuit made clear in *Jacobson* that federal courts do not have the authority to exercise jurisdiction to order relief against county officials who have not been named as parties. 974 F.3d at 1253; *see also Anderson*, 2020 U.S. Dist. LEXIS 188677, at *64 ("No Georgia law allows State Defendants to reach down into the county precincts and demand the relief Plaintiffs seek.")

In sum, having failed to establish that they have suffered an injury in fact, or that their purported injury is traceable to or redressable by the Defendants, Plaintiffs lack standing and their claims should be dismissed.

---

[4] Plaintiffs also cite to *Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011) in their Complaint, which held that Georgia's Secretary of State was "a proper party in [an] action for injunctive and declaratory relief pursuant to *Ex Parte Young*." 634 F.3d at 1316. But, as recognized in *Anderson*, "Article III standing and the proper defendant under *Ex parte Young* are separate issues." 2020 U.S. Dist. LEXIS 188677, at *64. *Grizzle* does not "address[]—let alone resolve[]—the standing issues in this suit." *Id.*

## II.     Plaintiffs' Claims are Barred by Laches.

Plaintiffs' inexcusable delay in bringing their claims warrants denial of their motion and dismissal of the action. Laches bars a request for equitable relief when (1) the plaintiff delays in asserting the claim; (2) the delay is not excusable, and (3) the delay causes the non-moving party undue prejudice." *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005). In the context of elections, "any claim against a state electoral procedure must be expressed expeditiously." *Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990). As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made. *Id.*

In *Wood*, Judge Grimberg held that the same claims raised by Plaintiffs here were barred by laches because the plaintiff failed to raise them prior to the November election. The facts are even more compelling here because Plaintiffs waited even longer to file this action. The absentee ballot regulations and procedures that Plaintiffs now complain of were adopted in March—well before the November 3, 2020 election or the commencement of the January 5, 2021, runoff election—and Plaintiffs fail to cite any justifiable excuse for failing to bring this challenge earlier. Although Plaintiffs argue that they have not been "dilatory in requesting this relief because the signature matching problems did not become apparent until after the

15

November election," this excuse is simply not credible. These procedures have been in place in multiple elections for 2020; it was not until Plaintiffs were disappointed by the election results that they chose to bring this action. If Plaintiffs' constitutional claims are valid, they "should not depend on the outcome of any particular election, to wit, whether [Plaintiffs'] preferred candidates won or lost." *See Wood*, 2020 U.S. Dist. LEXIS 218058 at *22. The claims "were ripe the moment the parties executed the Settlement Agreement," and should have been brought at that time. *Id.*

Plaintiffs' delay here is even more inexcusable and prejudicial than in *Wood*. It is *six* weeks after the general election and voting for the January run-off has already started. Over 300,000 absentee ballots have already been received and accepted under the current procedures. As the *Wood* court recognized, Defendants and "the public at large would be significantly injured" if Plaintiffs were permitted to raise these challenges after the general election has already taken place and while voting has already started for the next election. *Id.* at *23-24 (citing *Arkansas United v. Thurston*, 2020 U.S. Dist. LEXIS 2017145 for the axiomatic principle that "the equities do not favor intervention where the election is already in progress and the requested relief would change the rules of the game mid-play.").

III.    **Plaintiffs' Motion for Injunctive Relief Should be Denied.**

Even if Plaintiffs could overcome the jurisdictional defects that are fatal to their claims, they still fail to satisfy the requirements for the extraordinary injunctive relief they seek. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). To prevail on their motion, Plaintiffs are required to show: (1) a substantial likelihood of prevailing on the merits; (2) that the plaintiff will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest. *Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992). The Court "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

**A. Plaintiffs are not likely to succeed on the merits of their claims.**

Plaintiffs raise three constitutional counts in their Complaint, claiming that inconsistent application of signature verification procedures by county elections officials (1) is an undue burden on Plaintiffs' associational and voting rights under the First and Fourteenth Amendment; (2) violates due process under the Fourteenth Amendment; and (3) violates equal protection under the Fourteenth Amendment.

17

Because Plaintiffs' are not substantially likely to succeed on the merits of these claims, their motion for injunctive relief must be denied.

1. *Plaintiffs' claim under the First and Fourteenth Amendments fails because they allege no harm to their voting or associational rights.*

Plaintiffs cannot show a constitutional injury to their right to vote. Typically, when deciding a constitutional challenge to state election laws under the First and Fourteenth Amendments, federal courts apply the *Anderson-Burdick* framework, which balances the burden on the voter with the state's interest in the voting regulation. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008); *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318-19 (11th Cir. 2019).

