## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GEORGIA REPUBLICAN PARTY, INC., NATIONAL REPUBLICAN SENATORIAL COMMITTEE, PERDUE FOR SENATE, and GEORGIANS FOR KELLY LOEFFLER,<br><br>   Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, REBECCA N. SULLIVAN, in her official capacity as the Vice Chair of the State Election Board, DAVID J WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacity as Members of the State Election Board,<br><br>   Defendants,<br><br>  and<br><br>DEMOCRATIC PARTY OF GEORGIA and DSCC,<br><br>   Intervenor-Defendants. | Case No. 1:20-cv-05018-ELR |

## INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

I.   INTRODUCTION...........................................................................................1

II.  BACKGROUND............................................................................................2

   A.  Signature Matching in Georgia.................................................................2

   B.  Plaintiffs' Suit .......................................................................................4

III. LEGAL STANDARD ...................................................................................5

IV.  ARGUMENT................................................................................................6

   A.  Plaintiffs fail to allege any injury sufficient for standing................................6

   B.  Plaintiffs cannot succeed on the merits. .........................................................9

      1.  Plaintiffs cannot demonstrate any burden on the right to vote. .................10

      2.  Plaintiffs cannot succeed on their due process claim.................................13

      3.  Plaintiffs cannot succeed on their equal protection claim. .......................17

   C.  Plaintiffs have not demonstrated irreparable harm........................................19

   D.  Neither the balance of the equities nor the public interest favor Plaintiffs...21

   E.  The principles animating the Supreme Court's recent elections jurisprudence

   counsel against an injunction here.......................................................................23

V.  CONCLUSION ................................................................................................24

## I.   INTRODUCTION

Less than two weeks before Georgia begins processing absentee ballots for its January 5, 2021 runoff election, Plaintiffs ask this Court to upend a signature matching regime that has been on the books for nearly a decade and related guidance that has been in place for well over eight months (and used without incident in the prior three elections). Plaintiffs seek to use the power of this Court to revise the rules of Georgia's elections to ensure that more lawful voters are indiscriminately disenfranchised. Similar efforts have rightfully been rejected by other federal courts. *See generally Wood v. Raffensperger*, No. 1:20-cv-04651-SDG, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020) ("*Wood I*"), *aff'd*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020) ("*Wood II*"); Tr. of Motions Hearing, *Pearson v. Kemp*, No. 1:20-CV-4809-TCB (N.D. Ga. Dec. 7, 2020) ("*Pearson* Tr.") (attached as Ex. 1). This effort should fail, too. As a threshold matter, Plaintiffs lack standing to bring their claims. But even if they could clear that jurisdictional hurdle, they have failed to satisfy any of the requirements necessary to justify the extraordinary injunctive relief they seek: (1) they are not likely to succeed on the merits, as Georgia's signature matching procedures do not burden Plaintiffs' right to vote, are not fundamentally unfair, and do not deprive Plaintiffs of any liberty interests; (2) they have failed to establish that absent an injunction they will suffer irreparable harm, relying instead

on the same kind of rank speculation about potential fraud that federal courts have repeatedly found insufficient to even sustain jurisdiction, much less justify injunctive relief; and (3) the balance of the equities and public interest both weigh heavily against their requested relief. The U.S. Supreme Court has continually and vehemently cautioned federal courts against doing exactly what Plaintiffs ask this Court to do here—upend the rules of an election just weeks before ballots will be counted. Plaintiffs have provided no basis for this Court to deviate from this repeated admonition. The motion should be denied.

## II.    BACKGROUND

### A.    Signature Matching in Georgia

Since 2012, Georgia law has provided that upon receipt of an absentee ballot,

[T]he registrar or clerk shall . . . compare the signature or mark on the oath with the signature or mark on the absentee elector's voter registration card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or mark taken from said card or application, and shall, if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath.

O.C.G.A. § 21-2-386. If the signature does not appear valid, then it is rejected. *Id*.

