# Exhibit 1

```
1                    United States District Court
                      Northern District Of Georgia
2                         Atlanta Division

3

4    Coreco Jaqan Pearson,    )
     et al.,                  )
5                             )
                   Plaintiff, )
6                             )        Civil Action
               vs.            )        File No. 1:20-CV-4809-TCB
7                             )
                              )        Atlanta, Georgia
8    Brian Kemp, et al.,      )        Monday December 7, 2020
                              )        10:00 a.m.
9                  Defendant. )
     _____ )
10

11

12                   Transcript of Motions Hearing
             Before The Honorable Timothy C. Batten, Sr.
13                    United States District Judge

14

15   APPEARANCES:

16        FOR THE PLAINTIFFS:          Sidney Powell
                                       Harry MacDougald
17                                     Attorneys at Law

18        FOR THE DEFENDANTS:          Carey Allen Miller
                                       Joshua Barret Belinfante
19                                     Charlene Swartz McGowan
                                       Melanie Leigh Johnson
20                                     Attorneys at Law

21

22

23   Lori Burgess, Official Court Reporter
     (404) 215-1528
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by CAT.
```

1       THE COURT:  Good morning.  I would like to point out
2   that this hearing is being audio streamed nationally, so
3   whatever you say near your microphones will be picked up for
4   the world to hear, so you might want to be discreet in what
5   you have to say this morning with the microphones.  Also, I
6   would ask that -- each of y'all should have some plastic bags.
7   As you leave the lectern, take the bag with you, and the next
8   person who comes up should put a new bag.  You all have bags,
9   right?  Okay.  So that is what we are going to do.  All right.
10      In this case, the Plaintiffs are a group of
11  disappointed Republican presidential electors.  They assert
12  that the 2020 presidential election in Georgia was stolen, and
13  that the results, Joe Biden winning, occurred only because of
14  massive fraud.  Plaintiffs contend that this massive fraud was
15  manifest primarily, but not exclusively, through the use of
16  ballot stuffing.  And they allege that this ballot stuffing
17  has been rendered virtually invisible by computer software
18  created and run by foreign oligarchs and dictators from
19  Venezuela to China to Iran.
20      The defendants deny all of Plaintiffs' accusations.
21  They begin in their motions to dismiss by rhetorically asking
22  what a lot of people are thinking, why would Georgia's
23  Republican Governor and Republican Secretary of State, who
24  were avowed supporters of President Trump, conspire to throw
25  the election in favor of the Democratic candidate for

1    President.

2         We are going to turn now to the legal arguments.  We

3    have several motions today, but primarily they are grouped

4    into two.  First we have a motion to dismiss that has been

5    filed by the State Defendants, the original defendants in the

6    case, and then we have another motion to dismiss filed by the

7    Intervening Defendants in the case.  The Plaintiffs of course

8    oppose both of these motions.  They've been fully briefed, and

9    I have read everything that has been filed in this case by the

10   Plaintiffs and everything pertaining to these motions.  If the

11   Defendants are not successful on those motions to dismiss, we

12   will proceed to hear argument on the substantive merits of the

13   complaint and the claims in the complaint.  The way that time

14   is going to be -- well let me begin it this way.  In their

15   legal arguments the Defendants contend that Plaintiffs lack

16   standing to bring this suit, which is pretty much what the

17   11th Circuit just held in Mr. Woods's own separate suit

18   against the State on Saturday.  The Defendants further argue

19   that under Georgia law this kind of suit, one for election

20   fraud, should be filed in State Court, not Federal Court.

21   This too is what the 11th Circuit held in a separate but

22   similar case recently.  And next, Defendants assert that

23   Plaintiffs waited too long to file this suit which seeks an

24   order decertifying the election results.  The Secretary of

25   State has already certified the election result, and there is

1   no mechanism that the Court is aware of of decertifying it,

2   but that is that the Plaintiffs seek.

3          And finally, the law is pretty clear that a party

4   cannot obtain the extraordinary remedy of injunctive relief

5   unless he acts quickly.  And Defendants contend that the

6   Plaintiffs have failed to do that, pointing out that all of

7   Plaintiffs' claims about the Dominion voting machines, the

8   ballot marking devices, could have been raised months ago, and

9   certainly prior to the November 3 election, and certainly

10  before Plaintiffs filed this suit over three weeks after the

11  election took place.

12         So these are the procedural arguments that the

13  Defendants are making today, or at least the main ones, I

14  believe.  And then the question is, assuming the Plaintiffs

15  can survive these procedural hurdles, what is the relief that

16  they want?  They want me to agree with their allegations of

17  massive fraud.  And what do they want me to do about it?  They

18  want me to enter injunctive relief, specifically the

19  extraordinary remedy of declaring that the winner of the

20  election in Georgia was Donald Trump and not Joe Biden.  They

21  ask me to order the Governor and the Secretary of State to

22  undo what they have done, which is certify Joe Biden as the

23  election winner.  We will get to those merits if the

24  Plaintiffs survive the motion to dismiss.

25         At this time we're going to begin with the motion to

1    dismiss, and the time allotment will be as follows:  The State

2    Defendants have 20 minutes -- let me back up.  Each side gets

3    30 minutes.  The Plaintiffs get all 30 of their minutes, and

4    the Defendants' 30 minutes are divided among the two sets of

5    Defendants.  The State Defendants -- the State Defendants get

6    20 minutes, and then the Intervening Defendants get 10

7    minutes, following which we will hear the Plaintiffs'

8    response.  They have up to 30 minutes.  And then whatever time

9    was saved in -- reserved for rebuttal, the State Defendants

10    and Intervening Defendants will then have.

11         But before we go forward, is there any way we can

12    stop this fuzzy sound that is coming through up here?  I don't

13    know if it is coming through in the whole courtroom.  I don't

14    think has anything to do with my microphone.  (pause).  All

15    right, is that better?  I think it was the speaker, one of the

16    two speakers up here on the bench.  I talk loud enough and I

17    think the lawyers talk loud enough that I can hear what they

18    are going to say.  I don't need a microphone.  So at this time

19    I will turn the matter over to the State Defendants.

20         MR. MILLER:  Good morning, Your Honor.  Carey Miller

21    on behalf of the State Defendants.  I am joined today by Josh

22    Belinfante, Charlene McGowan, and Melanie Johnson.  Mr.

23    Belinfante will be handling the motion to dismiss.  I do want

24    to raise with the Court, to the extent that we get there,

25    State Defendants would like to renew their motion to alter the

1    TRO that is in place at this point.  I understand that we can

2    address that in that section.

3              THE COURT:  All right.  Thank you, sir.

4              MR. BELINFANTE:  I am not checking email, I am

5    trying to keep my time.

6              THE COURT:  Okay.

7              MR. BELINFANTE:  I would ask this.  Would the Court

8    allow me to speak without the mask?  Or do you prefer I keep

9    the mask on to speak?

10             THE COURT:  I think I need to have everybody keep

11   the mask on.

