# **Exhibit 3**

**December 16, 2020**

*Georgia Republican Party, Inc.*, *et al. v. Raffensperger, et al.,* **Case No. 1:20-CV-05018-ELR**

**United States District Court for the Northern District of Georgia**

**Expert Report of Jonathan Rodden, PhD**

_____

Jonathan Rodden, PhD

1

## I.     INTRODUCTION AND SUMMARY

On December 12, I received two declarations related to the practice of signature-matching in Georgia. First, based on his personal experience with Colorado, Mr. Scott Gessler argued that Georgia's signature-matching rate is "impossibly low." Second, in a separate report, Dr. Jason Sorens examined the distribution of ballots rejected for non-matching signatures across Georgia's counties. Specifically, he noted that some of Georgia's larger counties had rejection rates well below the statewide rate, while some small counties had rates that were well above—a pattern that he refers to as anomalous.

I was asked by Counsel for the Intervenors in this matter to review the claims made in these reports. First, I examine cross-state data from 2012 to the present, and discover that among the roughly 30 states that conduct some form of signature-matching and for which data are available, Georgia's absentee ballot rejection rate is quite typical. If anything, it is slightly more stringent than the median state. On the other hand, Colorado is an outlier, with one of the highest rejection rates in the country.

Next, I address Dr. Sorens' notion of "statistical anomalies" among Georgia's counties. In order to characterize the distribution of a set of observations as somehow unusual, or to characterize a set of specific observations as anomalous, one must understand the data generating process, and use that knowledge to explain what a

typical distribution *should* look like. For instance, since signature-matching is ostensibly used for fraud detection, one must articulate a theory about the cross-county incidence of fraud. Alternatively, if signature-matching is—as suggested by Dr. Sorens—primarily a way of disenfranchising voters who make mistakes, one must explain why mistakes should be distributed in a specific way across counties.

In addition, in determining the "correct" distribution of rejections across counties, one must consider the difficulty of the task of signature-matching, especially given the low quality of signatures on file, and the prospect that the quality likely varies from one county to another. If we give 159 individuals, or groups of individuals, the opportunity to rather arbitrarily throw out ballots according to vague criteria, what type of distribution of rejections should we expect?

Dr. Sorens has not addressed any of these questions, and has provided no theory whatsoever about what the cross-county distribution of ballot rejections *should* be. Thus, he provides no basis for calling into question the shape of the distribution of ballot rejections across counties in Georgia or any other state, and no basis for characterizing specific observations as "too high" or "too low."

In fact, Georgia's distribution of ballot rejections across counties is very similar to distributions in other states. This pattern—where the vast majority of counties reject zero or very few ballots, and a small handful of counties reject a sizable number—is ubiquitous. It could be explained by actual patterns of fraud, the

geographic distribution of voter mistakes, the geographic distribution of "sticklers" among county-level officials, or any number of other factors.

In short, without any other information, simply from observing cross-county distributions of rejections, it makes no sense to characterize ballot rejection rates as "too low" in the counties with very low rejection rates, or to call for increased rejections that would bring them up to the average level as Dr. Sorens has done—especially since that average is driven by a handful of counties with relatively high rates. Likewise, based purely on observing cross-state data, it makes little sense to argue, as Mr. Gessler has done, that Georgia as a whole should attempt to "catch up" with the rejection rates of unusually aggressive states like Colorado.

## II. QUALIFICATIONS

I am currently a tenured Professor of Political Science at Stanford University and the founder and director of the Stanford Spatial Social Science Lab ("the Lab")—a center for research and teaching with a focus on the analysis of geo-spatial data in the social sciences. In my affiliation with the Lab, I am engaged in a variety of research projects involving large, fine-grained geo-spatial data sets including ballots and election results at the level of polling places, individual records of registered voters, census data, and survey responses. I am also a senior fellow at the Stanford Institute for Economic Policy Research and the Hoover Institution. Prior to my employment at Stanford, I was the Ford Professor of Political Science at the

Massachusetts Institute of Technology. I received my Ph.D. from Yale University and my B.A. from the University of Michigan, Ann Arbor, both in political science. A copy of my current C.V. is included as an Appendix to this report.

In my current academic work, I conduct research on the relationship between patterns of political representation, geographic location of demographic and partisan groups, and the drawing of electoral districts. I have published papers using statistical methods to assess political geography, balloting, and representation in a variety of academic journals including *Statistics and Public Policy*, *Proceedings of the National Academy of Science*, *American Economic Review Papers and Proceedings*, the *Journal of Economic Perspectives*, the *Virginia Law Review*, the *American Journal of Political Science*, the *British Journal of Political Science*, the *Annual Review of Political Science*, and the *Journal of Politics.* One of these papers was recently selected by the American Political Science Association as the winner of the Michael Wallerstein Award for the best paper on political economy published in the last year, and another received an award from the American Political Science Association section on social networks.

