**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

GEORGIA REPUBLICAN PARTY, INC.; et al.,

                      *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, in his official capacity as SECRETARY OF STATE OF GEORGIA, et al.,

                      *Defendants*.

Case No. 1:20-cv-05018-ELR

**BRIEF OF *AMICI CURIAE* THE GEORGIA STATE CONFERENCE OF THE NAACP AND THE GEORGIA COALITION FOR THE PEOPLE'S AGENDA IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

## INTEREST OF *AMICI CURIAE*

*Amici* are nonpartisan organizations that represent thousands of Georgians, many of whom are now at risk of being unlawfully deprived of their right to vote. Both organizations are dedicated to eliminating barriers to voting and increasing civic engagement among their members and in traditionally disenfranchised communities. They expend substantial resources on voter education and turnout efforts; for this election, those efforts have included providing accurate information to voters on how to cast mail-in and absentee ballots to ensure that voters have a full and fair opportunity to participate in spite of the unprecedented circumstance of the election taking place during a global pandemic.

The Georgia State Conference of the NAACP is a non-profit advocacy group for civil rights for Black Americans that has approximately 10,000 members. The Georgia NAACP has active branches throughout the state and engages in voter registration, education, turnout, and voter assistance efforts in those counties. The Georgia NAACP has been working to ensure that Black voters in Georgia are educated on different voting methods, including mail-in and absentee voting, during the COVID-19 pandemic, and has conducted phone-banking to assist Georgia voters. The Georgia NAACP also has members, including President James Woodall, who plan to cast votes in the January 2021 Senate runoff election.

These members are at risk of facing unconstitutional burdens to their access to the ballot box in the January senate runoff election if Plaintiffs' relief is granted and additional absentee ballots are improperly and incorrectly rejected due to an allegedly mismatched signature.

The Georgia Coalition for the People's Agenda ("GCPA"), a coalition of more than 30 organizations, which collectively have more than 5,000 individual members, similarly encourages voter registration and participation, particularly among African-American and other underrepresented communities.  The GCPA's support of voting rights is central to its mission.  The organization regularly commits its time and resources to conducting voter registration drives, voter education, voter ID assistance, "Souls to the Polls" operations, and other get-out-the-vote operations throughout Georgia.  For the November 2020 election, the GCPA participated in media interviews, sponsored Public Service Announcements (PSAs), placed billboard ads, conducted phone banking, and engaged in text message campaigns to educate voters and to encourage participation in the 2020 election cycle.  These efforts would all become substantially more difficult if, just weeks before the January Senate runoff election, the rules were suddenly and dramatically changed by the Court and additional absentee ballots are improperly and incorrectly rejected due to an allegedly mismatched signature.

## INTRODUCTION

In the midst of the ongoing January 2021 runoff election, months after they were aware of the allegations they assert this week, Plaintiffs ask this Court to rewrite Georgia's procedures for reviewing signatures for mail ballots to ensure that additional absentee ballots are rejected due to an allegedly mismatched signature – even though election officials are not handwriting experts and their proposed relief risks disenfranchising hundreds or thousands of eligible voters.

This lawsuit could not come at a worse time. As of December 14, 2020, more than 1,229,917 Georgia voters have requested absentee ballots and more than 260,000 voters have cast their absentee ballots in the January 5, 2021 runoff election.[1] More than 477,000 of those absentee ballots were requested by Georgia Black voters and other voters of color,[2] while at least 604,221 of these absentee ballots were requested by voters 66 years of age and older.[3] The astronomical absentee ballot figures are attributable at least in part to many voters' concerns about

---

[1] U.S. Elections Project, *Georgia Early Voting Statistics - 2021 Senate Run-Off Election* , December 14, 2020, available at: https://electproject.github.io/Early-Vote-2020G/GA_RO.html.

[2] *Id.*

[3] *Id.*

3

voting in person during the COVID-19 pandemic. As of December 13, 2020,[4] over 10,000 Georgians have died from the coronavirus, with Black Georgians and other persons of color having higher rates of hospitalizations and deaths from COVID-19 than white Georgians.[5] Georgia election officials are maintaining much of the same mail voting apparatus and mechanisms it employed throughout the 2020 election cycle for the January 2021 runoff election, including implementation of the March 2020 settlement agreement in the signature match case.

