UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GEORGIA REPUBLICAN PARTY, INC., NATIONAL REPUBLICAN SENATORIAL COMMITTEE, PERDUE FOR SENATE, and GEORGIANS FOR KELLY LOEFFLER,<br><br>                      Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, in his official capacity as the Secretary of State of Georgia, REBECCA N. SULLIVAN, in her official capacity as the Vice Chair of the State Election Board, DAVID J WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacity as Members of the State Election Board,<br><br>                      Defendants,<br>    and<br><br>DEMOCRATIC PARTY OF GEORGIA and DSCC,<br><br>                      Intervenor-Defendants. | Case No. 1:20-cv-05018-ELR |

**PLAINTIFFS' CONSOLIDATED RESPONSE TO MOTION TO DISMISS AND REPLY IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

## INTRODUCTION

The November 2020 election exposed how Georgia's procedures for reviewing absentee ballot signatures are woefully inadequate. Plaintiffs show that Georgia fails to meaningfully and consistently review the absentee signatures—Defendants fail to claim otherwise. This is startling. Sometimes actions speak louder than words and just this week Defendants announced that they would conduct an audit of absentee ballot signatures "to restore confidence in our elections."[1] An audit is needed because there is a serious and systemic problem in Georgia. Plaintiffs have a right to, and request, relief from these serious constitutional violations before the January 2021 runoff election.

The Court should disregard unfounded assertions that Plaintiffs are seeking an "extreme" remedy or seeking to "drastically alter" state voting procedures. Plaintiffs seek only the following relief: (1) require three election officials to review signatures before the ballot is accepted; (2) allow poll watchers to meaningfully observe the signature matching process and to report any infraction or irregularities in that process in accordance with existing law; and (3) provide uniform standards and training to election officials conducting signature matching.

---

[1] Kate Brumback, *Georgia to Audit One County's Signatures on Ballot Envelopes*, AP (Dec. 15, 2020) https://apnews.com/article/election-2020-georgia-elections-atlanta-presidential-elections-02c99b51b6d2befa42ae9ea0c72c1e3d

Intervenors and Defendants previously agreed that *three* reviewers were necessary to reject absentee signatures; Plaintiffs merely seek to extend this to the rest of the signature verification process. This is a narrow, reasonable request. Defendants and Intervenors conveniently ignore this truth: a valid vote excluded is no less a deprivation of Constitutional rights than is the inclusion of an invalid vote; both are an equal affront to the integrity of the election process.

Defendants' briefing did not discuss Plaintiffs' relief at all, and offered nothing beyond the bare, unsupported assertion that granting relief would cause non-specific burdens. Rather than challenge Plaintiffs' actual case and requested relief on the merits, both Defendants and Intervenors offer two main points: (1) Plaintiffs' case should be lumped in with various and sundry *post-election* challenges; and (2) Plaintiffs' relief would undermine the March 2020 Settlement Agreement. These are diversions. Defendants and Intervenors likewise retreat behind standing, timeliness, (both rebutted in detail below), and repeatedly make a misleading comparison to *Wood v. Raffensperger*, No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020).

Nobody should mistake this case for *Wood*. That was primarily (1) a post-election challenge where (2) the plaintiff, a "private citizen" voter, (3) sought to overturn the results of the November 2020 election. *Id.* at *2. This case shares none

of those features. This case is (1) a pre-election challenge from (2) the political parties and campaigns contesting the January 2021 runoff election that stand to suffer direct injury from Georgia's unlawful signature matching process, and who (3) seek a narrow, targeted remedy. Moreover, this case is based on a robust factual and statistical analysis of the November 2020 election. *Wood* sought relief that could disenfranchise millions of voters, this case seeks narrow relief that will not discount any validly cast ballot. Thus, this case is not *Wood*.

Plaintiffs respectfully request that the Court grant the emergency relief necessary to redress the constitutional infirmities in Georgia's signature review process ahead of the January 2021 runoff.