But, as the *Wood* court recognized, Plaintiffs' claims do not fit within the *Anderson-Burdick* framework. 2020 U.S. Dist. LEXIS 218058 at *25. The first question a court must ask in the *Anderson-Burdick* analysis is whether a state policy imposes a burden on the right to vote. The answer here is clearly "no," which should end the inquiry. Plaintiffs make the attenuated argument that the current signature verification procedures make it too *easy* for absentee ballots to be counted, that this process favors Democrat voters, and that Republican votes are in turn likely to be "diluted." However, both the district court in *Wood* and the Third Circuit Court of Appeals in *Bognet* "squarely rejected" this theory of vote dilution as the basis for a

18

Fourteenth Amendment claim. *Bognet*, 2020 WL 6686120, at *31-2 ( stating that if "dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots" was a constitutional violation, it would "transform every violation of state election law" into a potential federal constitutional claim); *see also Jacobson*, 974 F.3d at 1247 (rejecting partisan vote dilution claim).

The Eleventh Circuit has been clear that the types of voting rights covered by the substantive due process clause in the Fourteenth Amendment are narrow. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). Accordingly, not every "garden variety" election dispute gives rise to a constitutional deprivation that should be entertained in federal court. *Id.* at 1315. Due process does not extend to examining the validity of individual ballots or supervising the administrative details of an election. *Id.* In only "extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation." *Id.*; *see also Wood*, 2020 U.S. Dist. LEXIS 218058 at *35 ("[p]recedent militates against a finding of a due process violation regarding such an ordinary dispute over the counting and marking of ballots") (*citing Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) for the proposition that "If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute.").

Plaintiffs have failed to demonstrate the "extraordinary circumstances" rising to the level of a constitutional deprivation to support their substantive due process claim. They cite generally to *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574 (11th Cir. 1995), but that case does not help their cause. In *Roe*, a circuit court had ordered state election officials to count absentee ballots that had previously been excluded for failure to comply with state law. *Id.* at 581. Although the Eleventh Circuit found that this "post-election departure from previous practice" under state law could "implicate fundamental fairness and the propriety of the elections at issue," it nevertheless refrained from overturning the ruling, and instead certified the question of state law to the Alabama Supreme Court. *Id.* at 581-82. Here, Plaintiffs have not alleged that there are specific unlawful ballots that have been counted that could implicate the propriety of an election, and *Roe* provides no lifeline for their fatally defective substantive due process claim.

Their reliance on *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019) is also misplaced and seeks to turn the holding of that case on its head. There, the State of Florida, like Georgia, reformed its election rules to allow for the cure of rejected absentee ballots. A federal court determined, however, that Florida's cure policy was still too restrictive, and ordered that the cure period be extended 48 hours. *Id.* at 1327. The Eleventh Circuit then *rejected* an effort by the NRSC to stay

20

this order, finding that the lack of a meaningful opportunity for voters to cure rejected absentee ballots imposed at least a "serious burden" on the right to vote that was not outweighed by the state's interest in preventing fraud. *Id.* at 1321-22. Therefore, *Lee* certainly does not support Plaintiffs' argument that this Court should further restrict the state's absentee ballot verification procedures.

2. *Plaintiffs' equal protection claim fails because they cannot show arbitrary and disparate treatment among classes of voters.*

Plaintiffs also have not articulated a cognizable harm that invokes the Equal Protection Clause. In the voting rights context, equal protection means that "[h]aving once granted the right to vote on equal terms, the state may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore,* 531 U.S. 98, 104 (2000) (citation omitted). The Prompt Notification Rule and OEB Guidance are both facially neutral, and Plaintiffs do not explain how either values one person's vote over another or treats voters arbitrarily or disparately. To the contrary, any actions taken by the Defendants here in promulgating rules and issuing guidance were "in a wholly uniform manner across the entire state." *Wood*, 2020 U.S. Dist. LEXIS 218058 at *26. Any alleged irregularities complained of by Plaintiffs, if true, would have taken place at the county level under the supervision of elections officials who are not parties to this case.

21

The Supreme Court's decision in *Bush v. Gore* does not help Plaintiffs, as that case found a violation of equal protection where certain counties were utilizing varying standards for what constituted a legal vote in the 2000 Florida recount. 531 U.S. at 105. Here, the Prompt Notification Rule and OEB Guidance provide uniform and consistent standards in complete harmony with the statutory framework for each county to employ when verifying signatures on absentee ballot envelopes, in order to avoid the kind of ad hoc standards that varied from county to county as found unconstitutional in *Bush v. Gore*. They are the polar opposite of arbitrary and disparate treatment.