On November 6, 2019, Intervenor-Defendants Democratic Party of Georgia, Inc. ("DPG") and DSCC, among others, sued Defendant Brad Raffensperger, Georgia's Secretary of State (the "Secretary"), and members of the State Election

Board (together with the Secretary, "Defendants"), in *Democratic Party of Ga., Inc. v. Raffensperger*, No. 1:19-cv-5028-WMR (N.D. Ga. Nov. 6, 2019), challenging Georgia's signature matching laws under the First and Fourteenth Amendments to the U.S. Constitution on the grounds that they burdened the right to vote by arbitrarily and unjustifiably disenfranchising lawful Georgia voters. After several weeks of arms-length negotiations, the parties publicly filed a settlement agreement with the Court on March 6, 2020 (the "Settlement Agreement").

That Settlement Agreement did not modify Georgia law. Instead, the Secretary and the State Board agreed to exercise their ordinary powers to issue rules and guidance to help ensure the uniform and fair treatment of voters within the existing statutory framework. Subsequently, on May 1, the Secretary issued an Official Election Bulletin ("OEB"), which required review of allegedly mismatched signatures by two additional registrars, deputy registrars, or absentee ballot clerks. It also required counties to continue to verify absentee voters' identities by comparing signatures as required by Georgia law. *See* Ex. 2, at 1. The OEB was widely publicized and was in place for each of the state's 2020 elections, including the June 9 primary, August 11 primary runoff, and November 3 general and special U.S. Senate elections. Accordingly, officials in Georgia rejected absentee ballots for signature mismatches under these rules and the Election Code during these elections.

**B.    Plaintiffs' Suit**

On November 3, Georgia held its election and special U.S. Senate elections. Georgia law requires a winning candidate to receive "a majority of the votes cast." O.C.G.A. § 21-2-501(a)(1). If no candidate surpasses the 50 percent threshold, then the state holds a runoff election between the two candidates that received the highest vote totals. *Id*. Because no candidate for either U.S. Senate seat won a majority, Georgia will hold a runoff election on January 5, 2021. *See* Pls.' Mot. for TRO and Prelim. Inj. ("Mot."), ECF No. 2-1, at 1.

Plaintiffs initiated this challenge to Georgia's signature matching process on December 10, 2020—only 11 days before processing of absentee ballots for the runoff election was set to commence. *See* Verified Compl. ("Compl."), ECF No. 1, ¶ 12. Voting in the election is already well underway. Advance voting began on Monday and, as of two days ago, roughly 1.2 million voters had requested absentee ballots, with more than 200,000 already returned. *See* Alexa Corse, *Georgia Senate Runoffs Early Voting Begins as Requests for Mail-in Ballots Top 1 Million*, Wall St. J. (Dec. 14, 2020), https://www.wsj.com/articles/georgia-senate-runoffs-early-voting-begins-as-requests-for-mail-in-ballots-top-1-million-11607953020.

Plaintiffs' complaint alleges three claims for relief: an undue burden on the right to vote in violation of the First and Fourteenth Amendments, Compl. ¶¶ 77–

89; violation of the Due Process Clause, *id.* ¶¶ 90–98; and violation of the Equal Protection Clause, *id.* ¶¶ 99–107. Plaintiffs also filed their motion for immediate injunctive relief on December 10, asking this Court to direct:

> (1) Georgia election officials to conduct a meaningful signature matching process; (2) that three election officials review the voter's signature on the absentee ballot to ensure that it matches the voter's reference signatures so that there is sufficient assurance that a lawful ballot has been cast; and (3) require that observers from the parties participating in the election be permitted to view the signature matching process by a means and in a manner sufficient to meaningfully observe signature matching and report any irregularities in the process.

Mot. 2–3.

## III.   LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted unless the movant clearly carries the burden of persuasion," *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). The moving party must show:

> (1) a substantial likelihood that he will ultimately prevail on the merits; (2) a showing that he will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to him outweighs the harm the injunction may cause the opposing party; and (4) a showing that granting the injunction would not be adverse to the public interest.

*Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992); *see also Wood I*, 2020 WL 6817513, at *4  (noting identical standards for TRO and preliminary injunction).

# IV.   ARGUMENT

## A.   Plaintiffs fail to allege any injury sufficient for standing.

As a threshold matter, Plaintiffs are unlikely to succeed on their claims here because the Court lacks jurisdiction to hear them due to Plaintiffs' lack of standing. To demonstrate Article III standing, a plaintiff must have suffered an injury in fact. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs equal protection, due process, and undue burden claims boil down to four alleged injuries, none of which is sufficient for standing. This Court should reject their motion on that basis alone.