12             MR. BELINFANTE:  I'll be happy to do it.  Good

13   morning, Your Honor.  I think you have hit the nail on the

14   head in terms of what the issues are.  This case simply does

15   not belong in this Court.  The relief that Plaintiffs seek is,

16   as the Court described, extraordinary.  It is to substitute by

17   judicial fiat the wishes of the Plaintiffs over presidential

18   election results that have been certified, that have been

19   audited, that have been looked over with a hand-marked count.

20   There is zero authority under the Federal law, under the

21   Constitution of the United States, or even under Georgia law

22   for such a remedy.

23             If the Plaintiffs wanted the relief they seek, they

24   are not without remedies.  They could do what the campaign of

25   the President has done, which is file a challenge in Georgia

1    court under Georgia law challenging election irregularities.
2    There are three currently pending.  I have with me two Rule
3    Nisi orders.  One will proceed today at 3:30 in the Cobb
4    Superior Court sitting by designation.  Another I believe is
5    Wednesday.  And the President's, as I understand it, is to
6    proceed on Friday.  That is where these claims should be
7    brought.
8              To the extent that the claims are about something
9    else, the Court need only look at what has happened in Georgia
10   since roughly 2019 and the passage of House Bill 316.  It was
11   at that time that the Georgia legislature completely redid
12   Georgia election law.  And there had been suit after suit
13   after suit, many of which brought by the Defendant
14   interveners, their allies, and others who question election
15   outcomes.  And in every suit no relief has been ordered that
16   has been upheld by the 11th Circuit.  In fact, no court has
17   ordered relief.  And to the extent that two have, the *Curling*
18   case and the *New Georgia Project* case on discrete issues, the
19   11th Circuit stayed those because it concluded that there was
20   a strong likelihood of reversible error.
21             So what does this tell you?  It tells you that
22   Georgia laws are constitutional, Georgia elections are
23   constitutional, and Georgia machines are constitutional.  The
24   constitutional that the legislature has set forward is
25   constitutional.  Now, that's where the Plaintiffs have backed

1    themselves into a corner from which they cannot escape.  In

2    their reply brief, the claims, from the State's perspective,

3    got significantly crystallized.  It became much clearer.  And

4    they're relying heavily on *Bush v. Gore*.  The problem is that

5    they are turning *Bush v. Gore* on its head.

6          In *Bush v. Gore* the challenge was that a Florida

7    Supreme Court decision was going to, as the Plaintiffs repeat

8    often, substitute its will for the legislative scheme for

9    appointing presidential elections.  That is exactly what they

10   are asking this Court to do, substitute this Court for the

11   Florida Supreme Court, and you have *Bush v. Gore* all over

12   again.  And that manifests itself in various different forms

13   that the Court has seen in our brief and the Court has already

14   identified.  I will not go through all of them.  I will try to

15   hit the high notes on some, but we will rely on our briefs.

16   We're not dropping or conceding arguments, but we will rely on

17   our briefs for those that I don't address expressly.

18          Let's talk briefly about what the complaint is,

19   because that has been I think significantly clarified with the

20   reply brief.  One, the parties are presidential electors.  And

21   they argue that that makes a significant difference.  But what

22   are the acts of the State?  Not Fulton County, not mullahs in

23   Iran, not dictators in Venezuela.  What are the acts of the

24   State that are at issue?  And it's in the discussion about

25   traceability and the *Jacobson* decision in the 11th Circuit

1    where that gets fleshed out really for the first time in the

2    reply brief, and there are three.  And they tell you, and I

3    will keep coming back to it, on Page 20 of their reply brief.

4         The Plaintiffs, describing the State, say they

5    picked the Dominion system.  Their policies led to de facto

6    abolition of the signature match requirement, their

7    regulations to permit early processing of absentee ballots is

8    unlawful and unconstitutional.  Those are the three acts of

9    the State.  Everything else is happening at a county level,

10   period.  And from that they raise what appears to now be four

11   claims.  One is the Elections and Electors Clause citing the

12   absentee ballot opening rule, I will refer to it as, the

13   settlement agreement.  They raise equal protection claims

14   saying that the violation of the Election Clause has led to a

15   vote dilution and discrimination against Republican voters.

16   They argue that due process is violated because they have a

17   property interest in lawful elections, again, under the

18   Elections and Electors Clause.  And finally, they raise a pure

19   State claim in Federal Court under a voter election challenge.

20        What is the relief they seek?  The Court has

21   identified it.  Why do they seek it?  The Court is informed of

22   this on Page 25 of the reply brief.  And it is -- if the Court

23   will not order a different result than what a certified

24   election has, they seek it through another means.  They say on

25   Page 25 that allowing the electors to be chosen by the

1    legislature under the plenary power granted to them for this

2    purpose by the elections and election laws.  One way or the

3    another, the relief they seek is judicial fiat, changing

4    certified election results.  And to evaluate these claims the

5    Court does need to consider aspects of State law.  And this is

6    where the problem lies.  I am going to keep going until you

7    tell me to stop.

8                 (noise from courtroom audio system).

9                 THE COURT:  I am sorry, Mr. Belinfante.  I don't

10   know what the issue is.  We just have to bear through it

11   unless or until somebody fixes it.  I've got six kids.  It

12   doesn't bother me.

13                 MR. BELINFANTE:  I have three, I understand.  I also

14   have the loudest dog in America.  In any case, to evaluate the

15   claims, you have to look at State law.  And because the

16   Plaintiffs raise Code Section 21-2-522 and the statutes that

17   surround it, it's those cases that are important.  It allows a

18   challenge based on these grounds - in fact some are pending

19   now - misconduct, fraud, irregularity, illegal votes, and

20   error are all grounds to challenge an election in Georgia.

21   All of these issues can be brought in in those cases.  Those

22   election challenges have to be decided promptly under

23   21-2-525.  And, and this is critical, the relief sought is not

24   to declare someone else a winner, it is to have another

25   election.  This goes to the point that there is simply no

1    authority for the relief that they seek.

2           Turning first, with that factual predicate in mind,

3    to standing.  There has been a fair amount of briefing on

4    whether the status as a presidential elector guarantees

5    standing.  The 8th Circuit said yes, the 3rd Circuit said no.

6    And I think the 3rd Circuit's analysis is more persuasive.

7    And to the extent that the Plaintiffs say the 3rd Circuit did

8    not consider their status as an electorate, that is true, but

9    the electorate is not what gives you unique status, it's if

10   the electorate is a candidate.  And that is expressly what the

11   3rd Circuit considered in the *Bognet* decision, and we would

12   suggest that that is the more persuasive one that we rely on

13   in our briefs.

14           But I do want to address two other aspects of

15   standing that are more particularized.  One is that when they

16   are seeking to invalidate a State rule or a consent decree

17   that the State has entered into, or anything truly under the

18   Elections Clause, the *Bognet* case speaks to this as well.  And

19   it says that because Plaintiffs are not the General Assembly,

20   nor do they bear any conceivable relationship to the State

21   law-making process, they lack standing to sue over the alleged

22   usurpation of the General Assembly's rights under the

23   Elections and Electors Clauses.  That is absolutely true here.

24   The *Wood* court, the 11th Circuit *Wood* opinion, says the same,

25   citing *Walker,* because Federal Courts are not constituted as

1    freewheeling enforcers of the Constitution and laws.  And that

2    is the injury that underlies all of their claims, which is why

3    they lack standing.