I have recently written a series of papers, along with my co-authors, using automated redistricting algorithms to assess partisan gerrymandering. This work has been published in the *Quarterly Journal of Political Science*, *Election Law Journal*, and *Political Analysis*, and it has been featured in more popular publications like the

*Wall Street Journal*, the *New York Times*, and *Boston Review*. I have recently completed a book, published by *Basic Books* in June of 2019, on the relationship between political districts, the residential geography of social groups, and their political representation in the United States and other countries that use winner-take-all electoral districts. The book was reviewed in *The New York Times*, *The New York Review of Books*, *Wall Street Journal*, *The Economist*, and *The Atlantic*, among others.

I have expertise in the use of large data sets and geographic information systems (GIS), and conduct research and teaching in the area of applied statistics related to elections. My PhD students frequently take academic and private sector jobs as statisticians and data scientists. I frequently work with geo-coded voter files and other large administrative data sets, including in recent papers published in the *Annals of Internal Medicine* and *The New England Journal of Medicine*. I have developed a national data set of geo-coded precinct-level election results that has been used extensively in policy-oriented research related to redistricting and representation.[1]

I have been accepted and testified as an expert witness in six recent election law cases: *Romo v. Detzner*, No. 2012-CA-000412 (Fla. Cir. Ct. 2012); *Mo. State Conference of the NAACP v. Ferguson-Florissant Sch. Dist.*, No. 4:2014-CV-02077

---

[1] The dataset can be downloaded at http://projects.iq.harvard.edu/eda/home.

(E.D. Mo. 2014); *Lee v. Va. State Bd. of Elections*, No. 3:15-CV-00357 (E.D. Va. 2015); *Democratic Nat'l Committee et al. v. Hobbs et al.*, No. 16-1065-PHX-DLR (D. Ariz. 2016); *Bethune-Hill v. Virginia State Board of Elections*, No. 3:14-cv-00852-REP-AWA-BMK (E.D. Va. 2014); and *Jacobson et al. v. Lee*, No. 4:18-cv-00262 (N.D. Fla. 2018). I also worked with a coalition of academics to file Amicus Briefs in the Supreme Court in *Gill v. Whitford*, No. 16-1161, and *Rucho v. Common Cause*, No. 18-422. Much of the testimony in these cases had to do with geography, voting, ballots, and election administration. I am being compensated at the rate of $500/hour for my work in this case. My compensation is not dependent upon my conclusions in any way.

### III.   DATA SOURCES

I have used individual-level absentee voting data from the Georgia Secretary of State to calculate the rate at which absentee ballots were rejected in Georgia's counties in recent elections. I have also consulted data on absentee ballots cast and rejections from the Election Administration and Voting Surveys (EAVS) for each general election from 2012 to 2018. These are surveys of state and county election officials in each state, carried out by the U.S. Election Assistance Commission in conjunction with each general election.

## IV.     DOES GEORGIA REJECT FEWER ABSENTEE BALLOTS FOR NON-MATCHING SIGNATURES THAN OTHER STATES?

Mr. Gessler's analysis in this case is drawn from his firsthand experience in Colorado, and although he cited no sources, he also mentioned a statistic about recent ballot rejections in Nevada. Based on this comparison with two other states, Mr. Gessler concluded that Georgia's rate of absentee ballot rejections due to non-matching signatures is "impossibly low."

It is not clear why two Western states are chosen as Mr. Gessler's comparison set. In fact, it is possible to do a much broader investigation. The Election Assistance Commission conducts surveys associated with each general election, and among many other things, collects data on absentee ballot rejections. I have consulted the reports and associated data sets for the elections of 2012, 2014, 2016, and 2018, with the goal of calculating, for each state in each election, absentee ballots rejected due to non-matching signature as a share of all absentee ballots submitted for counting. In each election, some states do not provide one or both of these variables, either because data are unavailable or because the state does not reject ballots due to non-matching signatures. This leaves 31 states in 2012, 32 in 2014, 32 in 2016, and 33 in 2018. The 2020 EAVS report is not yet available.

The comparative data suggest that since 2012, Georgia has been a very typical state. Colorado, on the other hand, has consistently demonstrated unusually high rejection rates.

**Figure 1: Kernel Densities of Absentee Ballots Rejected for Non-Matching Signature as Share of Absentee Ballots Submitted, U.S. States, 2012-2018**



In Figure 1, I use kernel densities to represent the distribution of rejection rates across the states for which data were available. A kernel density is a smoothed histogram that allows for the visualization of the shape of the distribution. In this case, we can see that the distribution of rejection rates across states is skewed, such that it has a long right tail. The "peak" of the histogram on the left side of each graph gives us an indication of the rejection rate where many states cluster, and in the tail of each distribution on the right are a handful of states with unusually high rejection

rates. The red dashed line corresponds to the rejection rate in Georgia, as reported by Dr. Sorens. The black dashed line corresponds to the rejection rate in Colorado.

The rate at which Georgia rejected absentee ballots for non-matching signature was relatively low compared to other states in 2012. Even in that year, however, 7 states had lower rates than Georgia. In 2014, Georgia's rejection rate increased substantially, bringing it well above the median state. The same pattern continued in 2016 and 2018. In each of those years, Georgia's rejection rate was higher than the median state. Note that Georgia's declining rejection rates from 2014 to 2018—mentioned in Dr. Sorens' report as an indicator of growing laxity in signature-matching—is in line with a national trend toward lower rejection rates over the same period.