Nevertheless, only now, Plaintiffs ask the Court for broad relief that would impose significant burdens on election officials who are not only processing incoming absentee ballots but also conducting in-person early voting and preparing for Election Day. Plaintiffs assert their extreme remedies are necessary because Defendants' procedures are somehow "facilitating fraud and undermining public confidence in elections" even though they do not identify a single ineligible voter who improperly cast an absentee ballot that was counted in the November 2020

---

[4] U.S. Centers for Disease Control COVID Data Tracker, *Trends in Number of COVID-19 Cases and Deaths in the US Reported to CDC, by State/Territory* for Georgia, December 13, 2020, available at: https://covid.cdc.gov/covid-data-tracker/#trends_totalandratedeaths.

[5] U.S. Centers for Disease Control, *COVID-19 Hospitalization and Death by Race/Ethnicity*, updated November 30, 3030, available at: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

election or any other election.  Plaintiffs do not reference or address the fact that other challenges to the March 2020 settlement agreement and Georgia's signature match procedures filed in state and federal courts have been wholly unsuccessful, let alone explain why the result in this case should be any different.

Theoretical, speculative, and unsubstantiated fears of fraud do not support this Court's granting of any relief whatsoever, let alone forcing election officials to reject additional absentee ballots cast by legitimate voters, which could disenfranchise numerous Georgians seeking to make their voice heard.  Indeed, Plaintiffs' action smacks instead of an effort to suppress mail voting in the January 2021 runoff election.

Plaintiffs' emergency motion is late, legally and factually baseless, and contrary to the bedrock values of our democracy.  *Amici* Georgia State Conference of the NAACP, Georgia Coalition for the People's Agenda therefore respectfully urge the Court to deny it.

I. **FACTUAL BACKGROUND**

On November 18, 2020, registrars began mailing absentee ballots for the January 5, 2021 runoff election.  See O.C.G.A. § 21-2-384.  As Plaintiffs acknowledge, "[a]bsentee ballots are now being received by county election officials." Pl's Br., Dkt. 2, at 9.  Advanced in-person voting for the January runoff

election began on December 14, 2020. On December 10, 2020, Plaintiffs filed the instant Emergency Motion for Temporary Restraining Order and Preliminary Injunction seeking immediate relief for the January runoff election.

## II.   PLAINTIFFS' EMERGENCY MOTION SHOULD BE DENIED

### A.   Plaintiffs Lack Standing Because They Bring a Generalized Grievance

Plaintiffs cannot obtain preliminary relief—and indeed cannot maintain suit—because their complaints about the March 2020 settlement agreement and Georgia's signature match procedures are, at most, the kind of generalized grievance about government conduct that the Supreme Court has repeatedly found insufficient to confer Article III standing. "The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004). To avoid dismissal on standing grounds, a plaintiff must show (1) an injury in fact, meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the defendant's conduct, and (3) a likelihood that the injury will be redressed by a favorable decision from the court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

6

Plaintiffs cannot demonstrate that they will suffer any injury absent the requested relief. Plaintiffs fail to allege that they will suffer an "actual or imminent" injury, as opposed to one that is merely "conjectural" or "hypothetical." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 409 (2013); *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

Plaintiffs' alleged injury rests on the unsupported assertion that the March 2020 settlement agreement and Georgia's signature match procedures cause the counting of "unlawfully cast ballots," which allegedly dilute Plaintiffs' legitimate votes, and because they have allegedly diverted unidentified resources "from the January 2021 runoff campaign to address the harm caused by … Georgia's signature matching process." Memorandum in Support of Preliminary Injunction, Dkt. 2-1 at 22-23. Plaintiffs also suggest they can assert standing "on behalf of" Senate candidates Perdue and Loeffler who are allegedly harmed by the counting of those ballots. *Id*.

Plaintiffs' arguments for standing mirror those that failed in *Wood v. Raffensperger*, --- F.3d ----, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). The Eleventh Circuit's opinion in that case forecloses every one of Plaintiffs' standing arguments here. The *Wood* Court held that the plaintiff's asserted interest in

7

"ensur[ing that] …. only lawful ballots are counted" and "requir[ing] that the government be administered according to the law" is a "generalized grievance." *Id*. at *4 (quoting *Chiles v. Thornburgh*, 865 F.2d 1197, 1205-06 (11th Cir. 1989)) (alteration adopted). Here, as in *Wood*, Plaintiffs "cannot explain how [their] interest in compliance with state election laws is different from that of any other person."