I.  **Plaintiffs are Entitled to Emergency or Preliminary Relief**

   A.  **Defendants Will Imminently Deprive Plaintiffs Of Their Rights To Vote And To Associate.**

Plaintiffs' and their members' right to vote, and to have that vote counted equally, is infringed by Georgia's arbitrary signature review process and the counting of unlawful votes. Defendants erroneously contend that a State's dilution of legitimate votes through counting unlawful ballots does not burden legitimate voters. *See* Defs. Br. 18–21; Intervs. Br. 13 n.3. However, the Eleventh Circuit has already held that allowing a State to count unlawful ballots "would dilute the votes of those voters who m[e]et the requirements of" the law and thus result in

3

"fundamental unfairness." *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 580–81 (11th Cir. 1995); *see also Anderson v. United States*, 417 U.S. 211, 226 (1974) ("The right to an honest (count) is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured[.]" (cleaned up). Regardless of when the State engages in unlawful behavior, *Roe* plainly holds that resulting vote dilution burdens the right to vote. Defendants' contrary arguments conflate standing with the merits. *Roe* leaves no doubt that vote dilution is a burden under *Anderson-Burdick*.

Because Plaintiffs have established a burden on their right to vote that is not justified by any state interest, Plaintiffs are likely to succeed on their claims under the First Amendment and Fourteenth Amendment due process clause. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 433–34 (6th Cir. 2012). Defendants fail to cite a single state interest to justify this burden. *See* Defs. Br. 18–20.

**B.   Defendants Will Imminently Deprive Plaintiffs Of Their Equal Protection Rights.**

The severe discrepancies in signature matching between Georgia's counties infringes on Plaintiffs' equal protection rights. Defendants do not deny that the empirical evidence in this case shows that signatures are accepted or rejected at a wildly disparate rate from county to county. Instead, they attempt to disclaim responsibility by laying the "alleged irregularities" at the feet of unnamed "election

4

officials" "at the county level." Defs. Br. 21. Defendants' "facially neutral" guidance documents cannot absolve them of responsibility for these observed irregularities. *See id.* at 21-22. Those documents say nothing about the substantive standard for accepting or rejecting signatures, and Defendants do not contend otherwise. Defs. Br. 5-6. Moreover, Plaintiffs' empirical evidence shows that signature matching is "being *applied* unequally across the state," Sorens Report at 2 (emphasis added), so even if Defendants' guidance *had* articulated a uniform standard, Plaintiffs argument stands.

The only authority Defendants cite proves the point. In *Bush v. Gore*, 531 U.S. 98 (2000), the Supreme Court found an equal protection violation where Florida "*applied* different standards in defining a legal vote" within and across counties. *Id.* at 106. In establishing that fact, the Court relied in part on statistical evidence showing that Broward County "uncovered almost three times as many new votes [as Palm Beach County], a result markedly disproportionate to the difference in population between the counties," *id.* at 107—evidence that is directly analogous to the evidence of county-level disparities that Plaintiffs offer here. Thus, Defendants' arguments fail to rebut Plaintiffs' showing that Georgia's process "is not a process with sufficient guarantees of equal treatment." *Id.*

    **C.**    **Defendants Will Imminently Deprive Plaintiffs Of Their Procedural Due Process Rights.**

5

The arbitrary, standardless process by which Georgia enforces, or does not enforce, review of absentee ballot signatures violates Plaintiffs' due process rights. Defendants also fail to rebut Plaintiffs' showing that they are likely to succeed on the merits of their procedural due process claim. According to Defendants, the procedural guarantees of the Due Process Clause do not apply "to a state's election procedures." Defs. Br. 23. But that is an open question in this Circuit. In *Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1262 (11th Cir. 2019) (per curiam), the Eleventh Circuit declined to stay a district court injunction that applied procedural due process to Georgia's election procedures. And Judge Pryor explained that the district court had properly applied "the framework from *Mathews v. Eldridge*, 424 U.S. 319 (1976)." *Id.* at 1267 (Pryor, J., concurring); but see *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020). Thus, contrary to Defendants' position, there is no binding authority foreclosing application of the *Mathews* factors where, as here, Plaintiffs' have shown a burden on their fundamental rights. Thus, Defendants' argument fails.

### D.     The Battle of the Experts Favor Plaintiffs.

Plaintiffs will suffer irreparable harm to their right to vote and their competitive interests in the January 2021 runoff in the absence of relief. A simple analysis of the raw data shows that the rejection rate for ballots with invalid

6

signatures for 2018 was nearly twice the same rate for 2020 and the low rates are "impossibly low." *See* Sorens Decl.; Gessler Decl. Defendants' claim—without any explanation or supporting data—that the signature matching rejection rates were the same in 2018 and 2020 is simply wrong. And the Harvey Declaration cannot be credited because it provides neither the number of rejected ballots nor the total number of ballots for the 2018 election. ECF 28-1 ¶ 6.