3. *Plaintiffs' procedural due process claim fails.*

The Eleventh Circuit expressly rejected Plaintiffs' "novel procedural due process argument" in *New Georgia Project*. 976 F.3d at 1282. Typically, a procedural due process claim raises two inquiries: (1) whether there exists a liberty or property interest which has been interfered with by the State and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *Wood*, 2020 U.S. Dist. LEXIS 218058 at *32 (citing *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 229 (5th Cir. 2020)). While the Eleventh Circuit "does assume that the right to vote is a liberty interest protected by the Due Process Clause," *Wood*, 2020 U.S. Dist. LEXIS 218058 at *33, it has also expressly declined to extend the

strictures of procedural due process to a state's election procedures, as Plaintiffs attempt here. *New Georgia Project*, 976 F.3d at 1282. "The generalized due process argument that the [Plaintiffs] argue[] for would stretch concepts of due process to their breaking point." *Id.* Accordingly, the Eleventh Circuit clarified that due process claims involving state election procedures should be analyzed under the *Anderson-Burdick* framework. And, as discussed above, Plaintiffs fail to show an undue burden on their right to vote that rises to the level of a constitutional deprivation.

In sum, because Plaintiffs are not likely to succeed on the merits of any of their constitutional claims, injunctive relief must be denied.

**B. Plaintiffs face no irreparable harm if the status quo is maintained.**

Plaintiffs cite the "competitive injury their members will suffer absent relief" as irreparable harm. However, the Eleventh Circuit has recognized that "[v]oters have no judicially enforceable interest in the outcome of an election." *Jacobson*, 974 F.3d at 1246. Plaintiffs also rely on the general notion that restrictions on the right to vote constitute irreparable harm, but Plaintiffs have not alleged that the State Defendants have actually imposed any unconstitutional restrictions on the right to vote. Instead, as discussed above, Plaintiffs' "allegations are the quintessential generalized grievance," and they have "not presented any evidence demonstrating

23

how [they] will suffer any particularized harm by the denial of this motion." *Wood*, 2020 U.S. Dist. LEXIS 218058, *37.

**C.  The balance of equities and public interest weigh heavily against an injunction.**

The remaining injunction factors—balancing the equities and public interest—are frequently considered "in tandem" by courts, "as the real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018), *aff'd in part, appeal dismissed in part*, 761 F. App'x 927 (11th Cir. 2019). The Court must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," paying "particular regard as well for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

Here, "the threatened injury to Defendants as state officials and the public at large far outweigh any minimal burden on [Plaintiffs]." *Wood*, 2020 U.S. Dist. LEXIS 218058 at *38. "Confidence in the integrity of our electoral process is essential to the functioning of our participatory democracy," and court orders affecting elections "can themselves result in voter confusion and consequent

incentive to remain away from the polls." *Purcell*, 549 U. S. at 4-5. For this reason, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (April 6, 2020) (per curiam).

"That mantra has consistently pointed the Supreme Court in one direction—allowing the States to run their own elections." *New Ga. Project*, 976 F.3d at 1283. Indeed, the Supreme Court and Eleventh Circuit have repeatedly stayed lower court injunctions that altered election rules once the 2020 general election cycle commenced. *Id.* (collecting cases). Similarly here, the run-off election *is already in process*, and Plaintiffs seeks relief that, if fully granted, would result in the disruption of ongoing electoral processes, with the potential for voter confusion and wide-spread disenfranchisement. Any theoretical fear of injury that Plaintiffs might have pales in comparison to the potential chaos and disruption that would result from the grant of the requested relief and the potential harm not only to county officials operating under limited resources, but also to voters who run the risk of having their ballots rejected due to last-minute changes in procedures.

In sum, Plaintiffs' motion should be denied and the action should be dismissed.

Respectfully submitted, this 16th day of December, 2020.

Christopher M. Carr        112505
Attorney General
Bryan K. Webb        743580
Deputy Attorney General
Russell D. Willard        760280
Senior Assistant Attorney General


*/s/ Charlene S. McGowan*
Charlene S. McGowan        697316
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
404-458-3658 (tel)


*Attorneys for State Defendants*

26

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing has been formatted using Times New Roman font in 14-point type in compliance with Local Rule 7.1(D).

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **STATE DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS AND RESPONSE TO PLAINTIFFS' MOTION FOR TRO AND PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel for all parties of record via electronic notification.

Dated: December 16, 2020.

/s/ *Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General