*First*, Plaintiffs' claim that they are injured because Georgia's signature matching process results in more unlawful votes being counted, thereby diluting the lawful votes of their members, is not cognizable. *See* Mot. 20. The purported injury of vote-dilution-through-unlawful-balloting has been repeatedly rejected as a viable basis for standing, and for good reason: supposed vote dilution caused by counting supposedly improper votes would affect *all* Georgia voters, not just Plaintiffs' members, making it no more than a generalized grievance. *See, e.g.*, *Bognet v. Sec'y of Commonwealth*, 980 F.3d 336, 354–56 (3d Cir. 2020) ("Th[e] conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment."); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445

– 6 –

JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (finding vote-dilution theory too speculative to confer standing); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) (concluding vote-dilution theory amounted to generalized grievance that could not confer standing); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020) (similar).

Plaintiffs purport to rely upon the Eleventh Circuit's recent decision in *Wood v. Raffensperger*, 2020 WL 7094866 ("*Wood II*"), to support their vote-dilution theory, *see* Mot. 20, but that case actually undermines their position. While the Eleventh Circuit noted that vote dilution *could* be a basis for standing, it explained that this theory requires a basis of comparison, such as in the contexts of racial gerrymandering and malapportionment, *see id.* at *5—a requirement that is not present here. The court *rejected* almost the exact same theory of standing Plaintiffs offer here—that Georgia's signature matching procedures dilute votes—explaining that, in contrast to malapportionment and racial gerrymandering cases, "'no single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" *Id.* (quoting *Bognet*, 980 F.3d at 356). Thus, the court concluded that a theory of vote-dilution injury like Plaintiffs' "is a 'paradigmatic generalized grievance that cannot support standing.'" *Id.* (quoting *Bognet*, 980 F.3d

at 356). This conclusion applies not only to voters, but also to the organizations and campaigns that purport to represent them and seek their votes, like Plaintiffs here. *See, e.g.*, *Cegavske*, 2020 WL 5626974, at *4 (concluding that candidate and political party lacked standing based on vote-dilution theory).

*Second*, Plaintiffs' claim that disparate implementation of signature matching in Georgia's counties constitutes a sufficient harm, *see* Mot. 20–21, but it is well-established that this type of allegedly differential treatment is not by itself a cognizable harm. Importantly, Plaintiffs have *not* alleged that they or their members were prevented from voting or had their votes denied based on signature matching. Nor do Plaintiffs allege that any voters were treated differently because of a suspect classification or that disparate treatment caused a deprivation of a fundamental right. Instead, they merely claim an injury because "the state is *not* imposing a restriction on *someone else's* right to vote." *Donald J. Trump for President, Inc. v. Boockvar*, No. 4:20-CV-02078, 2020 WL 6821992, at *12 (M.D. Pa. Nov. 21, 2020) (quoting *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *44 (W.D. Pa. Oct. 10, 2020)), *aff'd sub nom. Donald J. Trump for President, Inc. v. Sec'y of Commonwealth*, No. 20-3371, 2020 WL 7012522 (3d Cir. Nov. 27, 2020). The mere fact of some differential treatment of voters within a state does not alone constitute an injury absent resulting harm to Plaintiffs.

– 8 –

*Third*, Plaintiffs' alleged diversion of resources to combat the speculative vote dilution they believe results from Defendants' conduct does not confer standing. *See* Mot. 21. Spending money to combat a speculative injury cannot alchemize that expenditure into a cognizable injury for Article III purposes, since a plaintiff "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Vote dilution is a prototypical speculative harm, and spending money to combat it does not morph it into a concrete harm for Article III standing. *See Cegavske*, 2020 WL 5626974, at *5.

*Fourth*, any purported harm to Plaintiffs' candidates' electoral prospects also fails to provide a basis for standing. *See* Mot. 20–21. This harm is based on the same speculative vote-dilution theory that courts nationwide have repeatedly rejected as sufficiently concrete to demonstrate injury. Plaintiffs have provided no evidence whatsoever for this contention and do not even *explain* why their candidates would be harmed electorally, let alone prove it. Absent evidence to the contrary, it is just as likely that unlawfully cast ballots would *help* their candidates as harm them.