4           I am not going to get into traceability as much

5    because I think the most useful aspect of the traceability

6    issue is the crystallizing of Plaintiffs' complaints, and as

7    I've indicated, the isolating of the State acts in particular.

8           On sovereign immunity, I only want to highlight that

9    a decision just came out in Michigan seeking very similar

10   relief.  We will get you the cite.  It is Michigan -- it is

11   against Whitmer, *King versus Whitmer*, in the Eastern District

12   of Michigan.  Walks through all of the issues in this case and

13   rejects the claims, denies the relief.  On sovereign immunity

14   they raise the point that under *Young*, you can only get

15   prospective injunctive relief.  That is not decertification,

16   that is a retrospective.  And so sovereign immunity would bar

17   that.  They do seek to prevent the Governor from mailing the

18   results; that can be prospective, but there is just no relief

19   for it.  So that is all I will says on sovereign immunity.

20          On laches, the Michigan Court also joined in with

21   Judge Grimberg on laches in the *Wood* case and said that there

22   is time that is inexcusable.  The Court is well-aware of the

23   elements, was there a delay, was it not excusable, and did the

24   delay cause undue prejudice.  Judge Grimberg has already

25   looked at this argument in the context of the *Wood* case and

1    the challenge to the consent order and said laches applied.

2    And it does here for all of the Plaintiffs' arguments, and all

3    you need to do, again, is go back to that Page 20 and see why.

4    They say that their policies, the State's policies, led to a

5    de facto abolition of the signature requirement.  The

6    complaint at Paragraph 58 acknowledges in Exhibit A that that

7    happened in March of this year.  There has been plenty of time

8    that they thought the Secretary overstepped his bounds to

9    bring a challenge in that case or to bring a challenge even

10   afterwards, challenge the OEB.  They did not.

11              They say on Page 20 that they, the State, picked the

12   Dominion system.  They tell you on Paragraph 12 that happened

13   in 2019.  There has been significant litigation over the

14   Dominion system.  Nothing has been held in order that the

15   Dominion system is unconstitutional, is flawed, or anything

16   else that has stuck.

17              Third, they said that their regulation, the absentee

18   ballot regulation, permitted absentee ballots as unlawful and

19   unconstitutional.  They tell you in Paragraph 60 that happened

20   in April of 2020.  Georgia law, in the Administrative

21   Procedures Act, specifically allows you to challenge rules,

22   50-13-10.  That wasn't done.  They certainly could have.  And

23   you don't need the fraud, as they allege, to happen first,

24   because their argument is not based on the fraud, it is based

25   on usurpation of power by the Executive Branch.  That can be

1    challenged when the rule has been promulgated, when the order

2    is out, and when the Dominion machines were selected.

3          We raise in our brief several forms of abstention.

4    And truly, Your Honor, they all kind of get to the same place

5    under different theories.  And again, the reply brief made

6    this point to the clearest.  I think at the end of the day,

7    while we will rely on our briefs in terms of why those matter,

8    and the Michigan court found that *Colorado River* abstention

9    should apply, there are parallel proceedings in State Court --

10         THE COURT:  Did they even argue why it shouldn't?

11         MR. BELINFANTE:  They argued that in voting rights

12   cases the 11th Circuit does not typically abstain.  And those

13   cases are slightly different.  They are challenging an

14   underlying statute, for the most part.  *Siegel* is a slightly

15   -- it's a different case.  But they are mostly challenging

16   underlying statutes.  And there is not a pending election

17   challenge on the same thing in State Court.  It's like the

18   other cases that we have seen that we've defended since the

19   gubernatorial election in 2018.  So no, I don't think so.  But

20   I think the *Bush v. Gore* analysis is the one that is most

21   critical, and it is that simply the Secretary -- the

22   legislative scheme for electing presidential electors is set

23   forth in the Code in Title 21, it has a means of challenging

24   fraudulent illegal votes, it has a means of allowing the

25   Secretary to address various issues, the State Election Board

1    to pass regulations.  All of that authority has been delegated

2    by, first, Congress to the Georgia Legislature, and then to

3    the Executive Branch.  That is the scheme that is put in

4    place, and that is exactly what they seek to turn on its head.

5    And what the three justice concurrence on which they rely

6    says, makes that impossible.  Because the Supreme Court said

7    at Page 120, for the Court, in that case the Florida Court, to

8    step away from this established practice prescribed by the

9    Secretary, the State official charged by the Legislature with

10   the responsibility to obtain and maintain uniformity in the

11   application, operation, and interpretation of election laws

12   was to depart from the legislative scheme.

13        Read the proposed order.  That is exactly what the

14   Plaintiffs seek here, and that is exactly what their own

15   authority says the Court cannot issue in terms of relief, and

16   that would actually trump the remaining claims because it

17   would violate the Elections Clause in order to arguably save

18   some other vague right in terms of due process.

19        Turning to that, let me talk briefly about the

20   absentee ballot regulation, the return of the ballots.  There

21   is nothing that is inconsistent with that, number one, because

22   if you look in the Election Code, there are five times that

23   the General Assembly said something cannot occur earlier than

24   X date.  This doesn't say that.  This says beginning on this

25   date they can do this, but it doesn't say it can only happen.

1    And the five times elsewhere in the Code would suggest that
2    the legislature knew how to change it if they wanted.  That is
3    121-2-132, 133, 153, 187, and 384.  They are simply reading
4    the regulation to create the conflict, when every piece of
5    Federal and State law says you should read it to avoid the
6    conflict.  In terms of the settlement agreement itself, I
7    think Judge Grimberg has sufficiently analyzed that.  And it
8    fills the gap.  There is no conflict.  They can't point to any
9    language that it does.  And at the end of the day it is an
10   OEB, an Official Election Bulletin, not a statute and not a
11   regulation of the State Election Board anyway.
12          On the Dominion machines, I think we will rely on --
13   Mr. Miller is going to talk about that a good deal, but also
14   they argue that the audit somehow doesn't save it because of
15   *Prohm* and that we are estopped from raising *Prohm.*  There are
16   two problems with that.  One, estoppel doesn't apply.  There
17   has been no final order.  They're not estopped from doing
18   anything.  That's the *Community State Bank vs. Strong* decision
19   from the 11th Circuit applying Georgia law 2011.  And two,
20   there has not been an order in *Curling* saying that the
21   machines are unconstitutional.  There have been nine
22   preliminary injunctions filed, no standard relief, and it
23   ignores -- the entire premise of the argument ignores that
24   when a voter gets a ballot from the machine they can read who
25   they voted for.  And when the hand count took place, they

1    didn't scan it back in, they looked at what the ballot said

2    and who they voted for and that is why things were put in

3    different boxes.  Their own affidavits talk about that

4    provision of separating the boxes by hand.  It resolves the

5    issue.