Figure 1 also clarifies that Colorado—the comparison state highlighted in Mr. Gessler's report—has consistently been in the tail of the distribution. That is to say, it is among a small handful of states with unusually high rejection rates. Among all states, Colorado's rejection rate ranked 4th in 2012, 6th in 2014, 2nd in 2016, and 3rd in 2018. It is not clear why Georgia—a relatively typical state—should alter its ballot rejection practices in order to mimic the practices of an unusually aggressive state.

Clearly, it is not possible to support the claim that Georgia is exceptionally lax in its rejection of absentee ballots for non-matching signatures. In fact, in each of the last three elections, it has demonstrated higher rejection rates than the median

state. Although we do not yet have 2020 data for a broad group of states, the comparative data are also useful in assessing the claim that Georgia's 2020 rate— reported as .0005 by Dr. Sorens—is "impossibly low." Among the sample of around 30 states that actually engage in signature-matching and provide data, there were 13 states with lower rates in 2012, 10 in 2014, 9 in 2016, and 13 in 2018. Given the overall downward trend in rejections of this kind, it is very likely that a substantial number of states had lower rejection rates than Georgia in 2020 as well, and that Georgia is once again somewhere right in the middle of the national distribution.

In any case, there is no good reason to believe that a low or declining rejection rate is a bad thing, or indicative of laxity on the part of election administrators that might facilitate fraud. On the contrary, it is quite plausible that as Georgia and other states adopt more careful procedures for rejecting ballots, a declining rejection rate indicates a reduction in the number of ballots that are inappropriately flagged as non-matching.

## V. DOES THE DISTRTIBUTION OF ABSENTEE BALLOT REJECTIONS IN GEORGIA REVEAL "ANOMALIES?"

While Mr. Gessler examines statewide aggregate numbers, Dr. Sorens focuses his analysis not on the overall statewide share of absentee ballots rejected for non-matching signature, but rather, on the distribution of those rejections across Georgia's counties. He displays a histogram of rejection rates, and as with the state-level graphs above, he demonstrates that there is a pronounced right skew in

rejection rates across Georgia's counties. Of 159 counties, 100 do not reject a single ballot. Another 38 counties reject less than two tenths of a percent of their ballots. In the tail of the distribution are 15 counties with rejection rates above three tenths of a percentage point. These include the majority-minority counties specifically identified by Dr. Sorens as having unusually high rejection rates: Dougherty, Gwinnett, Henry, and Liberty.

It is important to note that when a distribution has a pronounced right skew, the mean is much larger than the median. In this case, the median county actually rejects zero ballots. The statewide average is driven by relatively high values in the outlier counties in the right tail of the distribution. Given that so many of Georgia's counties reject zero ballots, it is odd to characterize a handful of non-zero counties as "statistical anomalies" for their low rates while 100 counties with zero rejections are considered not to be anomalous.

Given Dr. Sorens' approach, these small counties cannot be classified as anomalous in their under-provision of rejections, simply because they are too small. By applying a statewide rate of .0005, Dr. Sorens expects that throughout Georgia, for every 2000 absentee ballots, we should see one rejection. There were 73 counties that received fewer than 2000 absentee ballots. Thus it is not possible for these counties to be viewed as "anomalous" even though they reject zero ballots. On the low side, Dr. Sorens is thus searching for "anomalies" only among larger counties.

To better understand Dr. Sorens' characterizations, consider the counties of Muscogee and Cherokee. Muscogee had 24,430 absentee ballots, which would lead Dr. Sorens to expect 12 rejections, where in fact there were zero. So according to Dr. Sorens, Muscogee fell short of expectation by 12 rejections. Cherokee County had 37,488 absentee ballots, which would lead Dr. Sorens to expect 18 rejections, while in fact there was only one. According to Dr. Sorens, Cherokee County fell short of expectations by 17 rejections.

To classify these counties as anomalous, without much explanation of his logic, he suggests that the distribution of rejections across counties should resemble a statistical distribution known as the Poisson distribution, and he then uses this rather arbitrary benchmark to classify some counties as having rejection rates that are either "too high" or "too low."

But Dr. Sorens never explains why we should expect a normal, uniform, Poisson, or any other type of distribution of absentee ballot rejections across counties. Nor does he explain how tight the distribution should be around the mean, or why we should be surprised by the right-skewed shape of the distribution displayed in his report. In the parlance of statistics, he is completely silent about the data generating process. That is to say, he does not explain what the anticipated, reasonable distribution of rejections should look like and why. For this type of

statistical analysis, it is only sensible to characterize values as "extreme" if one has provided this type of explanation. Above all, Dr. Sorens does not explain why he believes each county should look like "a random draw from the statewide population" (p. 4).