*Wood* is particularly instructive because Plaintiffs here are also alleging that legitimate votes will be diluted by purportedly illegal votes. Pl's Br., Dkt. 21 at 22 (citing *Wood*, 2020 WL 7094866, at *5 for the proposition that "vote dilution can be a basis for standing"). Beyond providing no legitimate evidence that any such dilution has occurred in the past or is at risk of happening in the future, Plaintiffs here fail to acknowledge that the Eleventh Circuit already held in *Wood* that "'no single voter is specifically disadvantaged' if a vote is counted improperly." *Id*. (quoting *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020)). Plaintiffs provide no evidence supporting the assertion that Democratic candidates or voters are benefiting from the purported vote harvesting, rendering Plaintiffs' asserted vote dilution theory a "paradigmatic generalized grievance." *Id*. The *Wood* Court rejected Plaintiffs' suggestion here that allegedly "arbitrary and inconsistent" application of signature matching procedures implicates "Plaintiff's constitutional rights," Pl's Br., Dkt. 2-1 at 4, noting that "[e]ven if we assume that

8

absentee voters are favored over in-person voters, that harm does not affect [the plaintiff] as an individual—it is instead shared identically by the four million or so Georgians who voted in person." *Id*.

Finally, Plaintiffs assert that *Roe v. Alabama ex rel. Evans*, 43 F.3d 574 (11th Cir. 1995), supports their standing, *see* Pl's Br., Dkt. 2-1 at 14-15. The *Wood* Court rejected that argument, too, noting that "no party raised and we did not did not address standing in *Roe*, so that precedent provides no basis for [the plaintiff] to establish standing." 2020 WL 7094866, at *5. The Court also noted that *Roe* was distinguishable because the voter-plaintiffs in that case "bore individual burdens— to obtain notarization or witness signatures if they wanted to vote absentee" – that distinguish it from more generalized grievances where a state "applie[s] uniform rules … to all voters," as is the case here. *Id*.

Plaintiffs' attempt to assert standing on behalf of Senate candidates Perdue and Loeffler also fails. As the district court noted in *Wood*, "the doctrine [of third party standing] is disfavored and [the plaintiff] has not alleged or proven any of the required elements." *See Wood v. Raffensperger*, 2020 WL 6817513, at *6 n. 26 (N.D. Ga. Nov. 20, 2020). In particular, they have failed to show that candidates Perdue and Loeffler have themselves suffered an injury in fact or that there is a

hindrance to the candidates' ability to protect their own interests. *See Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339 (11th Cir. 2019).

### B. Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims

Plaintiffs' lack of standing independently justifies denying the Emergency Motion. It also should be rejected because Plaintiffs have not shown that any of the alleged conduct by Defendants rises to the level of a violation of the U.S. Constitution.

#### 1. Plaintiffs' Seek to Turn the *Anderson-Burdick* Test Inside-Out

Plaintiffs' claim that their First and Fourteenth Amendment right to vote is violated by Defendants' decisions to abide by the March 2020 settlement agreement, *see* Pl's Br., Dkt. 2-1 at 13, turns settled principles of constitutional law inside-out. Plaintiffs here ask the Court to take measures in the midst of an ongoing election that would burden the rights of many eligible absentee voters – for example those whose absentee ballots are rejected due to alleged signature match because they have a medical condition that prevents them from having consistent handwriting – even though Plaintiffs do not assert that they are themselves affected by the challenged provisions. There is no precedent supporting Plaintiffs' argument that state actions making it *easier* for many voters

10

to cast a ballot (by preventing the rejection of legitimate ballots cast by eligible voters) somehow unconstitutionally denies or dilutes the votes of parties whose ability to vote is unaffected.

The foundational authorities for the *Anderson-Burdick* test, *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), protect against unnecessary restrictions on the right to vote. The *Anderson-Burdick* test applies a sliding scale balancing the burden the state's restriction places on the right to vote against the state's interest justifying that burden. *See Stein v. Alabama Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014) ("severe" restrictions on the right to vote "must be narrowly drawn to advance a state interest of compelling importance," but that a reasonable, nondiscriminatory restriction on voting rights is justified by a State's "important regulatory interests") (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

Here, Plaintiffs allege that there are two "burdens" placed on their right to vote: "vote dilution" caused by alleged widespread voter fraud, which Plaintiffs hypothesize would be made more prevalent by the facilitation of additional absentee voting, and "disparate treatment" of absentee voters between counties. *See* Pl's Br., Dkt. 2-1 at 8-9, 13-14. Plaintiffs' argument that these are legitimate burdens under *Anderson-Burdick* would render that framework virtually