Likewise, the challenges raised by Intervenors' proffered expert miss the mark. Dr. Rodden *does not* at any point claim that the data suggests that signature matching is actually occurring properly, nor does he point to any errors in Plaintiffs' expert calculations. He fails to explain the glaringly low rejection rates in various Georgia counties—including some of its largest counties. If anything, Dr. Rodden's report confirms Plaintiffs' claims that Georgia counties are arbitrarily reviewing signatures. *Compare* Rodden Report at 18 (attributing the disparity in county-by-county rejection rates to "local variation in good-faith interpretations of the standards"); *with Bush v. Gore*, 531 U.S. 98, 105-06 (2000) (Equal Protection Clause violated when "each of the counties used varying standards to determine what was a legal vote").

If the Court believes that there is, in fact, a material factual dispute regarding whether the signature matching rejection rates are low to a statistically significant

7

degree and in comparison to other states, then Plaintiffs request an evidentiary hearing. Under Eleventh Circuit law, evidentiary hearings are required "where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue." *Transcontinental Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1169 (11th Cir. 2018) (cleaned up).

### E. Defendants Will Suffer Irreparable Harm And The Balance Of The Equities And Public Interest Favor Relief.

Defendants' and Intervenors' arguments against irreparable harm are coextensive with their arguments against Plaintiffs' showing of a cognizable injury and alleged constitutional rights. Defs. Br. 23; Intervs. Br. 20. For the reasons stated below, these challenges are meritless. In addition, both parties base their challenges to Plaintiffs' showing that the equities and public interest tip in their favor on *Purcell* and other timeliness arguments, addressed below. Accordingly, Plaintiffs have demonstrated they are entitled to emergency relief.

## II. Plaintiffs Have Standing.

Plaintiffs assert the following separate injuries: (1) associational standing on behalf of their voter members who are injured by the dilution of their votes; (2) associational standing and standing in their own right to redress the injury to the competitive landscape caused by the counting of unlawful votes; and (3) the diversion of its resources to address Georgia's unlawful signature matching

8

process. Plaintiffs have demonstrated that these harms are imminent and reasonably likely to occur in the January 2021 election. Each of these injuries is distinct, and each independently supports standing.

As noted, Defendants and Intervenors primarily rely on the Eleventh Circuit's recent decision in *Wood*. But *Wood* actually supports Plaintiffs, because the Eleventh Circuit held that "vote dilution can be a basis for standing," and that "a political candidate harmed by [a state election process]" suffers "a personal, distinct injury." *Wood*, 2020 WL 7094866, at *4 (citing *Roe v. Alabama ex rel. Evans*, 43 F.3d 574, 579 (11th Cir. 1995)). The Eleventh Circuit thus explicitly recognized two of Plaintiffs' the three injuries. Defendants and Intervenors attempt to argue that the Eleventh Circuit's statement regarding vote dilution should be limited only to apportionment cases, Defs. Br. 9-10; Intervs. Br. 7, where some voters are "irrationally favored" over others. *See Wood*, 2020 WL at *5. But that is this case, where Plaintiffs have demonstrated that Georgia's signature review process raises an equal protection issue because Georgia's counties apply different standards that dilute votes in some counties greater than in others.

Defendants particularly miss the mark when they assert Plaintiffs lack standing to redress harm to their competitive interests, when *Wood* explicitly recognized that a candidate suffered a cognizable injury when an election practice

harmed their chances in an election. This injury arises from the dilution of Republican votes and improperly counting of unlawful votes in the close runoff election. The Eleventh Circuit's holding in *Wood* places it squarely in line with prevailing precedent. *See also Drake v. Obama*, 664 F.3d 774, 782–83 (9th Cir. 2011) (collecting "competitive standing" cases); *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (recognizing competitive standing); *Shays v. FEC*, 414 F.3d 76, 87 (D.C. Cir. 2005) (candidates have a "concrete interest" in retaining elected office and have standing to challenge rules that "illegally structure a competitive environment").