## B. Plaintiffs cannot succeed on the merits.

Even if Plaintiffs had standing to assert their causes of action, they have failed to demonstrate that they are likely to succeed on the merits of their claims.

### 1.    Plaintiffs cannot demonstrate any burden on the right to vote.

Plaintiffs' right to vote claim—which, "like Frankenstein's Monster, has been haphazardly stitched together from two distinct theories in an attempt to avoid controlling precedent," *Boockvar*, 2020 WL 6821992, at *4—is an unwieldy amalgamation of vote dilution and fundamental unfairness, neither of which is applicable to their alleged circumstances. *See* Mot. 11–15.

Plaintiffs suggest that "[t]he failure to prevent the imminent counting of unlawful absentee ballots will result in the dilution of the lawfully cast ballots of Plaintiffs' members." Mot. 10. But vote dilution is a viable basis for Equal Protection Clause claims only in certain contexts, such as when laws structurally devalue one community's votes over another's—a fundamental fact underscored by *Reynolds v. Sims*, on which Plaintiffs incorrectly rely. *See* 377 U.S. 533, 568 (1964) ("[A]n individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."); *see also, e.g.*, *Bognet*, 2020 WL 6686120, at *11 ("[V]ote dilution under the Equal Protection Clause is concerned with votes being weighed differently."). A court in this District has already rejected a purported vote dilution claim nearly identical to Plaintiffs'. *See Wood I*, 2020 WL 6817513, at *8–10. Such an injury is not "cognizable in the equal protection framework." *Id* at 10.

Plaintiffs cannot identify a single apposite precedent adopting their theory.[1] This is unsurprising: the claim of vote dilution based on fears of potential fraud is speculative and applies to all voters equally, making it an ill-fit for an equal protection challenge. *Cf. Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020) ("All binding authority to consider the burdensome effects of disparate treatment on the right to vote has done so from the perspective of only affected electors—not the perspective of the electorate as a whole."). And there is no authority for transmogrifying the vote-dilution line of cases into a requirement that the federal judiciary manage election procedures and disenfranchise lawful voters based on a plaintiff's (speculative) claims of unlawful balloting. "That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at *11; *cf. Short v. Brown*, 893 F.3d 671, 677–78 (9th Cir. 2018) ("Nor have the appellants cited any authority

---

[1] *Roe v. Alabama ex rel. Evans*, 43 F.3d 574 (11th Cir. 1995) (per curiam), on which Plaintiffs rely throughout their briefing, is readily distinguishable. There, the Eleventh Circuit considered the constitutionality of a state court order that permitted the counting of contested absentee ballots after an election; in other words, "a retroactive change in the election laws" that would have "constitute[d] a post-election departure from previous practice." *Id.* at 578–79, 581. It was on *this* distinguishable basis that the court determined that "counting ballots that were not previously counted would dilute the votes of those voters who met the requirements" of Alabama's election laws, *id.* at 581—*not* on the theory that unlawfully cast ballots *might* be cast and counted in a future election.

– 11 –

explaining how a law that makes it easier to vote would violate the Constitution.").[2] Instead, courts have rejected such efforts. *See Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031–32 (8th Cir. 2013); *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 827–28 (1st Cir. 1980); *Boockvar*, 2020 WL 5997680, at *67–68.

Moreover, although Plaintiffs incorrectly and inexplicably include a substantive due process argument premised on fundamental unfairness as a component of their right to vote claim, *see* Mot. 11–13, for the reasons discussed in Section IV.B.2 *infra*, Plaintiffs have demonstrated no such violation. At most, the harms they complain of are no more than "garden variety election irregularities [that] do not violate the Due Process Clause," as at least two courts considering similar claims challenging Georgia's signature matching regime have concluded in recent weeks. *Wood I*, 2020 WL 6817513, at *12 (quoting *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998)); *see also Pearson* Tr. at 41:15-42:15.

In short, Plaintiffs have failed to plead or prove *any* infringement of their right

---

[2] Indeed, "if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop the illegal activity.'" *Bognet*, 2020 WL 6686120, at *11 (quoting *Boockvar*, 2020 WL 5997680, at *46).

to vote,[3] and the two theories they invoke are not viable under these circumstances.