6            The remaining theories fail -- again, I want to be

7    cognizant of time and save some time for rebuttal.  We rely on

8    our briefs in terms of the merits of those, but the equal

9    protection and due process allegations I think are addressed

10   in *Wood* from the 11th Circuit.  On procedural due process, to

11   the extent that that is the due process claim, they don't

12   challenge the Georgia election means of correcting as somehow

13   invalid or insufficient.  In fact, they raised it.  And so you

14   can't have a procedural due process claim if you have a

15   remedy.  You can't have a substantive due process claim if it

16   doesn't shock the conscience, which having to use the remedy

17   here, they can do.  Your Honor, with that, unless there are

18   questions, I would will reserve the rest of my time for

19   rebuttal.

20           THE COURT:  Thank you, sir.

21           MS. CALLAIS:  Good morning, Your Honor.  I am Amanda

22   Callais on behalf of Intervenor Defendants, the Democratic

23   Party of Georgia, the DSCC and the DCCC, and I am mindful of

24   many of the points Mr. Belinfante just made, and I will not

25   repeat them, but for the record, Your Honor, I would just like

1    to say that for the statements that we've made in our motion

2    to dismiss, this case should be dismissed.  The Plaintiffs in

3    this case lack standing.  They bring their claims and assert

4    only generalized grievances.  This Court also lacks

5    jurisdiction to hear their claims because this case is moot

6    now that the election has been certified, which is what the

7    11th Circuit found just this past Saturday in the *Wood v.*

8    *Raffensperger* case.  And then Plaintiffs have also failed to

9    state any cognizable claim under the Election and Elections

10   Clause, Equal Protection Clause, and Due Process Clause.

11           Where I would like to begin though is where

12   Mr. Belinfante started, and I would like to bring us back to

13   this point about where we are in terms of Georgia elections

14   and with the remedy asked for in this case.  Over a month ago

15   five million Georgians cast their ballots in the 2020

16   presidential election with the majority of them choosing

17   Joseph R. Biden, Jr. as their next President.  Those votes,

18   both the ballots that were cast on Dominion machines and the

19   ballots that were cast by absentee were counted.  Almost

20   immediately after that count took place, those votes were

21   counted again by hand, and then almost immediately after that

22   count finished, the recount began again, a third time, by

23   machine.  Each and every one of those counts has confirmed

24   Georgia voters' choice.  Joe Biden should be the next

25   President of The United States.  At this point there is simply

1     no question that Joe Biden won Georgia's presidential election

2     and with it all of Georgia's 16 electoral votes.  Despite

3     that, Plaintiffs have come to this Court eight months after a

4     settlement agreement they challenged was entered, three weeks

5     after the election is over, and days after certification took

6     place, and they asked this Court to take back that choice, to

7     set aside the choice that Georgia voters have made, and to

8     choose the next president by decertifying the 2020

9     presidential election results and ordering the governor to

10    appoint a new slate of electors.

11         THE COURT:  Speaking of taking back, how do the

12    Intervening Defendants respond to the Plaintiffs' point in

13    their complaint that many people, including Stacey Abrams,

14    affiliated with the Democratic Party, opposed these machines

15    from the beginning and said that they are rife with the

16    possibility of fraud?

17         MS. CALLAIS:  I think, Your Honor, that the key

18    there is that when we talk about a possibility of fraud, that

19    does not mean that fraud has actually occurred.  And here

20    Plaintiffs come after an election has taken place and they say

21    on very -- as we will talk about if we get to the TRO

22    portion -- on very limited specious evidence that there is a

23    possibility of fraud.  A possibility of fraud does not mean

24    that fraud has actually occurred.  And truthfully, Your Honor,

25    that is what the Plaintiffs would need to show to get some

1    sort of -- the relief that they are requesting here, that

2    there has been actual fraud.  And that is just not in their

3    complaint, it is not in their evidence.  It makes no

4    difference whether there has been a possibility of fraud or

5    issues with the machines.  That is a case that is in front of

6    Judge Totenberg and that she is deciding.  But that is not the

7    evidence that they have presented here, and it certainly does

8    not support their claims.

9              So with that, Your Honor, as the 3rd Circuit

10   explained just a little over a week ago when denying an

11   emergency motion to stop certification in a case similar to

12   this one brought by Donald J. Trump's campaign, voters not

13   lawyers choose the President.  Ballots not briefs decide

14   elections.  Plaintiffs' request for sweeping relief in this

15   case is unprecedented.  It is unprecedented anywhere, and it

16   is particularly unprecedented in Georgia where the ballots

17   have been counted not once, not twice, but three times, and

18   the vote has been confirmed.  Their request for relief is not

19   just unprecedented, but also provides a separate and

20   independent grounds for this Court to dismiss this case.

21             As we explained in our motion to dismiss, granting

22   Plaintiffs' remedy in and of itself would require the Court to

23   disenfranchise over 5 million Georgia voters, violating their

24   constitutional right to vote.  Post-election

25   disenfranchisement has consistently been found to be a

1    violation of the Due Process Clause throughout the courts.

2    For example, in *Griffin v. Burns* the 1st Circuit found that

3    throwing out absentee votes post election that voters believed

4    has been lawfully cast would violate the Due Process Clause.

5    Similarly, in *Marks v. Stinson*, a number of years later, the

6    3rd Circuit found the same thing in their finding where they

7    found even if there is actual evidence of fraud, discarding

8    ballots that were legally cast or that voters believed to be

9    legally cast violates the Due Process Clause and is a drastic

10   remedy.  This is precisely what would happen here if this

11   Court were to order the requested relief.  That order would

12   violate the Due Process Clause.  And because of that, this

13   Court cannot grant the remedy that Plaintiffs seek and the

14   Court should dismiss this suit.

15        In finding that the Court can't grant this relief,

16   this Court would not be alone, it would be in actually quite

17   good company, not just from the 1st Circuit and the 3rd

18   Circuit in *Griffin* and *Stinson,* but also from more recent

19   cases.  In 2016 in *Stein v. Cortes*, the District Court

20   declined to grant Jill Stein's request to a recount because,

21   quote, it would well insure that no Pennsylvania vote counts,

22   which would be outrageous and unnecessary.  Just this cycle,

23   in *Donald J. Trump for President v. Boockvar* the Plaintiffs

24   sought to invalidate 7 million mail ballots under the Equal

25   Protection Clause, and the Court explained that it has been

1    unable to find any case in which a plaintiff has sought such

2    drastic remedy in the contest of an election in terms or the

3    sheer volume of votes asked to be invalidated.  The Court also

4    promptly dismissed there.

5            Just this last Friday in *Law v. Whitmer* in Nevada

6    State Court, which actually would have the ability to hear a

7    contest, found that it would not decertify the election in

8    Nevada.  And the list goes on, Your Honor.  We could talk

9    about findings in State Court in Arizona on Friday.  There

10   have been over 30 challenges to this election that have been

11   repeatedly dismissed since -- basically since election day.