The ostensible purpose of signature-matching is to combat fraud. If we believe that signature-matching is fulfilling this purpose, we should expect the distribution of signature-matching rejections to perfectly mirror the distribution of attempted fraud. To the extent that some nefarious, organized actors are attempting to commit fraud—as in Bladen County, North Carolina in 2018—we would expect the distribution of fraud, and hence failed signature matches, to be geographically concentrated. In other words, we would expect something quite different from a Poisson distribution of rejections across counties. We would expect some counties *not* to look like a random draw from the statewide population; we would expect them to have much larger rates than the overall statewide rate. We would also expect the overall number and geographic distribution of rejections to fluctuate from one year to another as different attempts at fraud come and go. In other words, we could not approach the data with the notion that there is a single "anticipated" distribution of rejections. Rather, we would expect the distribution to reflect the fraudulent activity that takes place in a given year, but without a good theory about the geography of

fraud, we can say very little about whether or not this is happening just by observing the distribution.

Oddly, Dr. Sorens does not even consider fraud-prevention among the *possible* explanations for the data generation process. After identifying what he refers to as "discrepancies" (counties like Cherokee that he believes are too far from the statewide rate), he considers three possible explanations. "One is that some county election boards were especially aggressive or reticent in rejecting absentee ballots, possibly in violation of state law. A second is that some county election boards may have misreported – or failed to report – ballot rejections. A third is that some counties are hugely demographically different from the rest of the state, which led their voters to make vastly fewer (or more) mistakes on their absentee ballot signatures."

This is as close as Dr. Sorens comes to explaining what he believes is the data-generating process. He seems to view geographic patterns of signature mismatches as resulting from discretionary decisions of election administrators as well as mistakes on the part of either voters or election administrators, but he does not even consider the possibility that they reflect successful fraud prevention efforts.

But even still, it is not clear why these stories about the data-generating process should lead us to expect a Poisson or any other specific distribution of rejections across counties. If rejections are driven by voter mistakes, it is not clear

why we should expect county-level proclivity to make mistakes to be tightly and symmetrically arranged around the statewide average. For instance, we might expect mistakes to be correlated with some county-level characteristics, like education and literacy, that are not evenly distributed across counties. Dr. Sorens suggests this possibility, but does not examine it empirically. More broadly, if one believes that rejected ballots are primarily driven by voter mistakes, it is unclear from what normative perspective it is desirable to "level up" the level of disenfranchisement in laggard suburban counties in order to "catch up" with leaders like Dougherty County.

To the extent that mistakes are made by election administrators, it is worthwhile to consider some of the constraints shaping those mistakes. For instance, in his report, Mr. Gessler points out that "...many signatures on the voter rolls are poor quality. Georgia has automatic voter registration, which relies heavily on signature samples obtained from motor vehicle registrations. Because these signatures are normally obtained using an electronic touchpad, they are notoriously poor quality. That means counties likely rely on motor vehicle signatures for voters who request absentee ballots online" (paragraph 25). If Mr. Gessler is correct, he points to another good reason why we might expect significant cross-county variation in rejection rates. Some counties might have better signatures on file for comparison, depending on the source they rely on for their comparison signature.

16

Even if two counties rely at similar rates on the DMV for their comparison signatures, one can imagine that the quality could be quite different in a county where the main DMV office had a scratched and poorly functioning touchpad than in one with new equipment. Again, if this is the reason for ballot rejections, it is not clear why it is desirable to "level up" the number of ballot rejections to catch up with the relatively poor, rural counties in the tail of the distribution that are pushing up the statewide rejection rate, quite possibly due to false mismatches.

A final unexplored aspect of the data-generating process goes to the heart of the task of signature-matching. County-level election administrators are in a very poor position to determine that one signature is similar to, inspired by, or a variation on another. County election officials are being asked to engage in a difficult task with the potential to disenfranchise voters. Even a professional handwriting analyst would require a large sample of "baseline" signatures, and even then, it is likely that experts would often disagree. Even if we accept Dr. Sorens' assumptions that 1) fraud attempts do not have any impact on the shape of the cross-county distribution of rejections and 2) voter mistakes should be similar from one county to another, and we further stipulate that election officials are acting in good faith and following uniform statewide guidance and best practices, we should expect large variation from one county to another in rejection rates purely because of the nature of the task.

Imagine a research project in which a researcher hires 159 different teams and gives each team the same task. For instance, imagine they are asked to read a set of newspaper articles about politics and determine whether the tone is positive, negative, or neutral. But there is no "right" answer, and there is no clear way of providing the research teams with airtight rules for coding. Under such conditions, we would expect the teams to provide very different answers to the same question. In the parlance of quantitative research, we would anticipate that "inter-coder reliability" is low. It would not be surprising to see that some of the teams adopted their own internal practice in which almost every story is interpreted as neutral, for example, while other teams interpreted the task differently, and developed a practice of coding almost all of the stories as negative if they contained some critical quotes or information.

The task of signature matching is analogous, in that due to the nature of the task, we should not be surprised to see a wide range of outcomes across counties, driven purely by local variation in good-faith interpretations of the standards provided by state officials. A wrinkle in the case of signature matching, however, is that it has the potential to unfairly disenfranchise people. Thus, given the stakes of wrongly determining that signatures do not match, we might expect the vast majority of teams to develop a rather cautious approach. It should also not be surprising if a handful of teams develops a much more stringent decision rule.