11

unrecognizable; the challenged provisions do not impede Plaintiffs or any other Georgian from voting but they do ease the burden of voting by mail on other voters. *See Wood*, 2020 WL 7094866, at *5 (distinguishing "the burden to produce photo identification" as a form of injury from a generalized grievance like the one suffered by Wood). Plaintiffs' claim is therefore entirely novel; *Anderson-Burdick* and their progeny have been applied *only* to enjoin state laws or procedures that have the effect of *restricting* the right to vote or limiting someone's access to the ballot.[6] No court applying the *Anderson-Burdick* doctrine has even hinted that the U.S. Constitution can be used to enjoin state action that *increases* access to the

---

[6] *See, e.g.*, *Dem. Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321-22 (11th Cir. 2019) (finding absentee ballot statute imposes "at least a serious burden" on voters and fails to satisfy *Anderson-Burdick*); *Ga. Coal. For the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (finding "severe burdens" on voting); *Ga. Coal. For the People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016) ("administrative hurdles pale in comparison to the physical, emotional, and financial strain Chatham County residents faced in the aftermath of Hurricane Matthew"); *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993) (holding the public disclosure of voters' Social Security Numbers on their voter records "substantially burdened" the right to vote); *Ne. Ohio Coal. For Homeless v. Husted*, 696 F.3d 530, 593 (6th Cir. 2012); *Mullins v. Cole*, 218 F. Supp. 3d 488, 493 (S.D. W.Va. 2016) (finding a "severe" burden where "the ease of registering to vote using the online registration system has been denied to over 4,500 Cabell County residents"); *Common Cause N.Y. v. Brehm*, 432 F. Supp. 3d 285, 314 (S.D.N.Y. 2020) (finding New York's "prohibition on providing the inactive list burdens its voters" and does not withstand scrutiny under *Anderson-Burdick*).

12

ballot and does not restrict the right to vote. Here, Plaintiffs' relief increases the burdens on voters such as the proposed Defendant-Intervenors and their members, thereby tilting the balance of the equities decidedly away from Plaintiffs.

As a matter of law, the Motion—which does not demonstrate any concrete or specific instances of fraud, systemic or otherwise—cannot support the extreme relief requested. Even if Plaintiffs' allegations were proven (they are not) and there were isolated, sporadic incidents in which the election laws were violated by election workers or officials, this occurrence could not possibly justify wide-scale disenfranchisement of Georgians and thereby violating the U.S. Constitution by burdening the right to vote. *See Ne. Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 595, 597-98 (6th Cir. 2012) (holding that rejecting ballots invalidly cast due to poll worker error likely violates due process). Far from curing any constitutional violation, the Plaintiffs' requested injunction would *create* grave constitutional violations. This is a classic case in which "the cure [is] worse than the alleged disease, at least insofar as the professed concern is with the right of voters to cast effective ballots in a fair election." *Baber v. Dunlap,* 349 F. Supp. 3d 68, 76 (D. Me. 2018).

Finally, even if Plaintiffs' allegations could support a finding of some sort of error in election administration under state law, they have come to the wrong

venue. The Eleventh Circuit has observed that "[i]n most cases, irregularities in state elections are properly addressed at the state level, whether through state courts or review by state election officials." *Burton v. State of Ga.,* 953 F.2d 1266, 1268 (11th Cir. 1992).

### 2. No Valid Constitutional Claim Arises From Georgia's May 1, 2020 Official Election Bulletin That Stems From A Settlement Agreement

Plaintiffs base their request for emergency injunctive relief in part on the May 1, 2020 Official Election Bulletin issued by Georgia Elections Director Chris Harvey after state officials entered into a settlement agreement with the Democratic Party of Georgia in *Democratic Party of Ga., Inc. v. Raffensperger*, No. 1:19-cv-05028-WMR (N.D. Ga.). In fact, Judge Grimberg rejected a challenge to the Official Election Bulletin and the Settlement Agreement in the *Wood* case. *See Wood v. Raffensperger*, 2020 WL 6817513, at *3 (N.D. Ga. Nov. 20, 2020) (noting that "[a]s part of the Settlement Agreement, Raffensperger agreed to issue an official Election Bulletin containing certain procedures for the review of signatures on absentee ballot envelopes by county election officials"), *aff'd on other grounds*, 2020 WL 7094866 (11th Cir. Dec. 5, 2020). The district court rejected the plaintiff's *Anderson-Burdick* argument, holding that his "equal protection claim does not fit within this framework." *Id.* at *9. For good measure, the court added that "[e]ven if [the] claim

14

were cognizable in the equal protection framework, it is not supported by the evidence at this stage" because there was no evidence that "invalid ballots were passed over and counted improperly." *Id*. at *10.