Likewise, the Eleventh Circuit's recent holding in *Jacobson v. Florida Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020), on which Defendants and Intervenors also rely, supports Plaintiffs' standing. *Jacobson* specifically reserved the question of whether "a political party would have standing to challenge an electoral practice that harmed one of *its* candidates' electoral prospects in a particular election." *Id.* at 1251. That is this case: Plaintiffs filed suit to protect their candidates and members in a specific, imminent runoff election against the backdrop of a recent contest where it one of the key safeguards against unlawful ballots being counted was disregarded or unequally applied. Plaintiffs are thus well within the exception to the holding in *Jacobson*, which other courts have recognized. *See Pavek v.*

*Simon*, 467 F. Supp. 3d 718, 743 (D. Minn. 2020); *see also Nelson v. Warner*, __ F. Supp. 3d __, 2020 WL 4004224, *4 (S.D. W. Va. 2020).

In addition to the injury to these competitive interests, Plaintiffs have also asserted an injury because they are forced to divert resources to address Defendants' constitutional violations. Resource diversion is a well-recognized basis for organizational standing. *See Jacobson*, 974 F.3d at 1250; *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018) (finding resource diversion injury in challenge to Georgia's signature matching process). At this stage, contrary to Defendants' assertions, Plaintiffs need not provide a "detailed quantification of their diverted resources," and the standing requirement is still satisfied "even if the diversion is 'slight.'" *Pavek*, 467 F. Supp. 3d at 740. As Plaintiffs' sworn Declarations show, Plaintiffs are expending resources to contest an election that is expected to be very close, and they are harmed by the diversion of resources to ensure proper absentee vote counting, resources that could go towards supporting the Republican candidates.[2]

The alleged injury is also traceable to and redressable by Defendants. Defendants do not deny that they have the authority to issue statewide rules that

---

[2] *See* Decl. of Benjamin Grayson at ¶¶ 8-10; Decl. of Darby Grant at ¶ 13; Decl. of Stewart Bragg at ¶ 11; Decl. of Benjamin Fry at ¶¶ 8-10.

govern county officials. *See* O.C.GA. § 21- 2-31(1)-(2). Indeed, Defendants' argument is particularly brazen given that earlier this year they settled Intervenors' lawsuit by agreeing to issue a "procedure applicable to the review of signatures on absentee ballot envelopes by county elections officials[.]" Compromise Settlement Agreement and Release, at 2-4, *Democratic Party of Ga. v. Raffensperger*, No. 1:19-cv-05028 (Mar. 6, 2020) (ECF 56-1); *see also Georgia Muslim Voter Project*, 918 F.3d at 1268 (Pryor, J., concurring). Indeed, Defendants issued guidance regarding the absentee ballot process to Georgia's counties just last week. Defendants rely on *Anderson v. Raffensperger*, __ F.3d __, 2020 WL 6048048 (N.D. Ga. Oct. 13, 2020), but in that case the plaintiff *conceded* that Defendants lacked the authority to provide the relief sought. *Id.* at *22. That is not the case here, where the Secretary of State not only has the authority to order the uniform, statewide relief necessary, but has *actually done so*.

### III.  Plaintiffs' Challenge is Timely.

Unsurprisingly Defendants rely on the Supreme Court's decision in *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) to argue that Plaintiffs' challenge is not timely. Defs. Br. 24; Intervs. Br. 23. But "*Purcell* is not a magic wand that defendants can wave to make any unconstitutional election restriction disappear so long as an impending election exists." *People First of Alabama v. Sec'y of State for Alabama*,

815 F. App'x 505, 514 (11th Cir. 2020) (Rosenbaum, J. & Pryor, J., concurring in three-judge panel's denial of stay). Nor does *Purcell* stand for the proposition that a Court should never order relief close to an election. The Eleventh Circuit upheld last year a district court order requiring a state to alter its signature matching scheme *after* "about 4,000 ballots" had already been "rejected for signature mismatch at the time of [the court's] order[.]" *Lee*, 915 F.3d, at 1322. Indeed, these circumstances *favor* preliminary relief because "the election is ongoing, and voters are already voting absentee," "Plaintiffs face immediate and irreparable harm if the burdens imposed by the challenged requirements are not enjoined." *People First of Alabama*, 815 F. App'x at 514 (Rosenbaum, J. & Pryor, J., concurring).[3] Plaintiffs' action is timely for the following reasons.

*First*, *Purcell* does not control this case. The heart of the Supreme Court's holding is the commonsense observation that "Court orders affecting elections, especially conflicting orders, can themselves result in *voter confusion* and consequent incentive to remain away from the polls." *Purcell*, 549 U.S. at 4–5 (emphasis added). This principle is inapposite in this case because the relief Plaintiffs seek will not affect the *voting process* itself, but how those votes are

---

[3] Defendants assert that 300,000 absentee ballots have already been processed and accepted. Defendants make no argument that it would be unduly burdensome to re-verify these ballots in the ample time before the January 5 election day.