### 2.   Plaintiffs cannot succeed on their due process claim.

Next, Plaintiffs suggest that Georgia's signature verification process violates their due process rights. *See* Mot. 15–18. But they have neither pleaded nor proved a viable due process violation, either substantively or procedurally.

Sealing Plaintiffs' fate is the fact that just *a few weeks ago*, another judge in this very District—in considering almost identical claims concerning the efficacy of Georgia's signature matching regime—found that the plaintiff's allegations of "fundamental unfairness" and "speculat[ion] as to wide-spread impropriety" amounted to no more than "'garden variety' election dispute[s]" and, as such, failed to establish a viable substantive due process claim. *Wood I*, 2020 WL 6817513, at *12. Accordingly, Plaintiffs' woefully inadequate due process claim is a nonstarter; their inability to succeed on the merits has already been adjudicated in this District.

Even setting aside this significant precedent, Plaintiffs cannot succeed on either a procedural or substantive due process claim. A procedural due process claim raises two inquires: (1) "whether there exists a liberty or property interest which has

---

[3] Although Plaintiffs suggest that the *Anderson-Burdick* balancing test applies to this claim, *see* Mot. 11, that framework is only implicated "[i]f a fundamental right is implicated," *Wood I*, 2020 WL 6817513, at *8—which is not the case here, since Plaintiffs do not allege any sort of infringement on the right to vote.

been interfered with by the State," and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). Although Plaintiffs identify "voting [as] a protected liberty interest," Mot. 17, they never allege an infringement or barrier in their supporters' right to vote. Instead, their procedural due process claim is actually premised on the alleged "depriv[ation] of equal or consistent standards in how absentee ballot signatures are verified." *Id.* at 15. But Plaintiffs do not have a liberty or property interest in enforcing state election procedures where, as here, the right to vote is not curtailed or even affected in any way by those procedures. *See Wood I*, 2020 WL 6817513, at *11 ("[T]he circuit court has expressly declined to extend the strictures of procedural due process to 'a State's election procedures.'" (quoting *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020)). Plaintiffs therefore have not alleged a viable procedural due process claim.

Furthermore, Plaintiffs cannot succeed on their substantive due process claim premised on fundamental unfairness. "Federal courts should not 'involve themselves in garden variety election disputes.'" *Serpentfoot v. Rome City Comm'n*, No. 4:09-CV-0187-HLM, 2010 WL 11507239, at *16 (N.D. Ga. Mar. 3, 2010) (quoting *Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 580 (11th Cir. 1995) (per curiam)); *accord Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986) ("Only in extraordinary

circumstances will a challenge to a state election rise to the level of a constitutional deprivation."); *Wood I*, 2020 WL 6817513, at *12 (same). Indeed, "[t]he Constitution is not an election fraud statute," *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986)), and it "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980); *see also Pettengill v. Putnam Cnty. R-1 Sch. Dist.*, 472 F.2d 121, 122 (8th Cir. 1983) (per curiam) (finding no cases "which authorize a federal court to be the arbiter of disputes . . . over alleged irregularities in the transmission and handling of absentee voter ballots"); *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) (noting that even "a deliberate violation of state election laws by state election officials does not transgress against the Constitution" (quoting *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987)).[4]

---

[4] Notably, the Fifth Circuit *rejected* a due process claim based on a similar slew of alleged irregularities, including "complaints about missing signatures, ballots that should have been mailed rather than hand-delivered, and six fraudulent votes"—*even though the contested ballots were enough to decide the election*—explaining that such claims implicated only "'garden variety' election disputes" for which "states," not federal courts, "are primarily responsible." *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985). This and other courts have rejected constitutionalizing every election dispute. *See, e.g.*, *Gamza*, 619 F.3d at 453; *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970).