12   Since election day.

13           So the Court is in good company, and it's not just

14   in company good company nationwide, but it is in good company

15   with the judge right down the hall from here who, just two

16   weeks ago, in a case nearly identical to this one, found a

17   request to disenfranchise nearly 1 million absentee voters in

18   Georgia to be extraordinary.  Judge Grimberg explained that to

19   prevent Georgia certification of the votes cast in the general

20   election after millions of people have lawfully cast their

21   ballots, to interfere with the results of an election that has

22   already concluded would be unprecedented and harm the public

23   and in countless ways.  Granting injunctive relief here would

24   breed confusion, undermine the public's trust in the election,

25   and potentially disenfranchise over 1 million Georgia voters.

1    Viewed in comparison to the lack of any demonstrable harm,

2    this Court finds no basis in fact or law to grant Plaintiff

3    the relief he seeks.

4           That same reasoning applies here.  And in fact, it

5    applies here even more because most of the claims that were

6    brought in front of Judge Grimberg are the same, but the

7    amount of votes that Plaintiffs here seek to decertify are far

8    greater in scope.

9           On this last point, Your Honor, about the inability

10   of the Court to order the remedy, I wanted to respond to

11   something that Plaintiffs raised in their brief last night.

12   In their brief last night they react to the briefing on

13   mootness that we included in our TRO and note that this

14   Court -- this case would not be moot because the Court can

15   decertify an election.  And that *Wood v. Raffensperger* that

16   came out by the 11th Circuit didn't discuss decertification of

17   the election, only halting certification.

18          And I would just like to point out that if this

19   Court were to decertify the election and specifically to point

20   a new slate of electors, which is what is asked, that in and

21   of itself would also violate the law.  The U.S. Constitution

22   empowers State Legislatures to choose the manner of appointing

23   presidential electors, and that is the Electors Clause that

24   Plaintiffs actually challenge.  And pursuant to that clause,

25   the Georgia General Assembly has chosen to appoint electors

1    according to popular vote.  Those are certified by the

2    governor through certificate of ascertainment.  That popular

3    vote has already taken place, Your Honor, and if this Court

4    were to order a new slate of electors to be appointed, that

5    would -- that would violate the Electors Clause.

6            In addition, Congress has also provided that

7    electors shall be appointed in each and every state on the

8    Tuesday next after the first Monday in November in every 4th

9    year as also known as Election Day, which this year took place

10   on November 3rd.  Georgia has held that election on Election

11   Day, and if this Court were to now, months after the -- over a

12   month after the election, to go and order that a new slate be

13   appointed, it would be violating that statute as well.  So for

14   the very reasons that the Plaintiffs -- the very relief that

15   Plaintiffs ask is actually what prevents this Court from

16   issuing any relief in this case, and precisely why it should

17   be dismissed.

18           THE COURT:  All right.  Thank you.  All right, I

19   will hear from the Plaintiffs.

20           MS. POWELL:  May it please the Court.  Sidney Powell

21   and Harry MacDougald for the Plaintiffs.  We are here on a

22   motion to dismiss which requires the Court to view the

23   pleadings and all the facts alleged in the light most

24   favorable to the Plaintiff.  In my multiple decades of

25   practice I have never seen a more specifically pled complaint

1    of fraud, and replete with evidence of it, both mathematical,

2    statistical, computer, expert, testimonial, video, and

3    multiple other means that show abject fraud committed

4    throughout the State of Georgia.

5              Forget that this machine and its systems originated

6    in Venezuela to ensure the election of Hugo Chavez and that it

7    was designed for that purpose.  Look just at what happened in

8    Georgia.  Let's start, for example, with the language, "the

9    insularity of the Defendants' and Dominion's stance here in

10   evaluation and management of the security and vulnerability of

11   the system does not benefit the public or citizens' confident

12   exercise of the franchise.  The stealth vote alteration or

13   operational interference risk posed by malware that can be

14   effectively invisible to detection, whether intentionally

15   seeded or not, are high once implanted, if equipment and

16   software systems are not properly protected, implemented, and

17   audited.  The modality of the system's capacity to deprive

18   voters of their cast votes without burden, long wait times,

19   and insecurity regarding how their votes are actually cast and

20   recorded in the unverified QR code makes the potential

21   constitutional deprivation less transparently visible as well;

22   at least until any portions of the system implode because of

23   system breach, breakdown, or crashes" -- all of which the

24   State of Georgia experienced -- "the operational shortcuts now

25   in setting up or running election equipment or software

1    creates other risks that can adversely impact the voting

2    process."

3             THE COURT:  You don't have to get into any of the

4    evidence or any of the statements or averments of the

5    complaint because I have read it.  And all these statements, I

6    am assuming that every word of it is true.  My question -- the

7    first question I have for you, for the Plaintiffs in the case,

8    is why -- first of all, whether you can or cannot pursue these

9    claims in State Court, specifically in Georgia Superior

10   Courts.  Just the question is, can you?

11            MS. POWELL:  No, Your Honor, we can't.  These are

12   exclusively Federal claims with the exception of the election

13   contest allegation.  They are predominantly Federal claims,

14   they are brought in Federal Court for that purpose.  We have a

15   constitutional right to be here under the Election and

16   Electors Clause.  I was not reading evidence.  What I was

17   reading to the Court was the opinion of Judge Totenberg that

18   was just issued on 10-11-20 which defeats any allegation of

19   laches or lack of concern over the voting machines.  This has

20   been apparent to everyone who has looked at these machines or

21   discussed them in any meaningful way or examined them in any

22   meaningful way, beginning with Carolyn Maloney, a Democratic

23   Representative to Congress back in 2006 who objected to them

24   being approved by CFIUS.  Judge Totenberg went on to say that

25   "the Plaintiffs' national cybersecurity experts convincingly

1    present evidence that it's not a question of might this

2    actually ever happen but, quote, when will it happen,

3    especially if further protective measures are not taken.

4    Given the masking nature of malware in the current systems

5    described here, if the State and Dominion simply stand by and

6    say we have never seen it, the future does not bode well."

7    And sure enough, exactly the fears articulated in her 147 page

8    opinion, and all the means and mechanisms and problems

9    discussed in that three day hearing she held have now

10   manifested themselves within the State of Georgia in the most

11   extreme way possible.

12          THE COURT:  She did not address the question before

13   the Court today though as to the propriety of bringing this

14   suit in this Court, did she?

15          MS. POWELL:  There is no other place to bring this

16   suit of Federal Equal Protection claims and the electors.

17          THE COURT:  You couldn't bring all of these claims

18   in State Court?  Is that your position?

19          MS. POWELL:  We are entitled to bring these claims

20   in Federal Court, Your Honor.  They are Federal constitutional

21   claims.

22          THE COURT:  What do you do with the 11th Circuit's

23   holding in *Wood* on Saturday that we cannot turn back the clock

24   and create a world in which the 2020 election results are not

25   certified?