18

In sum, whether we consider a data-generating process that is primarily driven by fraud, one that is driven by cross-county variation in mistakes made by voters, or by the difficulties of the task faced by election administrators, we would anticipate a wide range of rejection rates across counties, and under a variety of scenarios, a pronounced right skew in the distribution of rejections much like the one presented in Dr. Sorens' report. Thus, Dr. Sorens' report tells us nothing about the efficacy or deficiency of the signature matching process in Georgia except that the distribution of non-matches is precisely what we would anticipate seeing anywhere that signature matching is employed.

And indeed, this is what we see in states well beyond Georgia. We can use the responses to the 2016 EAVS survey to examine the distribution of absentee ballot rejections for signature mismatch across counties. There are a number of states that are best left out of this analysis, either because they provide no information at all about signature-matching rejections, or because a numbers or counties did not provide data on this type of rejection, or reported zero rejections in every county.[2] I also drop states (e.g. Delaware) where there are very few counties, or where towns rather than counties are the unit of analysis (Maine, New Hampshire, Rhode Island, and Wisconsin). This leaves 25 states with full county-level reporting.

---

[2] Zero rejections in every county were reported in Iowa, Massachusetts, Missouri, New Mexico, West Virginia, and Wyoming.

**Figure 2: Cross-County Histograms of Ballots Rejected for Non-Matching Signature as Share of Absentee Ballots Received, 2016 General Election**



Ballots rejected for matching signature as share of absentee ballots received

In Figure 2, I present cross-county histograms of the rejection rate for each of these 25 states. We can see that Georgia's large density at zero, and its highly skewed distribution, are the norm in states around the country. Georgia's neighboring states—Florida and North Carolina—look rather similar, except they do not have Georgia's cluster of high-rejection counties in the right tail of the distribution. Georgia is also not alone in the fact that the median county has zero rejections. This was true in most of the states (15). In another six states, the median county had a relatively low rejection rate, well below two tenths of a percentage point (Arizona,

California, Florida, New Jersey, Texas, and Utah). In Washington, the median county had a rejection rate of two tenths of a percentage point, and in Oregon, it was three tenths of a percentage point. Once again, Colorado is an outlier: the median county had a rejection rate around four tenths of a percentage point. Note that each of these Western states with tighter, less skewed distributions and higher overall rejection rates was a state where all, or nearly all, of the ballots were cast by mail.

It is difficult to draw a normative conclusion about these skewed distributions without a better understanding of the reason for the skew. As explained above, these distributions can be explained by any number of factors. As such, they cannot teach us anything about the vigor with which election administrators pursue signature matching, or about the efficacy or appropriateness of the signature-matching process.

## VI.     CONCLUSION

In comparison with other states, there is nothing anomalous about the rate at which Georgia rejects absentee ballots due to non-matching signatures. Most states are similar to Georgia in that they reject relatively few signatures, but a handful of states demonstrate elevated rejection rates. Elevated rejection rates in outlier states like Colorado tell us nothing about Georgia. Likewise, there is nothing unusual about the distribution of rejection rates across counties *within* Georgia. It is quite common to see a large number of counties with zero or very few rejections, and a handful of

counties in the tail of the distribution with elevated rejection rates. There are a number of potential explanations for this pattern, and neither Mr. Gessler nor Dr. Sorens explains why this pattern might be viewed as problematic, or why a typical county—one that rejects relatively few ballots—should suddenly attempt to emulate the outliers in the tail of the distribution.

In sum, neither of these reports can be relied upon to draw valid inferences about the costs or benefits of the signature-matching process in Georgia.

# Appendix

# Jonathan Rodden

Stanford University
Department of Political Science
Encina Hall Central
616 Serra Street
Stanford, CA 94305

Phone:   (650) 723-5219
Fax:       (650) 723-1808
Email:    jrodden@stanford.edu

## Personal

Born on August 18. 1971, St. Louis, MO.

United States Citizen.

## Education

Ph.D. Political Science, Yale University, 2000.

Fulbright Scholar, University of Leipzig, Germany, 1993–1994.

B.A., Political Science, University of Michigan, 1993.

## Academic Positions

Professor, Department of Political Science, Stanford University, 2012–present.

Senior Fellow, Hoover Institution, Stanford University, 2012–present.

Senior Fellow, Stanford Institute for Economic Policy Research, 2020–present.

Director, Spatial Social Science Lab, Stanford University, 2012–present.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, 2010–2012.

Associate Professor, Department of Political Science, Stanford University, 2007–2012.

Fellow, Center for Advanced Study in the Behavioral Sciences, Palo Alto, CA, 2006–2007.

Ford Career Development Associate Professor of Political Science, MIT, 2003–2006.

Visiting Scholar, Center for Basic Research in the Social Sciences, Harvard University, 2004.

Assistant Professor of Political Science, MIT, 1999–2003.

Instructor, Department of Political Science and School of Management, Yale University, 1997–1999.

# Publications

## Books

*Why Cities Lose: The Deep Roots of the Urban-Rural Divide.* Basic Books, 2019.