### C. Plaintiffs' Claims are Barred by Laches for the January 2021 Runoff

The doctrine of laches applies in the elections context to avoid gamesmanship in the middle of election, which Plaintiff seeks to accomplish here. Plaintiff has plainly (1) "delay[ed] in asserting a right or a claim," (2) lacks an excuse, and (3) that delay would result in undue prejudice with respect to the January 2021 runoff election. *See United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005) (setting out the laches factors); *see also Amtrak v. Morgan*, 536 U.S. 101, 121-22 (2002) (laches "bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant"); *Costello v. United States*, 365 U.S. 265, 282 (1961); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986); *Plyman v. Glynn Cty.*, 578 S.E.2d 124, 126 (Ga. 2003) (Georgia law).

A district court has already held that the plaintiff's challenge to the signature-match settlement agreement and Official Election Bulletin is barred by laches with respect to the November 2020 general election, let alone the January 2021 runoff. *See Wood*, 2020 WL 6817513, at *7 (holding that plaintiff's "claims regarding the Settlement Agreement" are "barred by the doctrine of laches"), *aff'd on other*

15

*grounds*, 2020 WL 7094866 (11th Cir. Dec. 5, 2020).  The court found that there was undue delay because the May 1, 2020 Official Election Bulletin resulted from a settlement agreement, which was entered into and made public in March 2020, ten months before the January 2021 runoff election, and has already been in effect for three elections during the 2020 election cycle.  *Id*.  The *Wood* court further observed that there is no excuse for challenging Georgia's signature matching procedures because those claims "were ripe the moment the parties executed the Settlement Agreement." *Id*.

A challenge to election procedures should be brought when there is still time to correct those procedures.  *See Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration and Elections*, 446 F. Supp. 3d 1111, 1126-27 (N.D. Ga. 2020) ("Plaintiffs were not faced with a binary choice and should have sought court intervention sooner."); *see also Republican Party of Pa. v. Cortes*, 218 F. Supp. 3d 396, 404-05 (E.D. Pa. 2016) (declining to enjoin aspects of Pennsylvania's poll-watcher statute in case filed "eighteen days before the election," observing that "Plaintiffs unreasonably delayed filing their Complaint and Motion, something which weighs decidedly against granting the extraordinary relief they seek").

By waiting until absentee voting for the January 2021 election is well underway, Plaintiffs have ensured that "Defendants, Intervenors, and the public at

16

large would be significantly injured if the Court were to excuse" Plaintiffs' delay here. *Wood*, 2020 WL 6817513, at *7. Voters have already cast absentee ballots, and election officials are currently reviewing absentee ballot envelopes. Members of *amici* organizations have already used drop boxes to drop off their mail ballot for the January 2021 runoff election. Other voters are planning to deliver their mail ballots to a drop box but have not yet done so. Under these circumstances, it is no stretch to conclude that "[b]eyond merely causing confusion, [the] requested relief could disenfranchise a substantial portion of the electorate and erode the public's confidence in the electoral process." *Wood*, 2020 WL 6817513, at *8.

Even assuming *arguendo* that there were problems with the conduct of the January 2021 runoff election and that any such conduct gave rise to constitutional concerns, if Plaintiff had timely asserted these claims, Defendants would have had the opportunity to address the concern. But having sat on their objections for more than nine months since the parties entered into the March 2020 settlement agreement, laches bars Plaintiffs' claims with respect to the January 2021 election.

## CONCLUSION

For all of these reasons, *amici* respectfully urge the Court to deny Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.

17

Dated:	December 16, 2020	Respectfully submitted,

/s/ Bryan L. Sells
BRYAN L. SELLS
Georgia Bar #635562
The Law Office of Bryan L. Sells, LLC.
P.O. Box 5493
Atlanta, GA  31107-0493
(404) 480-4212 (voice/fax)
bryan@bryansellslaw.com


   /s/ Ezra Rosenberg
Kristen Clarke*
kclarke@lawyerscommittee.org
Jon M. Greenbaum*
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg*
erosenberg@lawyerscommittee.org
Julie M. Houk*
jhouk@lawyerscommittee.org
John Powers*
jpowers@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL
RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300

\* *Pro hac vice* motion forthcoming

*Attorneys for Proposed Amici Georgia State Conference of the NAACP, et al.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 16, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: December 16, 2020.

>            */s/ Bryan L. Sells*
> BRYAN L. SELLS
> Georgia Bar #635562
> The Law Office of Bryan L. Sells, LLC.
> P.O. Box 5493
> Atlanta, GA  31107-0493
> (404) 480-4212 (voice/fax)
> bryan@bryansellslaw.com