13

reviewed and counted.[4] Consistent enforcement of the State's signature matching law will not confuse voters because it will not require voters to comply with any new requirements or otherwise alter their behavior to vote in the runoff. *See, e.g., Self Advocacy Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1055 (D.N.D. 2020) (no potential for voter confusion where process for submitting an absentee ballot remained unchanged); *Richardson v. Texas Sec'y of State*, No. SA-19-CV-00963-OLG, 2020 WL 5367216, at *43 (W.D. Tex. Sept. 8, 2020) (same with respect to signature matching process).

*Second*, Plaintiffs brought this action at the earliest possible time. The November 2020 election was the first major election to be conducted under the new procedures. The voter absentee files with signature matching data were publicly disclosed on a daily basis through November 16, 2020. *See* Georgia Secretary of State, Elections Division, Voter Absentee Files (updated Nov. 16, 2020), https://elections.sos.ga.gov/Elections/voterabsenteefile.do. Plaintiffs subsequently brought this action less than a month later after a thorough analysis of the data. Courts regularly entertain challenges to election procedures under these circumstances. *See e.g., Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312,

---

[4] Intervenors cite to *Purcell* and argue there is "confusion for administrators," Intervs. Br. 23, but the Supreme Court didn't mention of administrator confusion.

1326 (11th Cir. 2019) (rejecting laches argument where party challenged revised signature-match scheme after first major statewide election following revisions to rules); *Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1274 (11th Cir. 2019) (Pryor, J. concurring in the denial of the motion for a stay) (similar); *People First of Alabama v. Merrill*, No. 2:20-CV-00619-AKK, 2020 WL 5814455, at *43 (N.D. Ala. Sept. 30, 2020) (filing a month and a half after circumstances giving rise to claim was not delay); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1341 (N.D. Ga. 2018) (rejecting laches argument where "many of the issues . . . did not arise until after election day").

*Third*, the requested relief would *incentivize* voter participation by furthering the equally important *Purcell* policy of "preserving the integrity of [the State's] election process." *Purcell*, 549 U.S. at 4 (citation and internal quotation omitted). As the Eleventh Circuit explained, "assuring voters that all will play by the same, legislatively enacted rules" will "promote[] confidence in our electoral system." *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020). This confidence will ultimately help—not hinder—participation in Georgia's democratic processes. *See id.*; *accord Crittenden*, 347 F. Supp. 3d at 1341.

## CONCLUSION

The Court should grant the Motion for a Preliminary Injunction.

Respectfully submitted,

December 16, 2020

By: /s/ *Michael Francisco*

George J. Terwilliger*
Michael Francisco*
Brooks H. Spears*
2001 K Street N.W., Suite 400
Washington, DC 20006
Tel: 202-857-1700
Fax: 202-857-1737
gterwilliger@mcguirewoods.com
mfrancisco@mcguirewoods.com
bspears@mcguirewoods.com

Peter N. Farley (GA Bar No. 255165)
1230 Peachtree Street, N.E.
Promenade, Suite 2100
Atlanta, GA 30309-3534
Tel: 404-443-5500
Fax: 404-443-5599
pfarley@mcguirewoods.com

Richard Cullen*
800 East Canal Street
Richmond, VA 23219-3916
Tel: 804-775-1000
Fax: 804-775-1061
rcullen@mcguirewoods.com

*Counsel for Plaintiffs*
*Georgia Republican Party, Inc.*
*National Republican Senate Committee*
*Perdue for Senate*
*Georgians for Loeffler*
**Pro Hac Vice Applications Pending*

16

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Plaintiffs' Response to Motion to Intervene has been prepared in accordance with the font type and margin requirements of L.R. 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: December 16, 2020

*Counsel for Plaintiffs*

*/s/ Peter N. Farley*

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day caused the foregoing in the above-captioned matter to be filed with the United States District Court for the Northern District of Georgia, Atlanta Division, via the Court's CM-ECF system.

/s/ *Peter N. Farley*
Peter N. Farley
Georgia Bar No. 255165
MCGUIREWOODS LLP
Suite 2100, Promenade
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309-3534
Telephone:   (404) 443-5500
Facsimile:    (404) 443-5599
pfarley@mcguirewoods.com

*Counsel for Plaintiffs*