Instead, it is only where "a pervasive error [] undermines the integrity of the vote" that the Constitution is implicated; specifically, as the Ninth Circuit explained after considering cases where election irregularities rose to the level of constitutional violations, where "two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." *Bennett*, 140 F.3d at 1226–27; *cf. id.* at 1227 n.3 (noting that wholesale disenfranchisement of "entire electorate [] when legally required election did not occur" and "outrageous racial discrimination" might rise to level of "fundamental[] unfair[ness]" (quoting *Griffin v. Burns*, 570 F.2d 1065, 1080 (1st Cir. 1978))). In other words, the sort of unconstitutional irregularity that courts have entertained consists of widescale disenfranchisement— and Plaintiffs' allegations and evidence fall far short of such extreme circumstances. Plaintiffs do not allege *dis*enfranchisement at all; their due process theory is based on the alleged *en*franchisement of voters whose signatures might not have been properly verified. But "the due process clause . . . offer[s] no guarantee against errors in the administration of an election," *Powell*, 436 F.2d at 84, and absent allegations (let alone evidence) of widescale disenfranchisement, Plaintiffs cannot prevail on their substantive due process claim. *See Wood I*, 2020 WL 6817513, at *12.

### 3.    Plaintiffs cannot succeed on their equal protection claim.

Finally, Plaintiffs' equal protection claim fails as well. *See* Mot. 18–20. The gravamen of this claim is Plaintiffs' contention that "standards for accepting or rejecting signatures on absentee ballots var[y] from county to county." Mot. 18. The primary authority on which they rely for this claim—*Bush v. Gore*, 531 U.S. 98 (2000) (per curiam)—does not provide the support they need.[5]

In *Bush*, the U.S. Supreme Court considered "whether the use of standardless manual recounts" by some, but not all, Florida counties violated the Equal Protection Clause. *Id.* at 103. The Court specifically clarified that it was *not* deciding "whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Id.* at 109. Instead, it was addressing a situation which lacked even "minimal procedural safeguards." *Id*.

Here, by contrast, Georgia law and the Secretary's uniform guidance on signature matching provide the standards required by *Bush*. Whatever deviation might exist between counties in their application of these standards does not, under *Bush*'s, constitute a constitutional violation. Courts must

---

[5] Plaintiffs also cite *Moore v. Ogilvie*, 394 U.S. 814 (1969), and *Gray v. Sanders*, 372 U.S. 368 (1963), *see* Mot. 18, but these cases involved unequal distribution of voting power across counties in violation of the "one person, one vote" principle— *not*, as alleged here, misapplication of state law by certain counties.

> recognize a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause.

*Gamza*, 619 F.2d at 453; *see also Boockvar*, 2020 WL 5997680, at \*60 (rejecting equal protection claim where "[t]he Secretary's guidance . . . is uniform and nondiscriminatory" and "applies equally to all counties, and by extension, voters").

Even *if* such differentiation could amount to an equal protection claim, Plaintiffs have failed to demonstrate that any purported noncompliance or deviation from statewide requirements exists. Plaintiffs' entire case rests on a report by Dr. Jason Sorens that claims that certain counties in Georgia have anomalously low rates of signature matching rejections, *see* Mot. Ex. A, and a report by Scott Gessler, a former Secretary of State of Colorado, which asserts that Georgia's rate of signature rejections is low compared to other states, *see id.* Ex. B. But as the expert report of Dr. Jonathan Rodden demonstrates, *see* Ex. 3 ("Rodden Rep."), neither assertion holds up to even the most cursory of inspections. The distribution of signature rejections across counties in Georgia—where the vast majority of counties reject zero or very few ballots, and a small handful of counties reject many—is "ubiquitous" in states that have signature matching laws and says nothing about the efficacy or inefficacy of Georgia's signature matching regime. Rodden Rep. at 3.

– 18 –

Furthermore, Dr. Sorens's method for concluding that some counties' rates are "too low"—which involves, "without any other information, simply [] observing cross-county distributions of rejections"—"makes no sense." *Id.* at 4. There is no plausible reason for counties to converge around some average rate of rejection.

Similarly, Georgia's average rate of rejection statewide does not stand out when conducting a proper cross-state comparison. Colorado—the state which Mr. Gessler chooses as a comparator—has a particularly aggressive signature match regime. *See id.* at 9-10. In contrast, most other states have less aggressive rejection rates; Georgia's rejection rate is closer to the median state rejection rate, and was *above* that rate in 2016 and 2018. *Id.* at 10. Moreover, Georgia's declining rejection rate from 2014 to 2018 does not warrant the suspicion Dr. Sorens expresses, as this "is in line with a national trend toward lower rejection rates over the same period." *Id*. Simply put, there is nothing in the data, properly analyzed, to suggest that certain counties in Georgia are rejecting ballots at an anomalously low rate, or that Georgia is rejecting ballots at a substantially lower rate than the average state.