1          MS. POWELL:  Actually we can, but we don't need to
2    because we are asking the Court to decertify.
3          THE COURT:  Where does that exist?
4          MS. POWELL:  *Bush v. Gore*.  *Bush v. Gore* was a
5    decertification case.  There are other cases we've cited in
6    our brief that allow the Court the decertify.  And at the very
7    minimum this Court should order a preliminary injunction to
8    allow discovery and allow us to examine the forensics of the
9    machines.  For example, we know that already in Ware County,
10   which is a very small precinct, there were 37 votes that were
11   admittedly flipped by the machines from Mr. Trump to
12   Mr. Biden.  That is a 74 vote swing.  That equates to
13   approximately the algorithm, our experts also believe, was run
14   across the State that weighed Biden votes more heavily than it
15   did Trump votes.  That is a systemic indication of fraud that
16   Judge Totenberg was expressing concern about in her decision
17   just weeks before the election.  We have witness after witness
18   who have explained how the fraud can occur within the
19   machines.  We know for example that there were crashes, just
20   like she feared in the decision, and everybody expressed
21   concern about.  We know machines were connected to the
22   internet which is a violation of their certification
23   requirements and Federal law itself.  We could not have acted
24   more quickly.  In fact, the certification issue wasn't even
25   ripe until it was actually certified.

1      THE COURT:  But you weren't limited in your remedies

2   to attacking the certification, you could have attacked the

3   machines months ago.

4      MS. POWELL:  That is what happened in the Totenberg

5   decision, and that is why I read it to the Court.  The

6   machines were attacked by parties, and the election was

7   allowed to go forward.  And we have come forward with our

8   claims as fast as is humanly possible.  This is a massive

9   case, and of great concern not just to the nation and to

10  Georgia, but to the entire world, because it is imperative

11  that we have a voting system that people can trust.

12      They talk about disenfranchising voters, well there

13  are over a million voters here in Georgia that will be

14  disenfranchised by the counting of illegal ballots that render

15  theirs useless.  It's every legal vote that must be counted.

16  Here we have scads of evidence.  And the vote count here is

17  narrow.  I mean, the disparity now is just a little over

18  10,000 votes.  Just any one of our categories of that we have

19  identified require decertification.  For example, 20,311

20  nonresidents voted illegally.  Between 16,000 and 22,000

21  unrequested absentee ballots were sent in in violation of the

22  legislative scheme.  Between 21,000 and 38,000 absentee

23  ballots were returned by voters but never counted.  32,347

24  votes in Fulton County were identified to be statistically

25  anomalous.  And the vote spike for Mr. Biden, that is

1    completely a mathematical impossibility, according to multiple
2    expert affidavits we provided, shows that it was like 120,000
3    Biden votes all of a sudden magically appear after midnight on
4    election night.  That happens to coincide with the time we
5    have video of the Fulton County election workers running the
6    same stack of rather pristine-looking ballots through the
7    machine multiple times.  And as for the recounts, that makes
8    no difference because if you recount the same fake ballots,
9    you achieve -- in the same machines, you achieve the same
10   results.  That is why the hand count in Ware County that
11   revealed the 74 swing is so important and indicative of the
12   systemic machine fraud that our experts have identified, and
13   why it is so important that we at least get access for the
14   Department of Defense even, or our own experts, or jointly, to
15   examine the machines in Fulton County and the ten counties
16   that we requested in our protective order, or our motion
17   for --
18             THE COURT:  How is this whole case not moot from the
19   standpoint of even if you were to win, and win Georgia, could
20   Mr. Trump win the election?
21             MS. POWELL:  Well fraud, Your Honor, can't be
22   allowed by a Court of Law to stand --
23             THE COURT:  That is not what I am asking.  I am not
24   saying that there may not be other issues that need to be
25   addressed, and that there might not be questions that need to

1    be investigated, I am asking, as a practical matter, in this

2    particular election, can Mr. Trump even win the election even

3    if he wins Georgia?

4              MS. POWELL:  Yes, he can win the election.

5              THE COURT:  How would that happen?

6              MS. POWELL:  Because there are other states that are

7    still in litigation that have even more serious fraud than we

8    have in Georgia.  It is nowhere near over.  And it doesn't

9    affect just the presidential election.  This fraud affects

10   senate seats, congressional seats, gubernatorial seats, it

11   affects even local elections.  Another huge statistic that is

12   enough by itself to change the result is the at least 96,000

13   absentee ballots that were voted but are not reflected as

14   being returned.  All of these instances are violations of

15   Federal law, as well as Georgia law.  And in addition,

16   Mr. Ramsland's report finds that the ballot marking machine

17   appears to have abnormally influenced election results and

18   fraudulently and erroneously attributed between thirteen

19   thousand seven hundred and twenty-five thousand and the

20   136,908 votes to Mr. Biden just in Georgia.  We have multiple

21   witnesses who just saw masses of pristine ballots appearing to

22   be computer marked, not hand marked, and those were repeatedly

23   run through machines until votes were injected in the system

24   that night without being observed by lawfully required

25   observers in violation of Georgia and Federal law that

1    resulted in the mass shoot-up spike of votes for Mr. Biden.

2    Mr. Favorito's affidavit is particularly important.  He talks

3    about the Ware County Waycross City Commission candidate who

4    reported that the Ware County hand audit is flipped those 74

5    votes.  That is a statistically significant swing for a

6    precinct that small, and there is no explaining for it other

7    than the machine did it.  We have testimony of witnesses who

8    saw that their vote did not come out the same way it was.

9    Mr. Favorito is a computer tech expert.  He said that the vote

10   flipping malware was resident on the county election

11   management system of possibly one or more precinct or

12   scanners.  There was also an instance where it came out of the

13   Arlo system changed, and there was no way to verify the votes

14   coming out of the individual precincts versus coming out of

15   Arlo because apparently they didn't keep the individual

16   results so that they can be compared.  So there was a vote

17   swapping incident through the Arlo process also.

18            There was a misalignment of results, according to

19   Mr. Favorito, among all three presidential candidates.  Rather

20   than just a swapping of the results for two candidates, in

21   other words, they would sometimes put votes into a third-party

22   candidate and take those out and put them in Mr. Biden's pile.

23   The system itself according to its own technological handbook

24   explains that it allows for votes to be put in, it can scan to

25   set or overlook anything it wants to overlook, put those in an

1    adjudication pile, and then in the adjudication process, which

2    apparently was conducted in top secret at the English Street

3    warehouse, where all kinds of strange things were going on,

4    were just thrown out.  They could just literally drag and drop

5    thousands of votes and throw them out.  That is why it is so

6    important that we at least get temporary relief to examine the

7    systems and to hold off the certification or decertify or ask

8    the Court to halt the proceedings continuing right now until

9    we can have a few days to examine the machines and get the

10   actual evidence off the machines and look at the ballots

11   themselves, because we know there were a number of counterfeit

12   ballots that were used in the Fulton County count that night.

13   It would be a simple matter to examine 100,000 or so ballots

14   and look at which ones are fake.  It is possible to determine

15   that with relative ease.