*Decentralized Governance and Accountability: Academic Research and the Future of Donor Programming.* Co-edited with Erik Wibbels, Cambridge University Press, 2019.

*Hamilton's Paradox: The Promise and Peril of Fiscal Federalism*, Cambridge University Press, 2006. Winner, Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

*Fiscal Decentralization and the Challenge of Hard Budget Constraints*, MIT Press, 2003. Co-edited with Gunnar Eskeland and Jennie Litvack.

## Peer Reviewed Journal Articles

Partisan Dislocation: A Precinct-Level Measure of Representation and Gerrymandering, 2020, *Political Analysis* forthcoming (with Daryl DeFord Nick Eubank).

Who is my Neighbor? The Spatial Efficiency of Partisanship, 2020, *Statistics and Public Policy* (with Nick Eubank).

Handgun Ownership and Suicide in California, 2020, *New England Journal of Medicine* 382:2220-2229 (with David M. Studdert, Yifan Zhang, Sonja A. Swanson, Lea Prince, Erin E. Holsinger, Matthew J. Spittal, Garen J. Wintemute, and Matthew Miller).

Viral Voting: Social Networks and Political Participation, 2020, *Quarterly Journal of Political Science* (with Nick Eubank, Guy Grossman, and Melina Platas).

It Takes a Village: Peer Effects and Externalities in Technology Adoption, 2020, *American Journal of Political Science* (with Romain Ferrali, Guy Grossman, and Melina Platas). Winner, 2020 Best Conference Paper Award, American Political Science Association Network Section.

Assembly of the LongSHOT Cohort: Public Record Linkage on a Grand Scale, 2019, *Injury Prevention* (with Yifan Zhang, Erin Holsinger, Lea Prince, Sonja Swanson, Matthew Miller, Garen Wintemute, and David Studdert).

Crowdsourcing Accountability: ICT for Service Delivery, 2018, *World Development* 112: 74-87 (with Guy Grossman and Melina Platas).

Geography, Uncertainty, and Polarization, 2018, *Political Science Research and Methods* doi:10.1017/psrm.2018.12 (with Nolan McCarty, Boris Shor, Chris Tausanovitch, and Chris Warshaw).

Handgun Acquisitions in California after Two Mass Shootings, 2017, *Annals of Internal Medicine* 166(10):698-706. (with David Studdert, Yifan Zhang, Rob Hyndman, and Garen Wintemute).

Cutting Through the Thicket: Redistricting Simulations and the Detection of Partisan Gerrymanders, 2015, *Election Law Journal* 14,4:1-15 (with Jowei Chen).

The Achilles Heel of Plurality Systems: Geography and Representation in Multi-Party Democracies, 2015, *American Journal of Political Science* 59,4: 789-805 (with Ernesto Calvo). Winner, Michael Wallerstein Award for best paper in political economy, American Political Science Association.

Why has U.S. Policy Uncertainty Risen Since 1960?, 2014, *American Economic Review: Papers and Proceedings* May 2014 (with Nicholas Bloom, Brandice Canes-Wrone, Scott Baker, and Steven Davis).

Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures, 2013, *Quarterly Journal of Political Science* 8: 239-269 (with Jowei Chen).

How Should We Measure District-Level Public Opinion on Individual Issues?, 2012, *Journal of Politics* 74, 1: 203-219 (with Chris Warshaw).

Representation and Redistribution in Federations, 2011, *Proceedings of the National Academy of Sciences* 108, 21:8601-8604 (with Tiberiu Dragu).

Dual Accountability and the Nationalization of Party Competition: Evidence from Four Federatons, 2011, *Party Politics* 17, 5: 629-653 (with Erik Wibbels).

The Geographic Distribution of Political Preferences, 2010, *Annual Review of Political Science* 13: 297–340.

Fiscal Decentralization and the Business Cycle: An Empirical Study of Seven Federations, 2009, *Economics and Politics* 22,1: 37–67 (with Erik Wibbels).

Getting into the Game: Legislative Bargaining, Distributive Politics, and EU Enlargement, 2009, *Public Finance and Management* 9, 4 (with Deniz Aksoy).

The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting, 2008. *American Political Science Review* 102, 2: 215–232 (with Stephen Ansolabehere and James Snyder).

Does Religion Distract the Poor? Income and Issue Voting Around the World, 2008, *Comparative Political Studies* 41, 4: 437–476 (with Ana Lorena De La O).

Purple America, 2006, *Journal of Economic Perspectives* 20,2 (Spring): 97–118 (with Stephen Ansolabehere and James Snyder).

Economic Geography and Economic Voting: Evidence from the U.S. States, 2006, *British Journal of Political Science* 36, 3: 527–47 (with Michael Ebeid).

Distributive Politics in a Federation: Electoral Strategies, Legislative Bargaining, and Government Coalitions, 2004, *Dados* 47, 3 (with Marta Arretche, in Portuguese).

Comparative Federalism and Decentralization: On Meaning and Measurement, 2004, *Comparative Politics* 36, 4: 481-500. (Portuguese version, 2005, in *Revista de Sociologia e Politica* 25).

Reviving Leviathan: Fiscal Federalism and the Growth of Government, 2003, *International Organization* 57 (Fall), 695–729.