## C.   Plaintiffs have not demonstrated irreparable harm.

"A showing of irreparable harm is 'the *sine qua non* of injunctive relief.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th

Cir. 1978)). "[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Such injury must be "actual and imminent," not "remote [or] speculative." *Id.* (quoting *Gen. Contractors*, 896 F.2d at 1285).

Plaintiffs have failed to establish that they will suffer any harm, much less irreparable harm, if their requested relief is denied. The only bases for harm cited by Plaintiffs are inapposite. *First*, they claim that they "will suffer irreparable injury [] through the diversion of resources from supporting its candidates." Mot. 22. But any such harm is a self-inflicted effort to fight vote dilution that is insufficient for standing or irreparable harm. *See supra* Section IV.A. *Second*, Plaintiffs contend that they will be suffer harm "from the competitive injury their members will suffer absent relief." Mot 22. But as discussed in Section IV.A *supra*, Plaintiffs theory here is based on the same underlying vote-dilution rationale repeatedly rejected by courts nationwide. Plaintiffs do not even *explain* why their candidates would be harmed electorally, let alone prove it, and it is just as likely that unlawfully cast ballots would *help* their candidates as harm them. *Third*, Plaintiffs note that "[a] restriction on the fundamental right to vote constitutes irreparable injury." Mot 22. But they have neither alleged nor proved any abridgment of the right to vote.

**D.     Neither the balance of the equities nor the public interest favor Plaintiffs.**

In election cases, courts often consider the remaining two factors—the balance of equities and public interest—together. *See, e.g.*, *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). Both factors militate against injunctive relief.

*First*, Plaintiffs' case is untimely. Plaintiffs waited until the eve of early voting in this high-profile election to bring their claims, the factual underpinnings of which have been known to them for several months—more likely, several years. At a minimum, this constitutes an unreasonable delay in filing, which greatly prejudices the administration of the election and is furthermore barred by the equitable doctrine of laches. *See, e.g.*, *Smith v. S.C. Election Comm'n*, 874 F. Supp. 2d 483, 498 (D.S.C. 2012) (considering laches under balance of equities prong of preliminary injunction standard); *Wood I*, 2020 WL 6817513 (denying a request for a temporary injunction related to Georgia's signature matching procedures because laches barred similarly delayed claims).[6] Nor do Plaintiffs' assertions that they could not bring this suit until after the November 3 election save them. Indeed, as Dr. Rodden's analysis

_____

[6] Such an inexcusable delay also weakens any claim to irreparable injury. *See, e.g.*, *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action . . ." (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959))).

demonstrates, Georgia's rate of rejecting signatures—the purported impetus for this suit—has been steadily declining for several years and did not just suddenly begin declining in November. *See* Rodden Rep. at 10. Moreover, even if that were not the case, Georgia's signature matching rejection rates for the November 2020 election have been known since early November, and at least four other lawsuits invoking them have been brought (and dismissed) well before Plaintiffs' December 10 filing. *See generally Wood I*, 2020 WL 6817513; *Pearson* Tr.; *Boland v. Raffensperger*, No. 2020CV343018 (Ga. Super. Ct. Dec. 8, 2020) (attached as Ex. 4); *Wood* v. *Raffensperger*, No. 2020-CV-342959 (Ga. Super. Ct. Dec. 8, 2020) (attached as Ex. 5). Accordingly, it is plain that Plaintiffs could have and should have raised their claims much earlier, and that they have no excuse for their delay.

*Second*, Plaintiffs have failed to demonstrate how their preferred remedies will benefit the voters of Georgia. "[A]llowing for easier and more accessible voting for all segments of society serves the public interest." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1224 (N.D. Fla. 2018). The public interest is best "served by ensuring that qualified absentee voters have the opportunity to vote and, more importantly, have their votes counted." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1347 (N.D. Ga. 2018). Plaintiffs' lawsuit is in direct opposition to these principles; their requested relief

would, in fact and by design, cause irreparable injury to voters, as the rejection of more absentee ballots appears to be precisely what Plaintiffs seek. And as this Court recently explained, "[i]t is well-settled that an infringement on the fundamental right to vote amounts in an irreparable injury." *New Ga. Project v. Raffensperger*, No. 1:20-CV-01986-ELR, 2020 WL 5200930, at *26 (N.D. Ga. Aug. 31, 2020).