16          This is not about who or which government officials

17   knew anything was wrong with the machine.  It's entirely

18   possible that many people did not know anything was wrong with

19   them.  But it is about ensuring the integrity of the vote and

20   the confidence of the people that the will they expressed in

21   their vote is what actually determines the election.  Very few

22   people in this country have any confidence in that level right

23   now.  Very few.

24          The standard is only preponderance of the evidence.

25   We have shown more than enough for a prima facie case to get

1    to -- meet the standard required -- this Court is required to

2    apply.  It is crucial that we decertify and stop the vote.  We

3    need to have discovery.  It's so important to the American

4    people, particularly in a country that is built on the rule of

5    law, to know that their election system is fair and honest.

6            THE COURT:  But that rule of law limits where these

7    suits can be filed and who can bring them.  Specifically on

8    the standing issue, how does your -- how do your clients

9    survive the motion to dismiss with respect to the standing

10   issue if I don't follow the 8th Circuit's case opinion in

11   *Carson*?

12           MS. POWELL:  Even the Court's decision in *Wood* is so

13   distinguishable it should make clear electors have standing.

14   In that case, for example, the State could not even say who

15   did have standing.  But under the Constitution, electors

16   clearly do.

17           THE COURT:  But Georgia, unlike Minnesota,

18   differentiates between candidates and Presidential electors.

19   Right?

20           MS. POWELL:  I am not sure about that.  But we also

21   have the Cobb County Republican Party official who is suing,

22   and the electors themselves are part of the Constitutional

23   Clause that entitles them to standing.

24           THE COURT:  I just think you have a pretty glib

25   response to what the 11th Circuit has held regarding these

1    cases.  I mean, the 11th Circuit has basically said, you know,
2    we are not -- the Federal Courts are courts of limited
3    jurisdiction and we are not open 24/7 to remedy every
4    freewheeling constitutional issue that comes up.  They have
5    made it clear, the Appellate Courts have made it clear, they
6    don't want District Courts handling this matter, they want
7    State Courts handling State election disputes, even regarding
8    in Federal elections.  The Federal Government has nothing to
9    do with the State election and how it is conducted.  As you
10   said, it is the Secretary of State who is the chief election
11   officer, and decides it.  Why shouldn't the State of Georgia
12   investigate this?  Why should it be a Federal judge?
13            MS. POWELL:  Because we raise Federal constitutional
14   issues that are paramount to --
15            THE COURT:  They raised Federal constitutional
16   issues in *Wood*.
17            MS. POWELL:  -- to equal protection.  He did not
18   request decertification.  That is one of the things that
19   distinguished that case.  He was not an elector or
20   representative of a county.  He was simply an individual.  And
21   I am not sure that decision is correct because, in that case,
22   they were also wondering who could challenge it.  Well
23   obviously the Federal Equal Protection Clause and the
24   constitutional issues we have raised here give this Court
25   Federal question jurisdiction.  This Court's one of the

1    primary checks and balances on the level of fraud that we are

2    experiencing here.  It is extremely important that this Court

3    exercise its jurisdiction as a gatekeeper on these issues.

4    There were numerous departures from the State statute,

5    including the early processing of votes, and the de facto

6    abolition of signature matches that give rise to Federal Equal

7    Protection claims.

8              THE COURT:  Well, back to the standing question.

9    You know, the Plaintiffs allege that their interests are the

10   same, basically one in the same, as any Georgia voters.  In

11   Paragraph 156 of the complaint they aver that Defendants

12   diluted the lawful ballots of Plaintiffs and of other Georgia

13   voters and electors.  Further, Defendants allege that -- the

14   Plaintiffs allege that Defendants further violated Georgia

15   voters's rights, and they allege, the Plaintiffs, that quote,

16   all candidates, political parties, voters, including without

17   limitation Plaintiffs, have a vested interest.  It doesn't

18   sound like your clients are special, that they have some

19   unique status that they enjoy that allows them to bring this

20   suit instead of anyone else.  How do they have standing?

21             MS. POWELL:  They have the unique status of being

22   the Presidential electors selected to vote for Donald Trump at

23   the electoral college.  They were not certified as -- and

24   decertification is required to make sure they can do their

25   jobs that they were selected to do.

1           THE COURT:  Under the 3rd Circuit case, does your

2  theory survive?

3           MS. POWELL:  Our theory is -- I think the 3rd

4  Circuit decision is wrong, the 8th Circuit decision is

5  correct.  There is no circumstance in which a Federal elector

6  should not be able to seek relief in Federal Court, thanks to

7  our Constitution.  It is one of our most important principles.

8           There were multiple means of fraud committed here.

9  We have also the military intelligence proof of interference

10  in the election, the Ware County 37 votes being flipped, the

11  video of the Fulton City vote count, they lied about the water

12  leak, they ran off observers, they brought in unusually

13  packaged ballots from underneath a table.  One person is seen

14  scanning the same QR code three different times in the machine

15  and big batch of ballots which would explain why the same

16  number of ballots gets injected repeated into the system.

17  That corresponds with the math and the algorithms showing a

18  spike of 26,000 Biden votes at that time.  After Trump's lead

19  of 103,997 votes there were mysteriously 4800 votes injected

20  into the system here in Georgia multiple times, the same

21  number, 4800 repeatedly.  That simply doesn't happen in the

22  absence of fraud.  All of the facts we have laid out in our

23  well-pleaded complaint require that this Court decertify the

24  election results or at least, at the very least, stop the

25  process now in a timely fashion and give us an opportunity to

1    examine the machines in ten counties and get further

2    discovery, particularly of what happened in Fulton County.

3    Those things need to be resolved before any citizen of Georgia

4    can have any confidence in the results of this election.

5              Allowing voters to cast ballots that are solely

6    counted based on their voting designations and not on an

7    unencrypted humanly unverifiable QR code that can be subject

8    to external manipulation and does not allow proper voter

9    verification and ballot vote auditing cannot withstand the

10   scrutiny of a Federal Court and cannot pass muster as a

11   legitimate voting system in the United States of America.  For

12   those reasons, we request the Court to deny the motion to

13   dismiss, allow us a few days, perhaps even just five, to

14   conduct an examination of the machines that we have requested

15   from the beginning, and find out exactly what went on and give

16   the Court further evidence it might want to rule in our favor,

17   because the fraud that has happened here has destroyed any

18   public confidence that the will of the people is reflected in

19   their vote, and just simply cannot stand.