Beyond the Fiction of Federalism: Macroeconomic Management in Multi-tiered Systems, 2003, *World Politics* 54, 4 (July): 494–531 (with Erik Wibbels).

The Dilemma of Fiscal Federalism: Grants and Fiscal Performance around the World, 2002, *American Journal of Political Science* 46(3): 670–687.

Strength in Numbers: Representation and Redistribution in the European Union, 2002, *European Union Politics* 3, 2: 151–175.

Does Federalism Preserve Markets? *Virginia Law Review* 83, 7 (with Susan Rose-Ackerman). Spanish version, 1999, in *Quorum* 68.

## Working Papers

Federalism and Inter-regional Redistribution, Working Paper 2009/3, Institut d'Economia de Barcelona.

Representation and Regional Redistribution in Federations, Working Paper 2010/16, Institut d'Economia de Barcelona (with Tiberiu Dragu).

## Chapters in Books

Political Geography and Representation: A Case Study of Districting in Pennsylvania (with Thomas Weighill), forthcoming 2021.

Decentralized Rule and Revenue, 2019, in Jonathan Rodden and Erik Wibbels, eds., *Decentralized Governance and Accountability*, Cambridge University Press.

Geography and Gridlock in the United States, 2014, in Nathaniel Persily, ed. *Solutions to Political Polarization in America*, Cambridge University Press.

Can Market Discipline Survive in the U.S. Federation?, 2013, in Daniel Nadler and Paul Peterson, eds, *The Global Debt Crisis: Haunting U.S. and European Federalism*, Brookings Press.

Market Discipline and U.S. Federalism, 2012, in Peter Conti-Brown and David A. Skeel, Jr., eds, *When States Go Broke: The Origins, Context, and Solutions for the American States in Fiscal Crisis*, Cambridge University Press.

Federalism and Inter-Regional Redistribution, 2010, in Nuria Bosch, Marta Espasa, and Albert Sole Olle, eds., *The Political Economy of Inter-Regional Fiscal Flows*, Edward Elgar.

Back to the Future: Endogenous Institutions and Comparative Politics, 2009, in Mark Lichbach and Alan Zuckerman, eds., *Comparative Politics: Rationality, Culture, and Structure* (Second Edition), Cambridge University Press.

The Political Economy of Federalism, 2006, in Barry Weingast and Donald Wittman, eds., *Oxford Handbook of Political Economy*, Oxford University Press.

Fiscal Discipline in Federations: Germany and the EMU, 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

The Political Economy of Pro-cyclical Decentralised Finance (with Erik Wibbels), 2006, in Peter Wierts, Servaas Deroose, Elena Flores and Alessandro Turrini, eds., *Fiscal Policy Surveillance in Europe*, Palgrave MacMillan.

Globalization and Fiscal Decentralization, (with Geoffrey Garrett), 2003, in Miles Kahler and David Lake, eds., *Governance in a Global Economy: Political Authority in Transition*, Princeton University Press: 87-109. (Updated version, 2007, in David Cameron, Gustav Ranis, and Annalisa Zinn, eds., *Globalization and Self-Determination: Is the Nation-State under Siege?* Routledge.)

Introduction and Overview (Chapter 1), 2003, in Rodden et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Soft Budget Constraints and German Federalism (Chapter 5), 2003, in Rodden, et al, *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Federalism and Bailouts in Brazil (Chapter 7), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

Lessons and Conclusions (Chapter 13), 2003, in Rodden, et al., *Fiscal Decentralization and the Challenge of Hard Budget Constraints* (see above).

*Online Interactive Visualization*

Stanford Election Atlas, 2012 (collaboration with Stephen Ansolabehere at Harvard and Jim Herries at ESRI)

*Other Publications*

How America's Urban-Rural Divide has Shaped the Pandemic, 2020, *Foreign Affairs*, April 20, 2020.

An Evolutionary Path for the European Monetary Fund? A Comparative Perspective, 2017, Briefing paper for the Economic and Financial Affairs Committee of the European Parliament.

Representation and Regional Redistribution in Federations: A Research Report, 2009, in *World Report on Fiscal Federalism*, Institut d'Economia de Barcelona.

On the Migration of Fiscal Sovereignty, 2004, *PS: Political Science and Politics* July, 2004: 427–431.

Decentralization and the Challenge of Hard Budget Constraints, *PREM Note* 41, Poverty Reduction and Economic Management Unit, World Bank, Washington, D.C. (July).

Decentralization and Hard Budget Constraints, *APSA-CP* (Newsletter of the Organized Section in Comparative Politics, American Political Science Association) 11:1 (with Jennie Litvack).

Book Review of *The Government of Money* by Peter Johnson, *Comparative Political Studies 32,7: 897-900*.

# Fellowships and Honors

Fund for a Safer Future, Longitudinal Study of Handgun Ownership and Transfer (LongSHOT), GA004696, 2017-2018.

Stanford Institute for Innovation in Developing Economies, Innovation and Entrepreneurship research grant, 2015.

Michael Wallerstein Award for best paper in political economy, American Political Science Association, 2016.