**E.    The principles animating the Supreme Court's recent elections jurisprudence counsel against an injunction here.**

Relatedly, even if Plaintiffs had pleaded and proved legitimate constitutional claims (they have not), they filed a case asking a federal court to issue an injunction that would drastically alter state voting procedures *less than one week* before the state was set to begin using those procedures. This very action blatantly ignores the U.S. Supreme Court's repeated admonition that such late-hour disruptions should be scrupulously avoided. While the Supreme Court's decision in *Purcell v. Gonzalez* certainly does not *prohibit* the federal judiciary from interceding close to elections to defend the Constitution, it advises federal courts to tread carefully when deciding whether to do so. *See* 549 U.S. 1, 5–6 (2006) (per curiam) (staying injunction due to "the imminence of the election and the inadequate time to resolve the factual disputes" in order to allow election to proceed with settled rules). Here, granting an injunction would inject confusion for administrators and voters. Even if Plaintiffs' constitutional claims were not woefully insufficient, the weight of recent precedent

– 23 –

clearly demonstrates that an injunction would be inappropriate in this case.

Indeed, one need only look at the Supreme Court's election jurisprudence in the last eight months to see repeated warnings to tread carefully close to elections. The Court has invoked this principle to stay remedial injunctions even when confronted with demonstrable constitutional violations. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (2020); *Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020). And it has also affirmed district courts' decisions to stay their hands when asked to invalidate procedures announced by states' election officials. *See, e.g.*, *Moore v. Circosta*, No. 20A72, 2020 WL 6305036, at *1 (U.S. Oct. 28, 2020) (affirming district court's denial of injunction against consent decree entered by Secretary of State). The Court has emphasized that "federal courts ordinarily should not alter state election rules in the period close to an election." *Andino*, 2020 WL 5887393, at *1 (Kavanaugh, J., concurring). Plaintiffs' provide no basis to derogate from that principle.

## V.   CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: December 16, 2020        Respectfully submitted,

**<u>Adam M. Sparks</u>**
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Susan P. Coppedge
Georgia Bar No. 187251
Adam M. Sparks
Georgia Bar No. 341578
KREVOLIN & HORST, LLC
1201 W. Peachtree Street, NW
Suite 3250, One Atlantic Center
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
John M. Geise*
Henry J. Brewster**
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, D.C. 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com
jgeise@perkinscoie.com
hbrewster@perkinscoie.com

Laura Hill**
Jonathan P. Hawley**
PERKINS COIE LLP

1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
lhill@perkinscoie.com
jhawley@perkinscoie.com

*Counsel for Proposed Intervenor-
Defendants*
 **Pro Hac Vice Application Pending*
 ***Pro Hac Vice Application Forthcoming*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| GEORGIA REPUBLICAN PARTY, INC., NATIONAL REPUBLICAN SENATORIAL COMMITTEE, PERDUE FOR SENATE, and GEORGIANS FOR KELLY LOEFFLER,<br><br>        Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, REBECCA N. SULLIVAN, in her official capacity as the Vice Chair of the State Election Board, DAVID J WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacity as Members of the State Election Board,<br><br>        Defendants. | Case No. 1:20-cv-05018-ELR |

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: December 16, 2020.        **<u>Adam M. Sparks</u>**
*Counsel for Proposed Intervenor-Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| GEORGIA REPUBLICAN PARTY, INC., NATIONAL REPUBLICAN SENATORIAL COMMITTEE, PERDUE FOR SENATE, and GEORGIANS FOR KELLY LOEFFLER,<br><br>        Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, REBECCA N. SULLIVAN, in her official capacity as the Vice Chair of the State Election Board, DAVID J WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacity as Members of the State Election Board,<br><br>        Defendants. | Case No. 1:20-cv-05018-ELR |

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2020, I electronically filed this document with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record.

Dated: December 16, 2020

**Adam M. Sparks**
*Counsel for Proposed Intervenor-Defendants*