20             THE COURT:  Thank you, ma'am.  All right, rebuttal?

21   This is Josh Belinfante.

22             MR. BELINFANTE:  Just briefly, Your Honor.  Your

23   Honor, just a few points.  One, I want the get back to

24   *Colorado River* abstention.  There was a means and a process to

25   do that.  You had asked earlier about their response.  I did

1    go back and check.  The *Siegel* case they rely on cites to only
2    *Burford* and *Pullman* abstention, not *Colorado River*.  It is
3    appropriate in this case, and as the Michigan Court concluded,
4    the *Moses Cone* case which establishes it says that there is
5    really not a reason not to do so when you have concurrent
6    jurisdiction.
7         And that is one of the problems with the Plaintiffs'
8    argument.  They keep telling you that they can't go to State
9    Court because they have Federal constitutional claims.  Those
10   can be litigated in State Court pursuant to 1983.  They also
11   say on laches that -- it is interesting, they have cited to
12   you and read to you numerous aspects of the *Curling* case, and
13   they say that going back to 2006 somebody thought that there
14   was something wrong with these machines.  Well if that's the
15   case, then it makes the laches argument even stronger.  These
16   are the arguments that they are about the machines.  They
17   certainly could have been litigated prior to after the
18   certification of the election.
19        The other big problem that they raise is that the
20   *Curling* case, everything that was read was stayed by the 11th
21   Circuit, presuming that it is reading the part of the opinion
22   that I think it is.  If it is going back to a prior opinion,
23   that is about old machines which aren't even used anymore.
24   And then in Ware County, that was provided in an affidavit
25   that was new as part of the reply brief, it should not be

1    counted.  There is authority for that, *Sharpe v. Global*
2    *Security International* from the Southern District of Alabama,
3    from 2011.  But even still, that can be brought in the State
4    Court under the challenge mechanisms set.

5           You asked what is the authority for decertifying the
6    election.  The citation was *Bush v. Gore*.  *Bush v. Gore* stayed
7    a Florida recount, it did not decertify the election.  But
8    most importantly, what *Bush v. Gore* said is, when there is a
9    State process, the Elections Clause says that has to continue.
10   And they have not shown you that the State process is
11   insufficient, invalid, whatsoever.  On standing, they find
12   themselves in a bind.  If they are candidates as electors, the
13   State election code says you can bring a challenge under
14   21-2-522.  If they are not candidates and the 3rd Circuit
15   reasoning applies, then the 11th Circuit in *Wood* would apply
16   too, and say that when you are not a candidate you don't have
17   standing.  So either way, they find themselves out of Federal
18   jurisdiction on these arguments.

19          Just a few points on closing.  They tell you that
20   the voters lack confidence in the election system.  Well,
21   since 2018 candidates that were not successful have tried to
22   overturn the rule of voters in the Courts.  Since 2018 courts
23   have stayed with the State of Georgia and upheld Georgia's
24   election laws and Georgia's election machines.  This Court
25   should do the same.  The State is doing what it can to enhance

1    public confidence.  That is why we went the extra step of a

2    hand count, not that pushes ballots through a machine, but

3    that looks at what the ballot says, and when the voter had

4    access to that ballot they could see too.  And if they voted

5    for Donald Trump it will show it on the ballot; if they voted

6    for Joe Biden it will show it on the ballot.  And if not, they

7    can correct it right there.  That is the actions that instill

8    confidence, not this.  And if they want to challenge those

9    election results, the State Courts are open for them to do it,

10   there are hearings scheduled now, and those hearings should

11   proceed and not this one.  Thank you.

12              THE COURT:  Thank you, sir.  Ms. Callais, did you

13   have anything else?

14              MS. CALLAIS:  No, Your Honor.

15              THE COURT:  All right.  Thank you very much.  I have

16   considered the entire record in the case and I find that, even

17   accepting as true every averment of the complaint, I find that

18   this Court must grant the Defendants' motions to dismiss, both

19   of the motions to dismiss, beginning with the proposition that

20   Federal Courts are courts of limited jurisdiction; they are

21   not the legal equivalent to medical hospitals which have

22   emergency rooms that are open 24/7 to all comers.  On the

23   contrary, the 11th Circuit has specifically held that Federal

24   Courts don't entertain post election contests about vote

25   counting and misconduct that may properly be filed in the

1    State courts.  So whether the Defendants have been subjected

2    to a Federal claim, which is Equal Protection, Due Process,

3    Elections Clause and Electors Clause, it does not matter.  The

4    11th Circuit has said these claims in this circuit must be

5    brought in State court.  There is no question that Georgia has

6    a statute that explicitly directs that election contests be

7    filed in Georgia Superior Courts, and that is what our Federal

8    Courts have said in this circuit, it is that is exactly right.

9             Sometimes Federal judges are criticized for

10   committing the sin of judicial activism.  The appellate courts

11   have responded to that and said enough is enough is right.  In

12   fact, enough is too much.  And the courts have convincingly

13   held that these types of cases are not properly before Federal

14   Courts, that they are State elections, State courts should

15   evaluate these proceedings from start to finish.

16            Moreover, the Plaintiffs simply do not have standing

17   to bring these claims.  This Court rejects the 8th Circuit's

18   nonbinding persuasive-value-only holding in *Carson vs Simon*

19   and I find that the Defendants -- excuse me -- the Plaintiffs

20   don't have standing, because anyone could have brought this

21   suit and raised the exact same arguments and made the exact

22   same allegations that the Plaintiffs have made in their

23   complaint.  The Plaintiffs have essentially alleged in their

24   pleading that their interests are one and the same as any

25   Georgia voter.  I do not believe that the 11th Circuit would

1    follow the reasoning of the 8th circuit in *Carson*.

2           Additionally, I find that the Plaintiffs waited too

3    late to file this suit.  Their primary complaint involves the

4    Dominion ballot marking devices.  They say that those machines

5    are susceptible to fraud.  There is no reason they could not

6    have followed the Administrative Procedure Act and objected to

7    the rule-making authority that had been exercised by the

8    Secretary of State.  This suit could have been filed months

9    ago at the time the machines were adopted.  Instead, the

10   Plaintiffs waited until over three weeks after the election to

11   file the suit.  There is no question in my mind that if I were

12   to deny the motions to dismiss, the matter would be brought

13   before the 11th Circuit and the 11th Circuit would reverse me.

14   The relief that the Plaintiffs seek, this Court cannot grant.

15   They ask the Court to order the Secretary of State to

16   decertify the election results as if such a mechanism even

17   exists, and I find that it does not.  The 11th Circuit said as

18   much in the *Wood* case on Saturday.

19           Finally, in their complaint, the Plaintiffs

20   essentially ask the Court for perhaps the most extraordinary

21   relief ever sought in any Federal Court in connection with an

22   election.  They want this Court to substitute its judgment for

23   that of two-and-a-half million Georgia voters who voted for

24   Joe Biden, and this I am unwilling to do.

25           The motion for temporary restraining order that was

1    entered on November 29 is dissolved.  The motions to dismiss

2    are granted.  And we are adjourned.

3                    (end of hearing at 11:07 a.m.)

4                          * * * * *

5                    REPORTER'S CERTIFICATION

6

7        I certify that the foregoing is a correct transcript from

8    the record of proceedings in the above-entitled matter.

9

10   _____
                                 Lori Burgess
11                               Official Court Reporter
                                 United States District Court
12                               Northern District of Georgia

13                               Date:  December 8, 2020

14

15

16

17

18

19

20

21

22

23

24

25