Common Cause Gerrymandering Standard Writing Competition, 2015.

General support grant from the Hewlett Foundation for Spatial Social Science Lab, 2014.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2012.

Sloan Foundation, grant for assembly of geo-referenced precinct-level electoral data set (with Stephen Ansolabehere and James Snyder), 2009-2011.

Hoagland Award Fund for Innovations in Undergraduate Teaching, Stanford University, 2009.

W. Glenn Campbell and Rita Ricardo-Campbell National Fellow, Hoover Institution, Stanford University, beginning Fall 2010.

Research Grant on Fiscal Federalism, Institut d'Economia de Barcelona, 2009.

Fellow, Institute for Research in the Social Sciences, Stanford University, 2008.

United Postal Service Foundation grant for study of the spatial distribution of income in cities, 2008.

Gregory Luebbert Award for Best Book in Comparative Politics, 2007.

Fellow, Center for Advanced Study in the Behavioral Sciences, 2006-2007.

National Science Foundation grant for assembly of cross-national provincial-level dataset on elections, public finance, and government composition, 2003-2004 (with Erik Wibbels).

MIT Dean's Fund and School of Humanities, Arts, and Social Sciences Research Funds.

Funding from DAAD (German Academic Exchange Service), MIT, and Harvard EU Center to organize the conference, "European Fiscal Federalism in Comparative Perspective," held at Harvard University, November 4, 2000.

Canadian Studies Fellowship (Canadian Federal Government), 1996-1997.

Prize Teaching Fellowship, Yale University, 1998-1999.

Fulbright Grant, University of Leipzig, Germany, 1993-1994.

Michigan Association of Governing Boards Award, one of two top graduating students at the University of Michigan, 1993.

W. J. Bryan Prize, top graduating senior in political science department at the University of Michigan, 1993.

## Other Professional Activities

International Advisory Committee, Center for Metropolitan Studies, Sao Paulo, Brazil, 2006–2010.

Selection committee, Mancur Olson Prize awarded by the American Political Science Association Political Economy Section for the best dissertation in the field of political economy.

Selection committee, Gregory Luebbert Best Book Award.

Selection committee, William Anderson Prize, awarded by the American Political Science Association for the best dissertation in the field of federalism and intergovernmental relations.

## Courses

*Undergraduate*

Politics, Economics, and Democracy

Introduction to Comparative Politics

Introduction to Political Science

Political Science Scope and Methods

Institutional Economics

Spatial Approaches to Social Science

*Graduate*

Political Economy of Institutions

Federalism and Fiscal Decentralization

Politics and Geography

# Consulting

2017. Economic and Financial Affairs Committee of the European Parliament.

2016. Briefing paper for the World Bank on fiscal federalism in Brazil.

2013-2018: Principal Investigator, SMS for Better Governance (a collaborative project involving USAID, Social Impact, and UNICEF in Arua, Uganda).

2019: Written expert testimony in *McLemore, Holmes, Robinson, and Woullard v. Hosemann*, United States District Court, Mississippi.

2019: Expert witness in *Nancy Corola Jacobson v. Detzner*, United States District Court, Florida.

2018: Written expert testimony in *League of Women Voters of Florida v. Detzner* No. 4:18-cv-002510, United States District Court, Florida.

2018: Written expert testimony in *College Democrats of the University of Michigan, et al. v. Johnson, et al.*, United States District Court for the Eastern District of Michigan.

2017: Expert witness in *Bethune-Hill v. Virginia Board of Elections*, No. 3:14-CV-00852, United States District Court for the Eastern District of Virginia.

2017: Expert witness in *Arizona Democratic Party, et al. v. Reagan, et al.*, No. 2:16-CV-01065, United States District Court for Arizona.

2016: Expert witness in *Lee v. Virginia Board of Elections*, 3:15-cv-357, United States District Court for the Eastern District of Virginia, Richmond Division.

2016: Expert witness in *Missouri NAACP v. Ferguson-Florissant School District*, United States District Court for the Eastern District of Missouri, Eastern Division.

2014-2015: Written expert testimony in *League of Women Voters of Florida et al. v. Detzner, et al.*, 2012-CA-002842 in Florida Circuit Court, Leon County (Florida Senate redistricting case).

2013-2014: Expert witness in *Romo v Detzner*, 2012-CA-000412 in Florida Curcuit Court, Leon County (Florida Congressional redistricting case).

2011-2014: Consultation with investment groups and hedge funds on European debt crisis.

2011-2014: Lead Outcome Expert, Democracy and Governance, USAID and Social Impact.

2010: USAID, Review of USAID analysis of decentralization in Africa.

2006–2009: World Bank, Independent Evaluations Group. Undertook evaluations of World Bank decentralization and safety net programs.

2008–2011: International Monetary Fund Institute. Designed and taught course on fiscal federalism.

1998–2003: World Bank, Poverty Reduction and Economic Management Unit. Consultant for *World Development Report*, lecturer for training courses, participant in working group for assembly of decentralization data, director of multi-country study of fiscal discipline in decentralized countries, collaborator on review of subnational adjustment lending.

Last updated: October 19, 2020